**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| NASHWAN AL-TAMIR,<br>        Aka Nashwan al-Ramer Abdulrazzaq,<br>        Aka Abdul Hadi al Iraqi, ISN 10026<br>        Detainee, U.S. Naval Station, Guantanamo Bay,<br><br>                Petitioner,<br><br>v.<br><br>JOE BIDEN, President,<br>LLOYD AUSTIN, Secretary of Defense,<br>ANTONY BLINKEN, Secretary of State<br>SUSAN ESCALLIER, Convening Authority for<br>        Military Commissions,<br>COLONEL STEVEN KANE,<br>        Commander Joint Detention Force, U.S. Naval<br>        Station, Guantanamo Bay,<br><br>                Respondents. | Civil Action No. 1:25-cv-15<br><br>Related Cases:<br>Civil Action Nos. 1:09-cv-1462 EGS<br>                         1:17-cv-1928 EGS |

**PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Nashwan al-Tamir[1] pleaded guilty to various crimes in a military tribunal, and he was sentenced to 10 years in prison. As part of his plea agreement, the government promised to "pursue transfer to a third-party sovereign nation" (i.e., somewhere *other* than Iraq). (Ex. 1 at 5.) During the years that followed his plea, Mr. al-Tamir, through counsel appointed by the Department of Defense, repeatedly requested information about what efforts the government had

---

[1] Mr. al-Tamir was initially charged and prosecuted in the military tribunal under the name "Abd al Hadi al-Iraqi," which is not his actual name. He is identified on his Iraqi citizenship card as Nashwan al-Ramer Abdulrazzaq. His family name—the name he generally uses with friends and family—is Nashwan al-Tamir, which references a family history in trading commodities.

made to facilitate such a transfer. The government consistently government refused to give details, instead intimating that it was working on it and hoped to arrange a transfer soon.

Just a week before Christmas, the government informed Mr. al-Tamir's defense counsel that instead of sending him to a third-party country, it had negotiated a deal with Iraq to send him there to serve out the remainder of his sentence. Because of his conviction here and the myriad problems with Iraq's prison system, Mr. al-Tamir cannot safely be housed in an Iraqi prison. Additionally, he does not believe the Iraqi government can provide the medical care he needs for conditions that were aggravated by inadequate medical care while at Guantanamo.

Transferring Mr. al-Tamir to Iraq violates the Constitution and laws of the United States of America. For this reason, Mr. al-Tamir asks the court pursuant to 28 U.S.C. § 2241 to prohibit the transfer to Iraq and ensure that his sentence is executed in accordance with his constitutional and statutory rights.

## JURISDICTION

1.   The Court has jurisdiction over this petition pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2241(a) (Writs of Habeas Corpus).

2.   Even if the government were to argue that the court lacks jurisdiction, this court has jurisdiction to determine its jurisdiction. *Belbacha v. Bush*, 520 F.3d 452, 455-56 (citing *United States v. United Mine Workers*, 330 U.S. 258, 293 (1947)).

3.   This jurisdiction includes the authority to grant "interim relief" and enjoin a transfer to another country to preserve its ability to review its own jurisdiction. *Id.* (discussing All Writs Act, 28 U.S.C. § 1651).

## VENUE

4.   Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because respondents

2

are officers or employees of the United States, and a substantial part of the events or omissions giving rise to the Petition occurred in this judicial district.

## PARTIES

5.  Petitioner Nashwan al-Tamir is a citizen of Iraq and Afghanistan currently serving a prison sentence at Guantanamo.

6.  Respondent Biden is the President of the United States and Commander-in-Chief of the military forces detaining Mr. al-Tamir. He is named in his official capacity.

7.  Respondent Austin is the Secretary of Defense and supervises all United States military forces, including those detaining Mr. al-Tamir. He is named in his official capacity.

8.  Respondent Blinken is the Secretary of State and supervises all United States diplomatic actions, including those charged with carrying out the government's obligations under the plea agreement. He is named in his official capacity.

9.  Respondent Susan Escallier is a civilian who has been designated as the Convening Authority for Military Commissions pursuant to 10 U.S.C. 47A, section 948h. She is named in her official capacity.[2]

10. Respondent Kane is the Commander of Joint Task Force – Guantanamo. As such he functions as the warden of the prison where Mr. al-Tamir is detained. He is named in his official capacity.

## FACTS

11. In 2006, the CIA captured Mr. al-Tamir and took him to a CIA black site. Mr. al-Tamir

---

[2]  The Convening Authority is the entity responsible for the overall management of the military commissions process, including logistics and personnel support. The Convening Authority has authority and is responsible to provide resources to Commission defendants as necessary and appropriate to enable them to present a meaningful defense against charges brought against them.

told agents that he had serious back injuries and that doctors had told him he needed surgery.

12. In April 2007 he was transferred to Naval Station Guantanamo Bay, where he has been detained at Guantanamo by Respondents and their predecessors in office ever since.

### I.    First § 2241 petition

13. He was detained at Guantanamo without charge for more than 5 years. On August 3, 2009, he filed a Petition for a Writ of Habeas Corpus, challenging the legality of his detention. *Abdulrazzaq v. Obama*, 1:09-cv-1462 EGS (D.D.C.) The Indiana Federal Community Defenders, a federally funded public defender agency, represented him on that petition.

14. Four years later, the government filed charges against him in the Military Commission on June 7, 2013. Additional charges were added on August 28, 2013.

15. Subsequently, the Indiana public defenders had to withdraw from the case as a result of federal budget sequestration. At their request, this court entered a Stipulation and Order dismissing the original Petition without prejudice, but it retained jurisdiction to enforce the terms of the Stipulation and Order. *Id.*, ECF No. 51 (Dec. 17, 2013).

16. Additional charges were added on February 3, 2014. (Ex. 2.) And on June 2, 2014, the Convening Authority referred the February 3 charges for trial by military commission and dismissed the charges presented on June 7 and August 28, 2013.

### II.    Pretrial conditions of confinement.

17. Throughout his time in pretrial detention, Mr. al-Tamir suffered excessively because of Respondents' inadequate medical care. Those circumstances are described in detail in his second § 2241 petition (1:09-cv-1462 EGS, ECF No. 1 at 4-14) and are incorporated here by reference.

18. In brief, that petition alleged that he began seeking medical care not long after he arrived in Guantanamo for chronic and worsening pain in his back. The government's ability to adequately treat those medical problems was severely hindered by the lack of an MRI machine at

Guantanamo, as well as negligent medical care. These problems culminated in September 2017 when surgeons from the mainland had to brave a hurricane to get to Guantanamo to perform emergency surgery.

19. It was quickly apparent that the surgery was not successful and that Mr. al-Tamir would need another surgery. Without waiting for him to recover from the first surgery, a decision was made to fly surgeons back and operate again, this time on his neck. The government still refused to keep defense counsel apprised of Mr. al-Tamir's condition and what treatments were being administered.

### III.    Second § 2241 Petition

20. Unable to get information about Mr. al-Tamir's medical condition, defense counsel sought help from pro bono counsel to file a second § 2241 petition in this court. *Abdulrazzaq v. Trump*, 1:17-cv-1928 EGS (D.D.C.). The petition challenged the conditions of confinement under the Eighth Amendment, and it challenged the military tribunal's jurisdiction to prosecute him.

21. This court dismissed the Eighth Amendment claims and held the jurisdictional claims in abeyance until the military tribunal could address them in the first instance. *Id.*, ECF No. 175 (Oct. 28, 2019).

22. The jurisdictional challenge remains pending, and with the military proceedings now complete, Mr. al-Tamir will move to lift the stay in that case.

### IV.    Subsequent medical problems

23. Mr. al-Tamir continued to suffer greatly at Guantanamo, and his problems continued to be exacerbated by the lack of an MRI machine on the island and the general lack of specialized care available to treat acute conditions. (Ex. 3 at 1 (declaration of Susan Hensler).)

24. It had also become apparent that he suffered from osteoporosis, and in 2019 a

radiologist noticed that "diffuse osteopenia can be seen with osteoporosis." To treat the estopenia, Mr. al-Tamir needed a DEXA scan. But as with the MRI machine, there was no DEXA scan on the island. (*Id.* at 1-2.)

25. On September 24, 2021, a neurosurgeon saw Mr. al-Tamir and recommended what would be his sixth surgery. But before he could get the surgery, he would have to have a DEXA scan, but "this capability [was] not on island." (*Id.* at 2.)

26. Despite suffering for years from these debilitating conditions, he was unable to receive needed diagnostics (MRI and DEXA scan). (*Id.*)

27. In April 2022, defense counsel moved in the military tribunal to abate criminal proceedings until Mr. al-Tamir could get an MRI and a DEXA scan. (*Id.*)

## V.    *Plea negotiations*

28. That motion remained pending until a month later, when Mr. al-Tamir, with the assistance of defense counsel, reached a plea agreement in the criminal case. (Ex. 1.)

29. Under this agreement, he would plead guilty to Charges II, III, IV, and V and participate in an extensive debrief. (*Id.* at 1, 4.)

30. In exchange, the government agreed that the ultimate prison sentence could not be more than 10 years. (Ex. 4 at 1 (Appendix A to plea agreement).)

31. The most important aspect of the plea agreement, however, was the government's promise that it would "pursue transfer to a third-party sovereign nation." (Ex 1 at 5.) And part of this promise was a commitment that the government take into account Mr. al-Tamir's "healthcare needs" in its "efforts to effect a transfer." (*Id.*) Mr. al-Tamir relied on these promises when he entered his guilty plea in 2022, when he debriefed for three weeks with federal agents in May and June 2023, and when he went forward with sentencing rather than withdrawing his plea in June 2024.

32. These promises were critical to Mr. al-Tamir because as a convicted military combatant, he could not safely be returned to Iraq. (Ex. 3 at 2 (Hensler decl.).)

33. And his acute medical situation meant that transfer to a country that could not or would not provide adequate medical care would be inhumane and likely catastrophic. (*Id*.)

34. The government made this promise because it agreed that Mr. al-Tamir could not safely be returned to Iraq. (*Id.*)

35. Transfer to a third-party country was so important to Mr. al-Tamir that he agreed to delay sentencing for two years to allow time for the government to perform on this promise. (Ex. 1 at 5.)

36. And the plea included language that would allow Mr. al-Tamir to withdraw his plea prior to sentencing if the government did not fulfill its obligations under the plea agreement. (*Id.* at 2.)

37. If the military tribunal refused to delay sentencing for two years so the government could fulfill its obligation under the plea agreement, the plea agreement would be automatically withdrawn. (*Id.*)

38. The plea also contemplated that execution of his sentence would be governed by the law of the receiving country. (*Id.* at 5.) This would mean that he could benefit from a less rigid computation of how much time remained or early release under the laws of the receiving jurisdiction. (Ex. 3 at 3 (Hensler Decl.).)

### VI.    *Mr. al-Tamir relied on these promises.*

39. An addendum to the plea agreement stipulated, among other things, that sentencing would not occur until June 2024. (Ex. 5 at 3.)

40. As the sentencing date approached, Mr. al-Tamir faced a major decision. The plea agreement allowed him to withdraw his plea, which he would have done if he had known the

government wouldn't keep its promises. (Ex. 3 at 3 (Hensler Decl.).)

41. However, the government intimated that it was diligently pursuing a transfer to a third-party country that was willing and able to provide adequate medical care. (*Id.* at 3.)

42. As a result of these assurances, Mr. al-Tamir agreed to go forward with the debrief required under the plea agreement. (*Id.* at 3-4.)

43. Still, as sentencing approached, he wondered if he should withdraw his plea due to the lack of reported progress on identifying a third-party country for transfer. (*Id.* at 4.)

44. Defense counsel conferred with government officials, who reiterated they were working on a transfer to a third-party country that could care for his medical needs. (*Id.*)

45. Based on these repeated and emphatic assurances, Mr. al-Tamir decided not to withdraw his plea and to go forward with sentencing. (*Id.*)

## VII.    *Sentencing*

46. Sentencing was a multi-day hearing in June 2024 before a military jury. (*Id.*)

47. At the conclusion of this proceeding, the military jury announced its sentence, but under the governing rules, the actual sentence would be imposed by the convening authority. (*Id.*)

48. On December 5, 2024, the convening authority took action on the jury's sentence and announced the final sentence: 30 years in prison with 20 years suspended. (*Id.*)

## VIII.    *Execution of sentence.*

49. A few days after the jury sentencing concluded in June 2024, Mr. al-Tamir changed from to "prisoner" status, rather than detainee status, which meant he was moved from the jail that housed pre-trial detainees to a different area where he faced more severe conditions of confinement. (*Id.*)

50. As a result of his deficient medical care in pretrial detention, he now required assistance

to perform most activities of daily living. (*Id.*)

51. He was confined to a wheelchair, and required specialized equipment to bathe, use the restroom, and move around. (*Id.*)

52. Where before he was allowed to eat and pray with other inmates, here he found himself on lockdown for 20-hours per day. (*Id.* at 5.)

53. The only other inmates in that tier were two convicted men from Malaysia, and when their schedules for rec time aligned, they could help him get outside, help prepare food, and assist him with various tasks. (*Id.*)

54. The tier has not been retrofitted to accommodate disabled prisoners, so he could not even go outside by himself because he couldn't open the door. (*Id.*)

55. However, these two men recently were repatriated to Malaysia, and Mr. al-Tamir is now the only inmate left in his tier. (*Id.*)

56. The prison has allowed detainees who are not being held on his tier are allowed to visit him, but these visits are restricted. Other than their visits, he is all alone on his tier. (*Id.*)

57. He is not permitted to participate with them in Friday prayers as he could when he was in the same tier with them. (*Id.*)

## IX.     Government's breach of the plea agreement.

58. The only thing that made these conditions tolerable was the belief that the government was working hard to fulfill its promise to transfer him to a third-party country that could meet his medical needs. (*Id.*)

59. From the time Mr. al-Tamir entered his plea, defense counsel Susan Hensler was in regular contact with government officials about the transfer. (*Id.*)

60. Though the government remained opaque in its description of what efforts it was making or what third-party countries might be suitable placements, they continued to tell her

they were working hard to facilitate a transfer to a third-party country. (*Id.* at 5-6.)

61. Ms. Hensler first met with State Department officials to discuss resettlement plans in August 2022. They acknowledged the risks of repatriation to Iraq and discussed the path forward in finding potential options. They did not object to defense counsel reaching out to other nations to pursue options for transfer. (*Id.* at 6.)

62. Tina Kaidanow took over as the official envoy to Guantanamo in late 2022, and Ms. Hensler made regular efforts to contact her for an update on the progress. For example, on February 28, 2023, Ms. Hensler wrote:

> Nashwan is the first detainee to enter into a pretrial agreement in an active military commission in almost a decade. If the government is unable to arrange his transfer, he can withdraw his guilty plea without penalty – an outcome that neither party wants. . . .
>
> We hope to set up a meeting with you in the near term to discuss Nashwan's situation. Unfortunately, he cannot return to either country where he maintains citizenship – Iraq and Afghanistan – and has complex health issues that narrow the list of potential options.

(*Id.*)

63. Ms. Kaidanow did not respond to any of her emails until June 6, 2023, when Ms. Hensler emailed her to report on the results of her dialogue with two countries that seemed willing to take Mr. al-Tamir. (*Id.*)

64. Ms. Kaidanow responded to this email the same day and directed Ms. Hensler not to have direct contact with other countries. (*Id.*)

65. Ms. Hensler immediately replied, noting her frustration that her emails to Ms. Kaidanow over the last eight months had gone unanswered. (*Id.*)

66. Ms. Kaidanow responded again the next day:

> I acknowledge that you sent us those messages, and indeed, we owe you a more timely answer. In future, we'll endeavor to be more responsive.

But being responsive doesn't necessarily mean we can share all the information you might like. Again, these are extremely sensitive issues for any government, therefore almost always kept in close quarters. And again, I say with full respect and in the interest of your client, it is unwise to try and double track our diplomatic efforts.

Do be assured – and I mean this very sincerely – that we are working hard to find a location for transfer that would meet all the requirements needed to bring this case to sentencing. I doubt very much, in that vein, we would aim for a country we feared Mr. Hadi would reject.

(*Id.* at 6-7.)

67. She concluded by promising to have her deputy, Dan Schneiderman, schedule a meeting to hear Mr. al-Tamir's concerns, and Ms. Hensler met with Mr. Schneiderman and other members of Ms. Kaidanow's staff on a regular basis over the next year. They continued to express commitment to a third-country resettlement but said they could not share many details about those efforts. (*Id.* at 7.)

68. Shortly before sentencing was to begin in June 2024, Ms. Hensler met with Ms. Kaidanow to discuss the fact that the lack of information was making Mr. al-Tamir nervous that the government was not doing what it had promised to do, and he wondered if he should withdraw the plea. (*Id.* at 7.)

69. Ms. Kaidanow reiterated that the government was committed to seeking transfer to a third-party country that could accommodate Mr. al-Tamir's medical needs. She indicated that conflict in Gaza had complicated the matter, but her office was committed to continue pursuing a transfer for him even after sentencing. (*Id.* at 7.)

70. Following that meeting, Ms. Hensler met with Mr. al-Tamir to discuss these assurances, and on June 10, 2024, she emailed Ms. Kaidanow to say the because of her assurances, Mr. al-Tamir was ready to proceed the next day with presentencing procedures. (*Id.* at 7.)

71. Ms. Kaidanow responded on June 12, 2024:

> I am glad and relieved to hear that Mr. al-Tamir wishes to go ahead with the proceedings, which we regard as very important.
>
> Equally, I will – as I represented to you – continue to work as diligently as possible to find a third country willing to accept him. As I noted, there are circumstances which make this currently difficult, but that does not change my determination to do my job to the best of my ability.

(*Id.* at 7-8.)

72. The months after sentencing, however, continued as before with little communication and no concrete details about options. (*Id.* at 8.)

73. Unexpectedly and tragically, Ms. Kaidanow, passed away on October 16, 2024. Her deputy had left the office only a few weeks earlier to take a job in the Department of Defense. Rather than appoint a new envoy, the Secretary of State left the position unfilled, with only a few career employees to manage the entire Guantanamo portfolio on their own. (*Id.*)

74. Not long after Ms. Kaidanow died, a Department of Defense official told Ms. Hensler that the government was trying to resettle Mr. al-Tamir along with other detainees who would be leaving Guantanamo soon for a third-party country. (*Id.*)

75. During this period, State Department officials assured defense counsel they had White House support to find a suitable third-country option, and when asked, they expressed their support for defense-initiated efforts to identify a suitable option, something Envoy Kaidanow had previously discouraged. (*Id.*)

76. On December 1, 2024, Ms. Hensler and others from the defense team traveled to a third-party country to assess its suitability and receptivity as a possible recipient for the transfer. She did so with knowledge of and permission from State Department officials. (*Id.*)

77. They spent 10 days there at government expense, reporting back to the State Department on their various efforts and interactions. Based on what they learned during the visit,

as well as her prior interaction with representatives of that country, Ms. Hensler believed this country would be a suitable placement and that the country seemed open to receiving Mr. al-Tamir. (*Id.*)

78. While they were abroad, State Department officials scheduled a meeting to occur on December 17, 2024, to discuss their plans for transfer. (*Id.* at 9.)

79. At this meeting, to her alarm, State Department officials told her for the first time that they had given notice to Congress on December 13, 2024, that the government intended to send Mr. al-Tamir back to Iraq in 30 days. (*Id.*).

80. Despite everything they had said previously and their support of Ms. Hensler's travel abroad, government officials now said they had concluded the "only" option for Nashwan is Iraq due to his "high-profile" and significant health issues. (*Id.*)

81. However, when pressed, these officials acknowledged that at least one country (not even the country Ms. Hensler had visited in the Middle East) had said it might be willing to take Mr. al-Tamir later, but they would not elaborate on the details. (*Id.*)

82. Although they insisted no other country was willing to take him, the government officials still refused to describe what efforts had been made to secure a transfer to a third-party country. (*Id.*)

83. They told counsel the Iraqi government would hold him in the Al Karkh prison, a high-security prison outside of Baghdad, for the rest of his sentence, which they believed would end in 2032. They claimed the Iraqi government would give him his own cell, attend to his medical needs, and allow him to meet with his family. (*Id.*)

84. But they had made no arrangements to reunite him with his wife and four children who live in Afghanistan. (*Id.*)

85. The government said it would send him with medical equipment and a three-month supply of medications. (*Id*.)

86. Defense counsel expressed concern that they had seen evidence that Iraq may want to prosecute Mr. al-Tamir for a decades-old crime. (*Id*. at 9-10.)

87. The government confirmed a warrant was still pending for a charge that carried a 20-year penalty (a life sentence under Iraqi law), but they dismissed the concern, saying that the Iraqis "didn't seem interested" in pursuing that case, but they had no details or documentation to support this report. (Subsequently, however, she would learn that an Iraqi court had actually renewed the decades-old warrant not too long ago.) (*Id.* at 10.)

88. Ms. Hensler asked about the lack of spinal care in Iraq, and the State Department officials dismissed this concern as well, saying something to the effect of, "the Iraqis say they can handle it." (*Id*.)

89. It was clear to Ms. Hensler that the State Department officials had relied on that representation without doing any due diligence on their own to confirm that Iraq has the medical infrastructure in place to manage a complex case like Nashwan's. (*Id*.)

90. Follow-up questions from Ms. Hensler revealed that these State Department officials who would be supervising the transfer did not have even a minimal knowledge about Mr. al-Tamir's real situation (e.g., his age, his ethnicity) and that their primary concern was ensuring that Mr. al-Tamir serve the remainder of his American prison sentence. (*Id*.)

91. The bottom line was that the government planned to transfer Mr. al-Tamir to Iraq during the week of January 12, 2025, and that he would serve his prison sentence there. (*Id*.)

92. Ms. Hensler spoke with Mr. al-Tamir on a truncated video call later that same afternoon. (*Id.*)

93. They briefly discussed his concerns with the transfer and identified issues that should be addressed before a transfer was made. (*Id.*)

94. Ms. Hensler told him to let her know by December 27, 2024, whether he would agree to a transfer. (*Id.*).

95. After the video call, Mr. al-Tamir was so disturbed by the conversation that the guard force had to take him to the base hospital for medical treatment. (*Id.* at 10-11.)

96. On December 26, 2024, Mr. al-Tamir sent a letter that defense counsel received on December 28, 2024. (*Id.* at 11.)

97. In this letter, he stated that he did not want to return to Iraq because he feared for his safety there; he also did not believe the Iraqi prison system could adequately address his medical needs. (*Id.*)

98. The government's proposal was not only unexpected; it fully contradicted the government's position over the last several years that Mr. al-Tamir could not safely be repatriated to Iraq, as well as its promise in the plea agreement that it would seek transfer to a third-party sovereign. (*Id.*)

## X.    *Risk of torture if returned to Iraq.*

99. The risks posed by transfer to Iraq are well documented.

100.    As recently as 2023, the State Department concluded that found credible evidence of "[s]ignificant human rights issues" that include:

> arbitrary or unlawful killings, including extrajudicial killings; enforced disappearance; torture and cruel, inhuman, and degrading treatment or punishment by government officials; harsh and life-threatening prison conditions; arbitrary arrest or detention; arbitrary or unlawful interference with privacy; punishment of family members for offenses allegedly committed by an individual; serious abuses in a conflict, including attacks resulting in civilian deaths and harm; . . . restrictions on freedom of movement, including forced returns of internally displaced persons to locations where they faced threats to their lives and freedom; refoulement of refugees to a country where they would face torture or persecution, including

serious harm such as a threat to life or freedom or other mistreatment that would constitute a separate human rights abuse; serious government corruption.

U.S. State Dept., Bureau of Democracy, Human Rights, and Labor, *Iraq 2023 Human Rights Report* (2003), *available at* https://www.state.gov/wp-content/uploads/2024/03/528267_IRAQ-2023-HUMAN-RIGHTS-REPORT.pdf (last accessed Jan. 1, 2025); also attached as Ex. 6.

 101. More specifically, a recent report from a middle eastern news source painted a grim picture of Iraq's justice system and jails:

> Prisoners and detainees in Iraqi jails are enduring severe hardships, including significant delays and restrictions on visits from their relatives. In some prisons, it can take up to three months for family members to see their detained loved ones, a situation that has drawn sharp criticism from human rights organizations and activists. . . . . Under the current prison regulations, inmates are permitted to see their family or lawyer twice a month. However, in prisons such as Taji and Nasiriyah Central Prison (al-Hoot), visits are frequently banned for up to three months. . . .
>
> There have also been allegations of bribes being demanded for basic necessities like food and clothing.
>
> The Iraqi Center for Documenting War Crimes recently reported that 50 prisoners have died from torture in Iraqi prisons this year alone. The center highlighted the poor conditions under which tens of thousands of detainees are held, with health issues being neglected due to revenge and sectarian motives. Deaths have been recorded not only in prisons under the Ministries of Justice, Interior, and Defense but also in secret militia-run facilities. . . . .
>
> [Prominent political figure Misha'an al-Jibouri] noted that authorities sometimes prevent family visits to conceal the harsh realities of prison life. Some inmates have reportedly not seen their relatives for nearly seven years. Al-Jibouri also claimed that prisoners are often forced to pay for food and drink, exacerbating their already dire circumstances.
>
> The situation of prisoners in Iraq remains a critical human rights issue, with urgent calls for reform and better conditions to protect the rights and dignity of detainees.

Kurdistan24, *Death, torture, delayed visits: inside Iraq's harrowing prison system* (June 29, 2024), *available at* https://www.kurdistan24.net/en/story/395582/Death,-torture,-delayed-visits:-inside-Iraq%27s-harrowing-prison-system (last accessed Jan. 1, 2025).

102.     Arabic news sources have covered a report released just last week by the Justice

Network for Prisoners in Iraq, which concluded: "More than 80 percent of Iraq's prisons and

detention centres are unfit for human habitation." Dana Taib Menmy, The New Arab, *Crisis in*

*Iraqi prisons: overcrowding, widespread abuses, and systematic failings* (Jan. 1, 2025),

*available at* https://www.newarab.com/news/crisis-iraqi-prisons-overcrowding-and-widespread-

abuses; Shafaq News, *Iraqi prisons "Unfit for Human Life," NGO warns* (Dec. 29, 2024),

*available at* https://shafaq.com/en/Iraq/Iraqi-prisons-Unfit-for-Human-Life-NGO-warns (last

accessed Jan 1, 2025). *See also* Ex. 7 (Justice Network for Prisoners in Iraq report (Dec. 29,

2024) (in Arabic)).

103.     The report also criticized the lack of adequate medical care in Iraq's prison

system:

> "'Clinics designed for a small number of inmates are now overwhelmed, providing
> services to far more than their capacity.' . . . Health services in detention centres
> are particularly under-resourced, often failing to meet the needs of overcrowded
> facilities. *Inmates with critical health conditions frequently face delays in accessing*
> *external hospital care due to procedural inefficiencies.*

*Id.* (emphasis added).

104.     "International organisations, including Human Rights Watch (HRW), have

consistently condemned Iraq's prison conditions," documenting "overcrowding, unsanitary

environments, and widespread abuse, with skin and infectious diseases rampant among inmates."

*Id.* (reporting that "prison capacity had reached 300 percent").

105.     HRW also "estimates 8,000 individuals are on death row in Iraq, with reports of

torture-tainted confessions and secret executions . . . . Families of victims have alleged

harassment and denial of funeral rites or independent autopsies." *Id.*

106.     The fact that Mr. al-Tamir is a Sunni (the minority religion), a citizen of

Afghanistan, and an American convict make him a prime target for discrimination and violence in an Iraqi prison. *See, e.g.,* CBS News, *Shawki Omar, U.S. citizen held in Iraq prison, abused and discriminated against, wife claims* (Apr. 24, 2013) (reporting that Shawki Omar was sent to prison in Iraq after claims by the U.S. government that he "was unlikely to be tortured when it handed him to the Iraqi justice system"; however, he discovered he was a target for violence "discriminated against on three different levels there" for being a Sunni and American citizen "who was apprehended by U.S.-led forces in Baghdad nearly a decade ago on suspicion of fomenting jihad"), *available at* https://www.cbsnews.com/news/shawki-omar-us-citizen-held-in-iraq-prison-abused-and-discriminated-against-wife-claims/ (last accessed Jan. 2, 2025).

107.    Despite all this evidence, the government's position seems to be, "Just trust us; things in Iraq have changed." However, the government's plan to transfer Mr. al-Tamir to Iraq has several constitutional problems.

### GROUNDS FOR RELIEF

1.    Federal law authorizes this court to issue a writ of habeas corpus when a person is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(a), (c)(3).[3]

2.    "[A]n order barring their transfer to or from a place of incarceration" is "a proper claim for habeas relief." *Kiyemba v. Obama*, 561 F.3d 509, 513 (D.C. Cir. 2009).

3.    The government's plan to transfer Mr. al-Tamir in custody to Iraq has several

---

[3] Much of the Guantanamo litigation has surrounded detainees who have not been charged with any crimes. *See, e.g., Boumediene v. Bush*, 553 U.S. 723 (2008). Because Mr. al-Tamir was subjected to criminal prosecution by the United States, he is entitled to the constitutional protections afforded to defendants, including Due Process and the right to counsel, among other things.

constitutional and legal problems.

    **I.**    ***Claim 1: Transfer to Iraq violates Due Process and the Convention Against Torture.***

    4.   First, Mr. al-Tamir is entitled to relief under § 2241 because the proposal to transfer

custody to Iraq violates Due Process, the Convention Against Torture and the Geneva

Convention.

    5.   Article 3 of the Convention Against Torture states:

> 1. No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.
>
> 2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,

art. 3, Dec. 10, 1984, 1465 U.N.T.S. 85.

    6.   Additionally, "It shall be the policy of the United States not to expel, extradite, or

otherwise effect the involuntary return of any person to a country in which there are substantial

grounds for believing the person would be in danger of being subjected to torture, regardless of

whether the person is physically present in the United States." FARR Act § 2242(a), 112 Stat.

2681–822.

    7.   The Due Process clause of the Constitution prohibits the government from taking action

against a person without first having the opportunity for judicial review of the facts that support

the government action.

    8.   For example, in the immigration context, federal law allows deportable aliens to raise

claims that they should not be deported in violation of the Convention Against Torture, and the

administrative determination of this claim is reviewable in federal court. *See, e.g., Huisha-*

*Huisha v. Mayorkas*, 27 F.4th 718, 725 (D.C. Cir. 2022) (noting that a procedure to seek relief under CAT is codified and mandatory: "The Executive must provide [relief under CAT] to aliens who qualify for [it]").

9. Simply put, the government cannot constitutionally take away a person's rights—especially human rights such as those protected by the Convention Against Torture—without *some* reviewable process; here there is none.

10. Here, there is ample evidence that transferring Mr. al-Tamir to Iraq would violate the Convention Against Torture. (*See supra* ¶¶ 95-103.)

11. Until December 17, 2024, the government's stated position to Mr. al-Tamir's defense team was consistently that he could not be repatriated to Iraq.

12. Against the weight of publicly available evidence, including the State Department's 2023 report, the government cannot now credibly claim that it is safe for him to be transferred to an Iraqi prison to finish his sentence, especially not with his significant medical problems and his status as an Afghani Sunni who has been convicted in America for insurrection.

13. The court should prohibit Respondents and their agents from transferring Mr. al-Tamir to Iraqi custody without first deciding whether that transfer would violate CAT.

## II.     Claim 2: Transfer to Iraq is an unconstitutional breach of the plea agreement.

14. Second, transferring Mr. al-Tamir to Iraq is an unconstitutional breach of the plea agreement.

15. A negotiated plea implicates several constitutional rights—jury trial, confrontation, self-incrimination, and due process. *Santobello v. New York*, 404 U.S. 257, 264-65 (1971) (Douglas, J., concurring).

16. "When a prosecutor secures a plea with a promise, the promise must be fulfilled." *United States v. Jones*, 58 F.3d 688, 691 (D.C. Cir. 1995) (citing *Santobello*).

17. When the government breaches a plea agreement, the defendant is entitled to seek specific performance or withdraw his guilty plea. *Santobello*, 404 U.S. at 263.

18. Here, the government promised it would "pursue transfer to a third-party sovereign nation. (Ex. 3 at 5.)

19. Mr. al-Tamir relied on this promise when he entered his guilty plea in 2022, when he debriefed with federal agents in May 2024, and when he went forward with sentencing rather than withdrawing his plea in June 2024.

20. The fact that the government has not secured such a transfer in the two years since entering the plea agreement is evidence that it has not exercised good faith in its efforts to uphold this promise.

21. The government's unilateral decision to seek repatriation to Iraq is evidence not just of bad faith—it is an explicit breach of its promise to pursue transfer to a third-party sovereign.

22. Mr. al-Tamir asks the court to require the government to specifically perform under the plea agreement by not repatriating Mr. al-Tamir to Iraq.

23. Mr. al-Tamir further asks the court to require the government to pursue transfer to a third-party sovereign in good faith.

24. The government may claim that it has fully discharged its obligation by seeking a transfer in good faith up until December 2024.

25. However, the plea agreement gives no time limit on the government's obligation to fulfill its promise. Giving up is a breach of the plea agreement.

26. And at no point can the government lawfully pursue the *opposite* of what it promised to do by sending Mr. al-Tamir to an Iraqi prison.

27. If the government continues to breach the plea agreement by insisting on a transfer to

Iraq, Mr. al-Tamir asks the court to vacate his plea agreement.

### III.    Claim 3: Transfer to Iraq is an unlawful treaty transfer.

28. Third, the government's decision to transfer Mr. al-Tamir to Iraq is an unlawful treaty transfer.

29. Federal law governs the transfer of offenders serving a prison sentence between the United States and other countries. 18 U.S.C. § 4100, et seq.

30. The government has authority to transfer prisoners "only when a treaty providing for such a transfer is in force." 18 U.S.C. § 4100(a).

31. A "treaty" is "a treaty under which an offender sentenced in the courts of one country may be transferred to the country of which he is a citizen or national for the purpose of serving the sentence."

32. A "transfer" under this provision is the "transfer of an individual for the purpose of the execution in one country of a sentence imposed by the courts of another country."

33. The government's proposal clearly implicates these provisions—government agents have indicated a plan to transfer Mr. al-Tamir to Iraq to serve out the remainder of his sentence in Iraqi custody, which they claim will continue until 2032.

34. Mr. al-Tamir believes there is not a treaty with Iraq for the regular transfer of prisoners, in which case the proposed transfer is unlawful on its face.

35. Should the government provide evidence of such a treaty, the transfer would still be unlawful under this section.

36. Before the government can transfer a prisoner to serve his sentence in another country, a United States magistrate judge must first verify "that the offender consents to such transfer and that such consent is voluntary and with full knowledge of the consequences thereof." 18 U.S.C. § 4107(a).

37. Additionally, the defendant has "the right to the advice of counsel." 18 U.S.C. § 4109; U.S. Const. Amend. VI.

38. This right is critical because any effort to "modify or set aside the conviction or sentence" must be brought in the United States, and "his consent to transfer, once verified by the verifying officer, is irrevocable." 18 U.S.C. § 4107(b)(1), (4).

39. The right to counsel is also critical because the execution of the sentence in the foreign country will "be carried out according to the laws of the country to which he is to be transferred," which are "subject to change." 18 U.S.C. § 4107(b)(2).

40. An ill-informed defendant may discover without any opportunity for recourse that he is worse off in the receiving jurisdiction than he was in the country of conviction. *See, e.g., Verner v. U.S. Parole Com'n*, 150 F.3d 1172 (1998) (holding that the U.S. Parole Commission did not violate federal law or international treaty with Canada when decided the defendant's life sentence for a crime committed in Canada was ineligible for parole, despite the fact that defendant would have been eligible for parole after 25 years had he remained in Canada).

41. Thus, even if there is a treaty that might allow the government to transfer Mr. al-Tamir to Iraq to complete his sentence, the government's proposed transfer violates this law in several ways.

42. First, Mr. al-Tamir does not consent to the transfer, so that should end the discussion.

43. Moreover, although Mr. al-Tamir has appointed counsel, the accelerated timeframe coupled with constraints imposed by the government has prevented the effective assistance of counsel.

44. In the few days since learning of the government's proposal, undersigned counsel has never been able to meet with Mr. al-Tamir, either by phone or in person, and trial counsel has

met with him only once, briefly, by video.

45. Mr. al-Tamir has raised numerous questions and concerns about the transfer that will require time for counsel to resolve.

46. And both time and access to Mr. al-Tamir are needed to effectively advise him on these issues.

47. One aspect of his sentence in particular casts a cloud over this transfer: although defense counsel and government prosecutors have always treated the sentence as if it were a 10-year prison sentence, the fact is that it is a 30-year sentence with 20 years suspended.

48. Nothing prevents the Iraqi government from deciding that he must serve the suspended portion of his sentence in prison.

49. And as discussed further below, the government is wrong that his sentence doesn't expire until 2032.

50. On these facts, the government's proposed transfer over his objection violates 18 U.S.C. § 4100 et seq., as well as Mr. al-Tamir's constitutional rights to effective assistance of counsel and due process.

**IV.    *Claim 4: Telling Iraq that Mr. al-Tamir must remain in custody until 2032 violates due process because that is longer than the maximum sentence allowed by federal law.***

51.  Finally, the government will violate federal law and due process if it transfers Mr. al-Tamir to Iraq with a representation that his 10-year unsuspended sentence doesn't expire until 2032.

52. Federal law states:

> A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—
>
> > (1) as a result of the offense for which the sentence was imposed; or

(2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

that has not been credited against another sentence.

18 U.S.C. § 3585(b).

53. "A defendant convicted of a federal crime has a right under 18 U.S.C. § 3585(b) to receive credit for certain time spent in official detention before his sentence begins." *United States v. Wilson*, 503 U.S. 329, 330 (1992).

54. Under this section, a sentencing court does not dictate how much credit a defendant gets for time spent in pretrial custody; rather, the executive branch agency that carries out the sentence must "compute the credit under § 3585(b)."[4] *Id.* at 334.

55. Under *Wilson*, the sentencing court has no authority to give credit for pretrial custody time to which the defendant isn't entitled under § 3585(b), nor can it deny a defendant credit he is entitled to receive under § 3585(b).

56. Here, Mr. al-Tamir was taken into custody in connection with his criminal offenses in 2006.

57. Because none of that time has been credited towards another sentence, he is entitled to credit for all time in custody since 2006.

---

[4] The government may argue that *Wilson* does not apply here because it said the Attorney General had authority to compute the sentence, and Mr. al-Tamir is not in custody of the Attorney General. This position is inconsistent with the holding and logic of *Wilson*. The *Wilson* court did not set out to identify all federal agencies that might be the unspecified authority who awards credit under § 3585(b). The only issue in *Wilson* was whether *the sentencing court* had authority to compute credit for time served. The Court rejected Mr. Wilson's argument that the use of passive voice in § 3585 meant that the sentencing court had authority to compute pretrial custody credit, and the Supreme Court held it didn't. But that does not mean the unspecified actor in § 3585 can be only the Attorney General. The logic and holding of *Wilson*, coupled with the fact that § 3585(b) is not textually tied to a single government official, confirm that § 3585(b) applies to whatever federal agency has authority to do that computation.

58. The government may assert that Mr. al-Tamir waived his right to seek credit for this time in custody. (*See* Ex. 1 at 3, ¶ 11.)

59. However, this waiver does not eliminate the government's independent responsibility to *correctly* calculate his release date under federal law as required by *Wilson*, and it certainly does authorize the government to unlawfully prolong his sentence. *United States v. Guillen*, 561 F.3d 527, 531 (D.C. Cir. 2009) (holding that a waiver does not prevent a defendant's claim that his sentence "is unlawful because it exceeds the statutory maximum").

60. Under § 3585(b), Mr. al-Tamir has fully served his sentence.

61. Keeping him in custody pursuant to this sentence violates due process because he is serving more time for his sentence than what federal law allows.

62. If the United States is permitted to transfer Mr. al-Tamir to Iraq over his objection, it should be required to inform the government of Iraq that he has fully discharged his federal sentence, and he should not be transferred in custody to Iraq.

## PRAYER FOR RELIEF

For these reasons, Mr. al-Tamir asks the court to order the following relief:

1. Preliminarily and permanently enjoin respondents and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them from transferring Mr. al-Tamir to Iraq without his consent and due process of law;

2. Preliminarily and permanently enjoin respondents and their agents from telling the Iraqi government that his U.S. sentence does not expire until 2032;

3. Order discovery, including requiring respondents to:

   a. Produce complete copies of all internal and foreign correspondence and memoranda pertaining to his transfer to another country;

    b.  Provide Mr. al-Tamir's complete medical records from the beginning of his

        detention by the United States to the present;

    c.  Produce copies of all internal correspondence and memoranda pertaining to his

        medical care; and

    d.  Provide a report of the current proposed course of medical treatment.

4.  Set a briefing schedule with deadlines for Mr. al-Tamir to submit an amended petition

    followed by a deadline for the government's response and Mr. al-Tamir's reply;

5.  Schedule an evidentiary hearing on the petition;

6.  Issue a judgment declaring that the proposed transfer to Iraq is unconstitutional and in

    violation of U.S. laws and international treaties;

7.  Require the government to specifically perform with good faith its obligation to seek a

    transfer to a third-party country; and

8.  Grant such other relief as this Court deems just and proper.

    DATED this 3rd day of January 2025.

                      SCOTT KEITH WILSON (Utah Bar #7347)
                      Federal Public Defender

                      */s/ Benjamin C. McMurray*
                      BENJAMIN C. McMURRAY (Utah Bar #9926)
                      Federal Public Defender Office
                      District of Utah
                      46 W. Broadway, Suite 110
                      Salt Lake City, Utah 84101
                      Telephone:   801-524-4010
                      Email: benji_mcmurray@fd.org

                      *Counsel for Nashwan al-Tamir*