## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NASHWAN AL-RAMER ABDULRAZZAQ<br><br>Petitioner,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Respondents. | Civil Action No. 17-1928 (EGS)<br>~~UNDER SEAL~~ |
| NASHWAN AL-TAMIR<br><br>Petitioner,<br><br>v.<br><br>JOSEPH R. BIDEN, *et al.*,<br><br>Respondents. | Civil Action No. 25-15 (EGS)<br>~~UNDER SEAL~~ |

### MEMORANDUM OPINION

Nashwan al-Ramer Abdulrazzaq, also known as Nashwan al Tamir ("Mr. al-Tamir")[1] has been detained or imprisoned at U.S. Naval Base Guantanamo Bay ("Guantanamo") since 2007. Pending before the Court is Mr. al-Tamir's motion for preliminary injunction to prevent the government from transferring him to

---

[1] Mr. al-Tamir was "initially charged and prosecuted in the military tribunal under the name 'Abd al Hadi al-Iraqi' which is not his actual name. He is identified on his Iraqi citizenship card as Nashwan al-Ramer Abdulrazzaq. His family name—the name he generally uses with friends and family—is Nashwan al-Tamir . . . ." Pet., ECF No. 1 in 25-cv-15 at 1 n.1.

Iraq

█████████████████████████████████████ —until the Court

considers the claims raised in his two pending habeas petitions.

Mot. for Prelim. Inj., ECF No. 183 in 17-cv-1928; Mot. for

Prelim. Inj., ECF No. 2 in 25-cv-15.[2] These two petitions are:

Mr. al-Tamir's Second Amended Petition in 17-cv-1928 ("Second

Petition"); and Petition in 25-cv-15 ("Third Petition"). *See*

Not. of Filing, ECF No. 43 in 17-cv-1928; Pet., ECF No. 1 in 25-

cv-15.[3] Respondents, the government ("government"), oppose Mr.

al-Tamir's motions. Opp'n to Mot. for Prelim. Inj. ("Opp'n"),

ECF No. 15 in 25-cv-15; Opp'n to Mot. for Prelim. Inj.

("Opp'n"), ECF No. 191 in 17-cv-1928.

Upon careful consideration of Petitioner's motions,

Respondents' oppositions, and the replies and sur-replies

thereto; the applicable law; and for the reasons discussed

below, the Court **GRANTS** Mr. al-Tamir's motions.

---

[2] When citing electronic filings throughout this opinion, the
Court cites to the ECF header page number, not the original page
number of the filed document.

[3] Mr. al-Tamir filed his first habeas petition in 2009. *See* Pet.,
ECF No. 1 in 25-cv-15 ¶ 13 (citing *Abdulrazzaq v. Obama*, 09-cv-
1462-EGS (D.D.C.)). At the request of Mr. al-Tamir's former
counsel, the Indiana Federal Community Defenders, this Court
entered a Stipulation and Order dismissing Mr. al-Tamir's
original Petition without prejudice because his counsel had to
withdraw due to budget sequestration. *See id.* ¶¶ 12-15.

UNCLASSIFIED//FOR PUBLIC RELEASE

I.    **Background**

   A. **Mr. al-Tamir's Detention and Imprisonment**

   Mr. al-Tamir is a citizen of both Iraq and Afghanistan.
Pet., ECF No. 1 in 25-cv-15 ¶ 5. In 2006, the CIA captured him
and held him at a black site until he was transferred to
Guantanamo in April 2007. *Id.* ¶¶ 11, 12. Because Mr. al-Tamir is
now considered a "prisoner" at Guantanamo, he is incarcerated in
more restrictive conditions. *Id.* ¶¶ 49–57. According to Mr. al-
Tamir, ██████████████████████████████████████████████
████████████████████████████████ not able to attend
Friday prayer services, and has limited access to assistance
getting around. *Id.* Mr. al-Tamir asserts that his "tier" is not
retrofitted to accommodate his disability. *Id.; but see* Decl. of
Senior Medical Officer, Ex. 3, ECF No. 15-3 in 25-cv-15 at 6.

   Both the government and Mr. al-Tamir agree that he has
various medical conditions, but they dispute the adequacy of his
medical care at Guantanamo and the severity of his future
medical needs. Mr. al-Tamir asserts that he has "suffered
tremendously" at Guantanamo "as a result of chronic and
worsening degradation of his spine." Mot. for Prelim. Inj., ECF
No. 2 in 25-cv-15 at 2; *see also* Pet., ECF No. 1 in 25-cv-15 ¶
17–19. His "acute medical diagnoses . . . include[] degenerative
spinal disease, an osteoporotic spine, and a history of multiple
spinal surgeries . . . ." Mot. for Prelim. Inj., ECF No. 2 in

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

25-cv-15 at 3. According to Mr. al-Tamir, the government has "aggravated [his] medical issues by subjecting him to negligent medical care, including the unavailability of needed medical devices (such as an MRI machine) and adequately trained surgeons and medical specialists at Guantanamo." *Id.* The government describes how it has met Mr. al-Tamir's medical needs. *See* Opp'n, ECF No. 15 in 25-cv-15 at 15-18.

Mr. al-Tamir notes that his "inadequate medical care was the subject of extensive litigation in the military commission and this [C]ourt." *Id.* Indeed, this Court previously considered Mr. al-Tamir's medical conditions when it rejected his Eighth Amendment claim in his Second Petition because Mr. al-Tamir failed to show "deliberate indifference on the part of Guantanamo medical officers." Mem. Op., ECF No. 175 in 17-cv-1928 at 13. This Court also denied Mr. al-Tamir's request for prospective relief due to the numerous medical procedures he had received and observed that "[Mr. al-Tamir] . . . acknowledges that he has received intensive medical attention since just before the petition was filed and that the intensive medical attention has continued since that time." *Id.* at 17.

Mr. al-Tamir and the government dispute his current medical situation. Mr. al-Tamir claims that "[t]o this day, Mr. al-Tamir requires multiple daily medications, expert medical care, neurological imaging, and an extensive number of medical devices

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

. . . just so he can perform daily functions." Mot. for Prelim.
Inj., ECF No. 2 in 25-cv-15 at 2. The government asserts that
"[o]ther than his spinal issues, [Mr. al-Tamir] is generally in
good health." Opp'n, ECF No. 15 in 25-cv-15 at 18.

### B. Military Commission Proceedings

The Military Commissions Act ("MCA") provides military
commissions with the '"jurisdiction to try 'alien unprivileged
enemy belligerent[s]' [10 U.S.C.] § 948c, for 'any offense made
punishable' by the MCA, 'whether such offense was committed
before, on, or after September 11, 2001,' *id.* § 948d."' Mem.
Op., ECF No. 175 at 24 (quoting *In re Al-Nashiri*, 835 F.3d 110,
115 (D.C. Cir. 2016)).

Beginning in 2013, the government filed charges against Mr.
al-Tamir in a military commission. *See* Second Am. Pet., ECF No.
164 in 17-cv-1928 at 9; Pet., ECF No. 1 in 25-cv-15 ¶¶ 14-16.[4]
The government added additional charges on August 28, 2013 and
on February 3, 2014. Pet., ECF No. 1 in 25-cv-15 ¶¶ 14-16
(citations omitted). On June 2, 2014, the Convening Authority
referred the February 3, 2014 charges for trial by a military
commission and dismissed the 2013 charges. *Id.* Mr. al-Tamir
raised constitutional and statutory challenges to the military

---

[4]  A "Convening Authority," an official at the Department of
Defense, refers a case to trial. *See In re Al-Nashiri*, 835 F.3d
110, 112 (D.C. Cir. 2016).

UNCLASSIFIED//FOR PUBLIC RELEASE

commission proceedings that this Court rejected or held in abeyance pending resolution of those proceedings. *See* Pet., ECF No. 1 in 17-cv-1928; Mem. Op., ECF No. 175 in 17-cv-1928.

In 2022, Mr. al-Tamir entered into a pretrial agreement ("Plea Agreement") pursuant to which he would plead guilty to four counts[5] of his military commission charges and participate in an "extensive debrief" in exchange for a prison sentence not to exceed ten years. Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 3 (citing App. to Pretrial Agreement, Ex. 2, ECF No. 2-2 at 1). The government also promised to "pursue transfer to a third-party sovereign nation" and that it would consider Mr. al-Tamir's healthcare needs in its transfer efforts:

> 19.  I shall join the Government in requesting that the Military Judge delay the sentencing proceedings in my case, but no more than two (2) years from the date the Military Judge accepts my guilty plea, in order to pursue transfer to a third-party sovereign nation. I understand that the Convening Authority will recommend a transfer to a third-party sovereign nation consistent with this pretrial agreement, Appendix A, and applicable United States law, with the understanding that the third-party sovereign nation will agree to honor the terms of this agreement and my continued custody after transfer, if it occurs. Should my custody be transferred to a

---

[5] The government represents that Mr. al-Tamir pled guilty to five counts but Mr. al-Tamir claims it was four counts. His Plea Agreement provides: "and in consideration of the agreement by the Convening Authority to approve a sentence in accord with the limitations set forth in Appendix A, I offer to plead guilty to Charges II, III, IV, and V of the charges and specifications." Plea Agreement, Ex. 1, ECF No. 2-1 in 25-cv-15 at 1.

> third-party sovereign nation, I understand
> that the continued service of any portion of
> my sentence will be under the conditions, laws
> and procedures as established by such third-
> party sovereign nation and its appropriate
> governing entity willing to accept my request
> for transfer. Consideration of my healthcare
> needs will be afforded in efforts to effect a
> transfer. I also understand that the Convening
> Authority has no power under the law to
> approve a transfer to a third-party sovereign
> nation. I understand that failure to effect
> transfer to a third-party sovereign nation
> will not void or make voidable this pretrial
> agreement, and I would remain bound by this
> pretrial agreement.

Pretrial Agreement, Ex. 1, ECF No. 2-1 in 25-cv-15 at 5; *see*

*also* Add. to Pretrial Agreement, Ex. 3, ECF No. 2-3 in 25-cv-15

at 3 (delaying sentencing "until June 2024 . . . .").

    Mr. al-Tamir represents that the government's promises to

make efforts to transfer him to a third-party country and take

into account his healthcare needs were "critical" to him. Mot.

for Prelim. Inj., ECF No. 2 in 25-cv-15 at 3. He contends that

as a "convicted military combatant and a practicing Sunni, he

could not be safely returned to Iraq or imprisoned there." *Id.*

Further, he claims that transfer to Iraq, a country that "could

not or would not provide adequate medical care[,] would be

inhumane and likely fatal." *Id.* The importance of this provision

is why Mr. al-Tamir agreed to delay sentencing, so that the

government could find a suitable country. *See id.* Critically,

Mr. al-Tamir reserved the right to withdraw from his plea

UNCLASSIFIED//FOR PUBLIC RELEASE

agreement prior to sentencing. *See id.*; *see also* Offer for Pretrial Agreement, Ex. 1, ECF No. 2-1 in 25-cv-15 at 6.

The government disagrees that any provision of the Plea Agreement bars it from transferring Mr. al-Tamir to Iraq. Opp'n, ECF No. 15 in 25-cv-15 at 14.

### C. Transfer Discussions and Decision

Mr. al-Tamir claims that leading up to his sentencing, the government "consistently . . . acknowledged that [he] could not safely return to Iraq." Mot. for Prelim. Inj., ECF No. 2 at 4. He cites to a declaration from his Department of Defense counsel, Susan Hensler ("Ms. Hensler"), that describes these communications. *See* Pet., ECF No. 1 in 25-cv-15 ¶¶ 58-98 (citing Hensler Decl., Ex. 3, ECF No. 1-3). The government contends that because Mr. al-Tamir agreed that his Plea Agreement was the *entire* agreement, these discussions do not change its meaning. Opp'n, ECF No. 15 in 25-cv-15 at 38.

Ms. Hensler primarily communicated with Tina Kaidanow, who became the official envoy to Guantanamo in late 2022. *See id.* (communicating that Mr. al-Tamir could not return to Iraq or Afghanistan, and that his health conditions limited the possible transfer countries). Ms. Hensler highlighted that Mr. al-Tamir could "withdraw his guilty plea without penalty" if "the government is unable to arrange his transfer," which she described as "an outcome that neither party wants." *Id.* ¶ 62. In

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

response, Ms. Kaidanow informed Ms. Hensler that the government was "working hard to find a location for transfer that would "meet all the requirements needed to bring this case to sentencing." *Id.* ¶ 66 (citing Hensler Decl., Ex. 3, ECF No. 1-3 at 6-7). Ms. Kaidanow remarked that she "doubt[ed] very much, in that vein, [the government] would aim for a country [it] feared Mr. [al-Tamir] would reject." *Id.* (citing Hensler Decl., Ex. 3, ECF No. 1-3 at 6-7). Ms. Hensler met regularly with members of Ms. Kaidanow's staff and the government "continued to express commitment to a third-country resettlement but said they could not share many details about those efforts." *Id.* ¶ 67 (citing Hensler Decl., Ex. 3, ECF No. 1-3 at 7).

As the June 2024 sentencing proceedings approached, the lack of information concerned Mr. al-Tamir, so Ms. Hensler met with Ms. Kaidanow to convey his concerns and consideration of whether he should withdraw his plea. *Id.* ¶¶ 68, 69 (citing Hensler Decl., Ex. 3, ECF No. 1-3 at 7). Ms. Kaidanow confirmed that the government was still committed to finding a transfer country that addressed Mr. al-Tamir's medical needs. *Id.* ¶ 69 (citing Hensler Decl., Ex. 3, ECF No. 1-3 at 7) (noting that the conflict in Gaza complicated the matter of identifying a transfer country). Ms. Hensler shared these assurances with Mr. al-Tamir, and Mr. al-Tamir decided to go forward with sentencing. *Id.* ¶ 70 (citing Hensler Decl., Ex. 3, ECF No. 1-3

UNCLASSIFIED//FOR PUBLIC RELEASE

at 7). Ms. Kaidanow promised that she would continue to "work as diligently as possible to find a third country willing to accept [Mr. al-Tamir]." *Id.* ¶ 77 (citing Hensler Decl., Ex. 3, ECF No. 1-3 at 7–8). Ms. Kaidanow unexpectedly passed away on October 16, 2024. *Id.* ¶ 73. According to Mr. al-Tamir, the Secretary of State left the envoy position unfilled and only a few career State Department employees remained to handle the Guantanamo portfolio. *Id.*

Without first informing Mr. al-Tamir or his counsel, the government notified Congress ███████████████ that it planned to transfer Mr. al-Tamir to Iraq. Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 4. A few days later, on December 17, 2024, State Department officials informed Mr. al-Tamir's counsel about the transfer decision ████████ ████████████████ ███████Pet., ECF No. 1 in 25-cv-15 ¶¶ 78–80 (citing Hensler Decl., Ex. 3, ECF No. 1-3 at 9). Ms. Hensler claims that "when pressed, ████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ ████████ ████████ The government maintains that ██████████ ███████████████████████████████████████ ████████████████████████. . . ." Opp'n, ECF No. 15 in 25-cv-15 at 21.

The government informed Ms. Hensler that Mr. al-Tamir would

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 4. The
government officials said that they would ████████████████████

███████████████████████████████████████████████████████████

Pet., ECF No. 1 in 25-cv-15 ¶ 85 (citing Hensler Decl., Ex. 3,
ECF No. 1-3 at 9). The government ████████████████████

███████████████████████████████████████████████████████████

████████. . . ." Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at
4. Mr. al-Tamir objected to the transfer as unconstitutional and
violative of multiple treaties. *Id.* Nevertheless, the government
plans to transfer him to ████████████████████████
Notice, ECF No. 11 in 25-cv-15; Opp'n, ECF No. 15 in 25-cv-15 at
7 (Mr. al-Tamir's ████████████████████████████████

### D. Conditions in Iraq

The government asserts that the State Department ████████

███████████████████████████████████████████████████████████

████████████████████████████████████████ ensure ████████████

████████ transfer is consistent with the Government's human
treatment policy not to transfer detainees to countries where
they are likely to be tortured, consistent with the [Foreign
Affairs Reform and Restructuring Act]." Sur-Reply, ECF No. 19 in

**UNCLASSIFIED//FOR PUBLIC RELEASE**

25-cv-15 at 9 (citing Richard Decl., Ex. 1, ECF No. 15-1 in 25-cv-15 ¶¶ 3-15).

Mr. al-Tamir has provided reports and letters in support of his concerns about conditions in Iraq. Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 5-7; Reply, ECF No. 17 in 25-cv-15. The State Department detailed the following conditions in 2023:

> arbitrary or unlawful killings, including extrajudicial killings; enforced disappearance; torture and cruel, inhuman, and degrading treatment or punishment by government officials; *harsh and life-threatening prison conditions*; arbitrary arrest or detention; arbitrary or unlawful interference with privacy; punishment of family members for offenses allegedly committed by an individual; serious abuses in a conflict, including attacks resulting in civilian deaths and harm; . . . restrictions on freedom of movement, including forced returns of internally displaced persons to locations where they faced threats to their lives and freedom; refoulement of refugees to a country where they would face torture or persecution, including serious harm such as a threat to life or freedom or other mistreatment that would constitute a separate human rights abuse; serious government corruption.

Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 4-5 (citing U.S. State Dept., Bureau of Democracy, Human Rights, and Labor, Iraq 2023 Human Rights Report (20[2]3), available at https://www.state.gov/wp-content/uploads/2024/03/528267_IRAQ-2023-HUMAN-RIGHTS-REPORT.pdf (last visited Jan. 11, 2025) ("2023 DOS Country Report") (emphasis added)).

**UNCLASSIFIED//FOR PUBLIC RELEASE**

Reports from news outlets have provided further details
about the danger in Iraqi prisons and jails. *See id.* at 4-6. For
example, a June 29, 2024 article from Kurdistan24 highlighted a
report from the Iraqi Center for Documenting War Crimes, which
discussed "poor conditions under which tens of thousands of
detainees are held, with health issues being neglected due to
revenge and sectarian motives." *Id.* at 5 (citing Kurdistan24,
*Death, torture, delayed visits: inside Iraq's harrowing prison
system* (June 29, 2024), available at
https://www.kurdistan24.net/en/story/395582/Death,-torture,-
delayed-visits:-inside-Iraq%27s-harrowing-prison-system (last
visited Jan. 11, 2025)). These reports detail intentional
deprivation of medical care, overcrowding, and '"delays in
accessing external hospital care due to procedural
inefficiencies."' *Id.* at 6 (quoting Shafaq News, Iraqi prisons
"Unfit for Human Life," NGO warns (Dec. 29, 2024), available at
https://shafaq.com/en/Iraq/Iraqi-prisons-Unfit-for-Human-Life-
NGO-warns (last visited Jan. 11, 2025) (emphasis omitted). Mr.
al-Tamir claims that because he is Sunni (a minority religion),
citizen of Afghanistan, and "an American convict," he is a
"prime target for discrimination and violence in an Iraqi
prison." *Id.* at 7 (citations omitted).

The government explains that when it is considering whether
to transfer Guantanamo detainees, it determines whether it is

UNCLASSIFIED//FOR PUBLIC RELEASE

*more likely than not* that the individual will be tortured in the country to which he may be transferred." Opp'n, ECF No. 15 in 25-cv-15 at 19 (citing Richard Decl., Ex. 1, ECF No. 15-1 in 25-cv-15) (emphasis added). When making this determination, the government considers:

> the treatment the individual is likely to receive upon transfer, taking into account any specific commitments of officials from the foreign government responsible for accepting the transfer of custody of the individual; information or allegations of prior or potential future mistreatment in the receiving State; the receiving State's overall human rights record; any specific risk factors that may be present such as religion or political views; whether similarly situated individuals have been tortured in the receiving State; and the humane treatment assurances provided by the receiving State, including an assessment of the assurances' credibility.

*Id.* at 20. The government claims that in this case:



*Id.* at 21.

UNCLASSIFIED//FOR PUBLIC RELEASE

### E. Procedural Background

On January 3, 2025, Mr. al-Tamir filed several motions to renew his Second Petition, raise new arguments in his Third Petition, and seek to enjoin the government from transferring him to Iraq while the Court considers his claims. The Court granted Mr. al-Tamir's motion to reopen in 17-cv-1928 but delayed setting further proceedings until it considered the preliminary injunction. *See* Minute Order (Jan. 4, 2025).[6] The Court also granted Mr. al-Tamir's motion for expedited briefing. *See* Minute Order (Jan. 4, 2025).

## II. Standard of Review

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting

---

[6] The three claims that remain in Mr. al-Tamir's Second Petition are: (1) discrimination against Mr. al-Tamir on the basis of his nationality in violation of the equal protection guarantees of the Fifth Amendment ("equal protection" claim); (2) that the structure of the military commission process violates the Due Process Clause of the Fifth Amendment ("conflict-of-interest" claim); and (3) deprivation of the right to counsel guaranteed by the Sixth Amendment and the Military Commissions Act ("interference-with-counsel-communications" claim). *See* Pet., ECF No. 1 in 17-cv-1928; Am. Pet., ECF No. 34; Notice, ECF No. 43 in 17-cv-1928; Redacted Second Am. Pet., ECF No. 164 in 17-cv-1928; Mem. Op., ECF No. 175 in 17-cv-1928.

*Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In this Circuit, the four factors have typically been evaluated on a "sliding scale," such that if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Holmes v. FEC*, 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley*, 644 F.3d at 393 ("[W]e read Winter at least to suggest if not to hold that a likelihood of success is an independent,

freestanding requirement for a preliminary injunction.")
(quotation marks omitted). Nonetheless, "the Circuit has had no
occasion to decide this question because it has not yet
encountered a post-*Winter* case where a preliminary injunction
motion survived the less rigorous sliding-scale analysis."
*ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014); *see
also Archdiocese of Washington v. Washington Metro. Area Transit
Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (quotations omitted)
("[T]his court has not yet decided whether [*Winter*] is properly
read to suggest a sliding scale approach to weighing the four
factors be abandoned."); *Changji Esquel Textile Co. Ltd. v.
Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (quotations
omitted) ("In the past, we have . . . reserved the question
whether the sliding-scale approach remains valid. We follow the
same approach here because, even under the sliding-scale
approach, the movant must raise at least a serious legal
question on the merits."); *cf, Hanson v. District of Columbia*,
120 F.4th 223, 243 (D.C. Cir. 2024) (citations omitted).

### III. Analysis

Mr. al-Tamir has shown that all factors weigh in favor of
granting his requested temporary relief. Neither party asks the
Court to use a sliding scale to evaluate these factors, and the
Court concludes that Mr. al-Tamir prevails under either

approach. Before the Court discusses these factors, it addresses some preliminary matters.

## A. Preliminary Matters

### 1. Jurisdiction

An antecedent question to Mr. al-Tamir's claims is whether this Court has jurisdiction. Title 28 U.S.C. § 2241 permits district courts to grant writs of habeas corpus for "prisoner[s]" who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(a), (c)(3). In *Boumediene v. Bush*, the Supreme Court held that Congress could not strip federal courts of the ability to consider habeas claims brought by individuals at Guantanamo. 553 U.S. 723 (2008). The D.C. Circuit has rejected the proposition that *Boumediene* only applied to "core" as opposed to "ancillary" habeas rights. *Kiyemba v. Obama*, 561 F.3d 509, 512 (D.C. Cir. 2009) ("Accordingly, we read *Boumediene* to invalidate § 2241(e)(1) with respect to all habeas claims brought by Guantanamo detainees, not simply with respect to so-called "core" habeas claims.").

"[B]ased upon longstanding precedents . . . it is clear that . . . an order barring [a petitioner's] transfer to or from a place of incarceration" is "a proper claim for habeas relief." *Id.* at 513 (citations omitted); *see also Belbacha v. Bush*, 520 F.3d 452, 456 (D.C. Cir. 2008) (holding that a court may "act to

UNCLASSIFIED//FOR PUBLIC RELEASE

preserve the status quo" while a claim related to jurisdiction to challenge transfer was considered).

The government does not dispute this Court's jurisdiction to hear Mr. al-Tamir's claims. Opp'n, ECF No. 15 in 25-cv-15.

### 2. Mr. al-Tamir's Status

This case presents issues related to Guantanamo proceedings that it appears have not yet been addressed: Specifically, whether and how the rights of a person who was detained at Guantanamo change when he pleads guilty and are sentenced to imprisonment for crimes against the United States, and relatedly, whether and how does this result in a change to the government's authority.

The government assumes that Mr. al-Tamir has no more rights than "detainees" at Guantanamo and generally asserts that "[Mr. al-Tamir] is detained at the United Staes Naval Station, Guantanamo Bay, Cuba, under the authority of the Authorization for the Use of Military Force [("AUMF")]." Opp'n, ECF No. 15 in 25-cv-15 at 11. In support, it cites to authority generally establishing its power to detain people under the AUMF. *Id.* at 11 n.3.[7] When discussing this point further in its Sur-Reply, the

---

[7] At another point in its opposition, the government claims: "[t]he D.C. Circuit has concluded that Respondents' authority to transfer a military detainee—even one convicted of war crimes like Petitioner—is not dependent on any such treaty [under 18 U.S.C. § 4100]." Opp'n, ECF No. 15 in 25-cv-15 at 9. But the government provides no citation to this authority.

UNCLASSIFIED//FOR PUBLIC RELEASE

government asserts that "as a matter of law, [Mr. al-Tamir] remains a military detainee . . . ." Sur-Reply, ECF No. 19 in 25-cv-15 at 5. It advances an interpretation of the 2012 National Defense Authorization Act ("2012 NDAA") whereby nothing would change in his status as the government exercised its authority to: (1) initially detain him under the law of war until the end of the hostilities authorized by the AUMF have ended; (2) try them under the 2009 MCA; and then (3) transfer him to his country of origin. *Id.* at 5-6. According to the government, throughout all these processes, Mr. al-Tamir would remain a "wartime detainee." *Id.* The government does not cite to any authority supporting this interpretation of the 2012 NDAA. *Id.*

To further support its argument, the government also cites to the 2009 MCA, which '"establishes procedures governing the use of military commissions to try alien unprivileged enemy belligerents for violations of the law of war and other offenses triable by military commission."' *Id.* at 5 (quoting 10 U.S.C § 948b(a)). The government claims that Mr. al-Tamir's "military commission proceeding and resulting sentence pursuant to his plea agreement under the [MCA] do not remove [him] from any military detention scheme or mean that he somehow should be treated equivalent to a domestic criminal convict." *Id.* Again,

UNCLASSIFIED//FOR PUBLIC RELEASE

the government cites no authority for this proposition other than its own interpretation of the MCA and 2012 NDAA.

Mr. al-Tamir claims that he "is not a wartime detainee . . . he is a prisoner serving a sentence in a United States facility." Reply, ECF No. 17 in 25-cv-15 at 7. He asserts that by becoming a criminal defendant serving a sentence for offenses against the United States, he has gained protections that have not been recognized for other detainees. *See* Pet., ECF No. 1 in 25-cv-15 at 18 n.3; Reply, ECF No. 17 in 25-cv-17 at 11 ("Mr. al-Tamir's status as a person serving a U.S. prison sentence affords him constitutional protections that those detainees lacked."). As with the government, Mr. al-Tamir cites no authority in support of his position.

Because neither party cites any authority where courts have previously resolved these questions, the Court will begin by reviewing the relevant legal principles.

### 1. Detention Authority at Guantanamo

Shortly after the September 11, 2001 attacks, Congress passed the AUMF, which authorized the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided in the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

against the United States by such nations, organizations or persons." Authorization for Use of Military Force, Pub. L. No. 107-40, § 3(s), 115 Stat. 224, 224 (Sept. 18, 2001). In *Hamdi v. Rumsfeld*, the Supreme Court interpreted the AUMF to provide detention authority. 542 U.S. 507, 518 (2004) (plurality opinion) (internal quotations omitted) ("[The] detention of individuals falling into the limited category we are considering, for the duration of the particular conflict in which they were captured, is so fundamental and accepted as incident to war as to be an exercise of the necessary and appropriate force Congress has authorized the president to use."). This detention authority was rooted in international law of war principles. *See id.* at 520.

Congress affirmed the President's detention authority in the 2012 National Defense Authorization Act ("NDAA"), providing that: the President has authority to "use all necessary and appropriate force pursuant to the [AUMF] . . . to detain covered persons (as defined in sub-section (b)) pending disposition under the law of war." Nat'l Defense Auth. Act for Fiscal Year 2012, Pub. L. No. 112-81, 125 Stat. 1298 (2012) § 1021(a). "The disposition of a person under the law of war as defined in subsection (a) may include the following:

> (1) Detention under the law of war without trial until the end of the hostilities authorized by the [AUMF].

UNCLASSIFIED//FOR PUBLIC RELEASE

> (2) Trial under Chapter 47A of title 10,
> United States Code (as amended by the Military
> Commissions Act of 2009 (title XVIII of Public
> Law 111-84)).
> (3) Transfer for trial by an alternative court
> or competent tribunal having lawful
> jurisdiction.
> (4) Transfer to the custody or control of the
> person's country of origin, any other foreign
> country, or any other foreign entity."

*Id.* § 1021(c).

### 2. Military Commission Act

"The MCA provides that military commissions have jurisdiction to try 'alien unprivileged enemy belligerent[s],' [10 U.S.C.] § 948c, for 'any offense made punishable' by the MCA, 'whether such offense was committed before, on, or after September 11, 2001,' *id.* § 948d." *In re Al-Nashiri*, 835 F.3d at 115. "In the MCA, Congress established an 'integrated' scheme dictating how enemy belligerents are to be tried and obtain appellate review . . . ." *Id.* at 122. That scheme establishes "procedural protections and rigorous review mechanisms for military commissions." *Id.* at 120. The "significant procedural and evidentiary safeguards include "the right to be represented by counsel, 10 U.S.C. § 949c, be presumed innocent, *id.* § 949*l*, obtain and offer exculpatory evidence, *id.* § 949j, call witnesses on his behalf, *id.* and challenge for cause any of the members of the military commission and the military judge, *id.* § 949f." *Id.* at 123.

UNCLASSIFIED//FOR PUBLIC RELEASE

The "rigorous review mechanisms" include:

> trial with a military judge presiding and a "jury" that, in capital cases, generally consists of twelve military officers known as "members" of the military commission. 10 U.S.C. §§ 948m, 949m(c). If he is convicted, the convening authority—the Defense Department official who initially referred the case to trial—may review the guilty finding and set it aside, or reduce it to a finding of guilty of a lesser-included offense. *Id.* § 950b. The convening authority must review a sentence to approve, disapprove, commute, or suspend it in whole or in part. *Id.* A guilty finding, as modified by the convening authority, will then be reviewed by the CMCR unless the defendant properly waives this right of review. *Id.* §§ 950f, 950c. The CMCR is composed of both military and civilian judges and has the power to review factual and legal questions alike. *Id.* § 950f. The defendant may appeal the CMCR's decision to our court, and we are empowered to review all questions of law, including the sufficiency of the evidence. *Id.* § 950g. Finally, our ruling can be challenged via petition for writ of certiorari in the Supreme Court. *Id.* § 950g(e).

*Id.*

### 3. Constitutional Rights for Non-Citizens

It has been long established that non-citizens are entitled to constitutional protections in certain circumstances. *See e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. . . . These provisions are universal in their application, to all persons within the territorial jurisdiction . . . ."); *but see Dep't of Homeland Security v.*

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

*Thuraissigiam*, 591 U.S. 103, 139–40 (2020) (internal quotations omitted) (holding that a non-citizen who "succeeded in making it 25 yards into U.S. territory before he was caught" was "on the threshold" and not entitled to due process). This includes access to constitutional protections in criminal proceedings. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("Applying this reasoning to the 5th and 6th Amendments, it must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by those amendments, and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law.").

### 4. Constitutional Protections at Guantanamo

Courts have intentionally left open the extent of constitutional protections non-citizens under military authority at Guantanamo hold. *Cf. Hamdi*, 542 U.S. at 532 (recognizing due process rights for American citizens at Guantanamo). As recently as 2023, the *en banc* D.C. Circuit has continued to hold that this question remains open and is not foreclosed by precedent. *Al-Hela v. Biden*, 66 F.4th 217, 225–28 (D.C. Cir. 2023) (*en banc*) ("[W]hether the Due Process Clause applies to a habeas petition filed by a foreign national detained at [Guantanamo] as

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

an alleged military combatant is a question that the Supreme Court has not yet answered.").

One of the main arguments against applying the Due Process Clause to non-citizens at Guantanamo is that constitutional rights are unavailable outside the "territorial sovereignty" of the United States. *Id.* at 249 (quotations omitted) (rejecting dissent's argument). But, as the D.C. Circuit has discussed, such an approach would "run headlong into *Boumediene*'s explicit rejection of the view that the Constitution, as applied to non-U.S. citizens, 'necessarily stops where de jure sovereignty ends,' at least where the United States, 'by virtue of its complete jurisdiction and total control over [a territory], maintains de facto sovereignty over th[at] territory.'" *Id.* (quoting *Boumediene*, 553 U.S. at 755); *see also id.* at 248-49 (citing *Boumediene*, 553 U.S. at 763) ( "*Boumediene* made clear, *Eisentrager* should not be read to foreclose constitutional claims of non-U.S. citizens outside U.S. sovereign territory under a 'bright-line test' based solely on *de jure* territorial sovereignty."). Indeed, the Supreme Court held in *Rasul v. Bush*:

> By the express terms of its agreements with Cuba, the United States exercises "complete jurisdiction and control" over the Guantanamo Bay Naval Base, and may continue to exercise such control permanently if it so chooses . . . . Respondents themselves concede that the habeas statute would create federal-court jurisdiction over the claims of an American citizen held at the base . . . . Considering

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

> that the statute draws no distinction between
> Americans and aliens held in federal custody,
> there is little reason to think that Congress
> intended the geographical coverage of the
> statute to vary depending on the detainee's
> citizenship . . . . Aliens held at the base,
> no less than American citizens, are entitled
> to invoke the federal courts' authority under
> § 2241.

*Rasul v. Bush*, 542 U.S. 466, 480-81 (2004).

### 5. Determination of Mr. al-Tamir's Status

Because of the lack of authority, the Court declines to accept the government's position that despite being subjected to MCA proceedings and serving a sentence imposed from this process, Mr. al-Tamir has no different status or protections than individuals who are detained, without charge or trial, for the duration of hostilities. The Court also does not accept Mr. al-Tamir's position that he is necessarily entitled to all protections that criminal defendants have in non-military proceedings. At this juncture, and in view of the expedited nature of this proceeding, the Court need not decide the full impact of Mr. al-Tamir's status as a person convicted of offenses against the United States, as part of the MCA process, and serving a prison sentence based on this conviction. Based on the principles discussed above, the Court concludes that for purposes of its preliminary injunction analysis, the government has not shown its interpretation necessarily prevails; rather

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

other principles and authority support an alternative
interpretation.

### 3. Status Quo

Finally, because the purpose of preliminary injunctions is
to preserve the status quo, the Court acknowledges that the
status quo in this case strongly favors Mr. al-Tamir. The status
quo would keep Mr. al-Tamir at Guantanamo, serving his U.S.-
imposed sentence. The Court addresses the irreparable harm and
balance of equities below, but notes at the outset that
transferring Mr. al-Tamir to Iraq would be a significant shift.
*Compare Aamer*, 742 F.3d at 1043–44 (risk of enjoining the
government from force-feeding is that petitioners could die from
hunger, but "if it was later determined that force-feeding as
practiced at Guantanamo violates petitioners' rights,
petitioners would suffer . . . but they would ultimately be able
to engage in an uninterrupted hunger strike as they wish.");
*Sherley*, 644 F.3d at 398.

### B. Irreparable Harm

The strongest factor in support of granting Mr. al-Tamir's
motion is that he likely will suffer irreparable harm if the
Court does not temporarily enjoin his transfer. As discussed in
detail below, the harm is twofold: (1) once transferred, Mr. al-
Tamir may lose access to review of any claims in the U.S. legal
systems; and (2) Mr. al-Tamir may be tortured and/or die in an

UNCLASSIFIED//FOR PUBLIC RELEASE

Iraqi prison, with no recourse for relief in the country that
caused his imprisonment.

    As to the point, in the context of upholding a preliminary
injunction related to transfer of a U.S. citizen in Iraq, the
D.C. Circuit has remarked:

> [A]n initial point bears noting: the transfer
> of a citizen to another country's custody,
> unlike continued detention of that citizen, is
> irrevocable. Once the Executive relinquishes
> custody of an American citizen to another
> country, our government, and our laws—
> including our law's habeas guarantee, which a
> detainee can use to seek relief from detention
> over time—would be unavailable to [him],
> perhaps in perpetuity. Decisions about the
> duration and conditions of [his] custody, and
> about the availability to [him] of a means of
> challenging [his] confinement, would be
> entirely up to the detaining sovereign.

*Doe v. Mattis*, 928 F.3d 1, 17–18 (D.C. Cir. 2019); *see also id.*
at 22 ("Doe, wishing to avoid that irrevocable change in his
station [a forcible transfer that would render him devoid of any
oversight or recourse to the United States] objects to the
proposed transfer . . . . No more is required to demonstrate
that he would face irreparable injury if he were involuntarily
(and irreversibly) handed over to [the other country] in
violation of his constitutional rights.").

    The government does not directly address this argument. At
best, it claims—when discussing another preliminary injunction
factor—that Mr. al-Tamir "is incorrect that no potential avenue

exists in the military-commission system for Petitioner to challenge an alleged breach of the plea agreement and its effect on his sentence." Opp'n, ECF No. 15 in 25-cv-15 at 40 (discussing *Khadr v. United States*, 67 F.4th 413 (D.C. Cir. 2023)). But *Khadr* does not make the government's point. First, it addresses only whether someone who entered a plea agreement as part of military commission proceedings can raise a challenge to that plea agreement, which does not reach all of Mr. al-Tamir's claims here. *See id.* Second, *Khadr* does not show that any U.S. judicial body actually exercised jurisdiction over Mr. Khadr's claims after he was transferred. *Id.* The military appellate court held that it lacked subject matter jurisdiction over Mr. Khadr's case, and the D.C. Circuit did not determine whether it had jurisdiction, choosing to instead resolve the case on waiver. *Id.* The Court is therefore not persuaded that Mr. al-Tamir could continue to seek relief in the United States after he is transferred. Additionally, even if there were a mechanism for relief, Mr. al-Tamir could still lose access to it if he were to die in an Iraqi prison for any of the reasons that he fears. *See Johnson v. Missouri*, 143 S. Ct. 417, 418 (Jackson, J., dissenting) ("As for irreparable harm, [Mr.] Johnson's execution irrevocably mooted our consideration of his due process claim . . . .").

UNCLASSIFIED//FOR PUBLIC RELEASE

Second, Mr. al-Tamir also faces irreparable harm of injury or death if he is transferred to an Iraqi prison. *See* Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 8-9. The government argues that Mr. al-Tamir fails to show a likelihood of irreparable harm that is "certain and great." Opp'n, ECF No. 15 in 25-cv-15 at 45-46 (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In support, it relies on its determination that Mr. al-Tamir's risks of torture or death if transferred are sufficiently low to allow the transfer to proceed in keeping with U.S. policy guidelines and based on assurances from the Iraqi government. *See* Opp'n, ECF No. 15 in 25-cv-15 at 22-24, 45-46.

The Court acknowledges that deference is owed to the government's determination that a person's transfer satisfies policies regarding assessing the risk of torture. But this determination does not mean that the government has determined Mr. al-Tamir is not at risk of abuse, torture, insufficient medical treatment, or death in an Iraqi prison. It means that, based on numerous factors, the government has assessed that the risk is low enough—it is not "more likely than not" that he will be tortured—that it should proceed with his transfer. Opp'n, ECF No. 15 in 25-cv-15 at 30.

The key question here, though, is whether Mr. al-Tamir is at risk of serious harm if he is transferred, which the record

UNCLASSIFIED//FOR PUBLIC RELEASE

shows he is. First, the government does not deny the concerns about Iraqi prisons raised in the State Department's 2023 country report. *Id.* at 33 (conceding it "contains reports of mistreatment of prisoners in Iraq, but does not draw any legal conclusions and cannot predict the treatment of any specific individual."). Mr. al-Tamir has pointed to more recent reports of abuse, torture, inadequate medical care, and death in Iraqi prisons. *See* Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 5-7; Reply, ECF No. 17 in 25-cv-15.

Second, the government does not explain how the case it cites for rejection of an irreparable harm that was not "great" or "certain" is analogous to Mr. al-Tamir's situation. The government's authority, *Chaplaincy of Full Gospel Churches*, considered a challenge by "current and former Navy chaplains of 'non-liturgical Protestant' faiths" who alleged that "the Navy had unconstitutionally established and maintained a religious quota system for the promotion, assignment, and retention of Navy chaplains" to their disadvantage. 454 F.3d at 293. The D.C. Circuit held that the petitioners did not articulate an injury that was "certain and great" because it was "far too speculative" that the Navy's practice of retaining Catholic chaplains past applicable age limits resulted in the Protestant chaplains' loss of possible promotions. *Id.* at 298. The harm that Mr. al-Tamir fears here—torture, abuse, negligent medical

UNCLASSIFIED//FOR PUBLIC RELEASE

care, or even death in an Iraqi prison—is far greater than a foregone opportunity for a promotion. *Compare Belbacha v. Bush*, 520 F.3d 452, 459 (D.C. Cir. 2008) (noting the "seriousness of the harm [Mr. Belbacha] claims to face, namely, torture at the hands of a foreign state"); *with Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("At most, the Navy's purported practice reduces Appellants' opportunities for promotion . . . ."). Additionally, the risk that Mr. al-Tamir faces, given conditions in Iraq and factors unique to him, is much less speculative than the doubt as to if Catholic chaplains could not work past age limits, Protestant chaplains could possibly be promoted more easily.

Moreover, the record indicates that the government considered only some of the factors that increase Mr. al-Tamir's risk, ████████████████ ████████████████ ████████ ████████ but not the other reasons for concern, including his Afghan citizenship or his status as someone serving a U.S.-imposed sentence. *Compare* Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 8–9, *with* Opp'n, ECF No. 15 in 25-cv-15 at 7, 21–24.[8] The supplemental letters that Mr. al-Tamir provided further

---

[8] The government's offer in its Sur-Reply filed on January 10, 2025 to provide classified information about its efforts comes too late in these expedited proceedings in view of its representation to the court that Mr. al-Tamir will be transferred no sooner than January 13, 2025.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

support his concerns that these factors elevate his risk of harm. *See, e.g.,* Letter from Grazia Careccia, Amnesty International, ECF No. 17-2 in 25-cv-15 at 1 ("Additionally, people held on terrorism related offences [sic] routinely report that factions of [a militia] enter prison facilities to verbally abuse and threaten prisoners."). Nor does the government address all of the concerns Mr. al-Tamir raises about his medical treatment. The government states that it plans to transfer him

█████████████████████████████████████████████

████████████████████  *see* Opp'n, ECF No. 15 in 25-cv-15 at 17; but it does not adequately address, for example, concerns that individuals incarcerated in Iraqi prisons face serious delays in seeking external hospital care, *see* Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 6. Again, the question here is not whether the government's decision to transfer Mr. al-Tamir was in error; but whether notwithstanding the government's determinations, Mr. al-Tamir has still shown that he faces a serious risk of irreparable harm. The Court concludes that he does. As he describes it, that Mr. al-Tamir "fears returning to Iraq (where he would be able to see his family) more than he fears staying at Guantanamo (where he has not been well cared for and may ultimately die), speaks forcefully to the need for a preliminary injunction." *Id.* at 11.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

### C. Likelihood of Success on the Merits[9]

This analysis focuses on the claims Mr. al-Tamir raises in his Third Petition because they are the focus of his motions for preliminary injunction. In his Third Petition, Mr. al-Tamir raises four claims: (1) the transfer would violate the Convention Against Torture, the Due Process Clause, and the Geneva Conventions; (2) the government breached his Plea Agreement; (3) transferring Mr. al-Tamir to Iraq is an unlawful treaty transfer and violates his right to counsel; and (4) informing the Iraqi government that Mr. al-Tamir's sentence does not end until 2032 violates due process. Pet., ECF No. 1 in 25-cv-15 at 19–26. Mr. al-Tamir claims that he has '"a substantial likelihood of success on the merits."' Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 7–8.

The government disagrees and argues that Mr. al-Tamir has no chance of success on the merits on the first three claims. *See* Opp'n, ECF No. 15 in 25-cv-15 at 7–9. On the first and third issues, the government's arguments are based on its position that Mr. al-Tamir is afforded no more rights than a law of war

---

[9] In his Third Petition, Mr. al-Tamir seeks to permanently enjoin the government from transferring him to Iraq, but his Motion for Preliminary Injunction only seeks temporary relief while the Court considers his claims. Therefore, the Court does not need to apply a heightened standard here. *Cf. Doe*, 928 F.3d at 7 (citing *Winter*, 555 U.S. at 7) ("The same factors apply when a party seeks a permanent injunction, except the party must show 'actual success' on the merits rather than just a likelihood.")

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

"detainee" at Guantanamo. *See id.* On the second issue, the
government argues the plea agreement does not prevent Mr. al-
Tamir's transfer to Iraq, and therefore, the government has not
breached it. *See id.* at 9. The government also argues that a
preliminary injunction is not necessary to permit Mr. al-Tamir
to challenge a breach of the plea agreement after he is
transferred because he will continue to have access to relief.
*See id.* at 40 (citing *Khadr*, 67 F.4th at 413).

### 1. Due Process and Convention Against Torture

Mr. al-Tamir argues that his transfer would violate the
Convention Against Torture, the Due Process Clause, and the
Geneva Conventions. Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15
at 8–9. He points to reports of torture in Iraqi prisons to
support his argument that he qualifies for such protections, or
at least judicial review of the procedure the government went
through to determine his level of risk. *See* Pet., ECF No. 1 in
25-cv-15 at 19-20; Reply, ECF No. 17 in 25-cv-15 at 6-14.

The government's primary opposition to Mr. al-Tamir is that
the government's decision to transfer him is unreviewable.
Opp'n, ECF No. 15 in 25-cv-15 at 7 ("These decisions are
controlling here and compel the conclusion that Petitioner is
not entitled to an injunction preventing the United States from
transferring him to Iraq based on his allegations of potential
mistreatment."); *see also id.* at 29-34.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Generally, the government must have authority in a statute or treaty to extradite someone from U.S. custody to another country's custody. *See Doe*, 928 F.3d at 10 (discussing *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 8-9 (1936)). In some circumstances, the Supreme Court and D.C. Circuit have held that the government has greater discretion to transfer military detainees from U.S. custody to the custody of another country that has an interest in prosecuting the individual for offenses committed there. *See Munaf v. Geren*, 553 U.S. 674 (2008). The government argues that these latter cases render Mr. al-Tamir unable to succeed on the merits of his argument that his transfer violates due process and the Convention Against Torture. *See Opp'n*, ECF No. 15 in 25-cv-15 at 7, 29. Mr. al-Tamir argues these cases are distinguishable, and even if not, do not foreclose his procedural argument. *See* Reply, ECF No. 17 in 25-cv-15 at 6-15. The Court agrees that the authority cited does not dictate the outcome for Mr. al-Tamir's claims.

### a. Judicial Review of Transfers

In *Munaf v. Geren*, the Supreme Court considered two consolidated appeals related to two "American citizens who voluntarily traveled to Iraq and allegedly committed crimes there." 553 U.S. 674 at 679. The two questions before the Court were: (1) whether U.S. courts have jurisdiction over habeas petitions filed on behalf of these American citizens challenging

UNCLASSIFIED//FOR PUBLIC RELEASE

their detention by the Multinational Force-Iraq ("MNF-I") and (2) if so, whether district courts could enjoin the MNF-I from transferring the individuals to Iraqi custody. *Id.* On the first question, the Supreme Court held that federal courts had jurisdiction under 28 U.S.C. § 2241 because the two individuals were in "custody by the United States, even if that custody could be viewed as 'under . . . color of' another authority, such as MNF-I." *Id.* at 686 (referencing 28 U.S.C. § 2241). On the second question, the Court held that "the detainees' claims do not state grounds upon which habeas relief may be granted, that the habeas petitions should have been promptly dismissed, and that no injunction should have been entered." *Id.* at 692. The Court reached these conclusions because it held that both the petitioners' 'transfer' and 'release' claims would "interfere with Iraq's sovereign right to 'punish offenses against its laws committed within its borders.'" *Id.* (quoting *Wilson v. Girard*, 354 U.S. 524, 529 (1957)).

The following year, the D.C. Circuit considered *Munaf* in the context of Guantanamo detainees. *Kiyemba v. Obama*, 561 F.3d 509, 511 (D.C. Cir. 2009). The district court had granted requests for interim relief brought by nine Uighurs who asked the court to order that the government provide 30 days' notice prior to transferring them. *Id.* Before reaching the question of whether this relief was available, the D.C. Circuit rejected the

government's argument that it lacked jurisdiction to consider these claims because they are "ancillary" as opposed to "core" habeas issues. *Id.* at 512. The court held that "a potential transfer out of the jurisdiction of the court is a proper subject of statutory habeas relief." *Id.* It then held, however, that the petitioners failed on the merits and reversed the preliminary injunction. *Id.* at 513. The D.C. Circuit said that its "analysis of [petitioners'] claims is controlled by . . . *Munaf*" and that "[u]nder *Munaf* . . . the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." *Id.* at 514. The D.C. Circuit qualified this ruling, however: "[a]s in *Munaf*, we need not address what rights a detainee might possess in the "more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway." *Id.* n.5 (citation omitted). The D.C. Circuit also rejected the petitioners' attempt to distinguish their case from *Munaf* by arguing their transfers violated the Convention Against Torture. *Id.* at 514–15. Finally, the D.C. Circuit held that the detainees could not enjoin their transfer based on an expectation that the receiving country might prosecute or detain them because it "would be effected by the foreign government pursuant to its own laws and not on behalf of the United States." *Id.* at 515 (quotations omitted).

UNCLASSIFIED//FOR PUBLIC RELEASE

Although *Kiyemba* generally supports the government's arguments, there are some key distinctions between the detainees in that case and Mr. al-Tamir's situation. First, the individuals in *Kiyemba* were not being transferred to serve a prison sentence that had been imposed on them by an MCA proceeding. Second, even though Mr. al-Tamir's transfer means he would serve his sentence under Iraqi law, he would still arguably be imprisoned on behalf of the United States. Third, the D.C. Circuit later distinguished *Kiyemba*, which involved detainees who had "no cognizable interest against being moved from Guantanamo to a foreign country," from a case in which "the transfer centrally implicate[d] [the petitioner's] interest in not being forcibly moved" to another country, akin to extradition. *Doe*, 928 F.3d at 18. Even though Mr. al-Tamir is clearly not a U.S. citizen, he may still have an interest in where he serves his U.S. prison sentence.

The D.C. Circuit later considered the case of Mr. Omar, who was one of the petitioners in *Munaf*, again in *Omar v. McHugh*, 646 F.3d 13 (D.C. Cir. 2011). In this case, Mr. Omar argued that the Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act") "[gave] him a right to judicial review of conditions in the receiving country before he may be transferred." *Id.* at 15. He also argued that "he [was] entitled under the Constitution's habeas corpus guarantee—either by itself or in conjunction with

UNCLASSIFIED//FOR PUBLIC RELEASE

the Due Process Clause or the FARR Act—to judicial review of conditions in the receiving country." *Id.* The D.C. Circuit rejected both arguments based on *Munaf* and *Kiyemba*. *Id.*

Years later, the D.C. Circuit again considered whether an individual who was detained by the military could be transferred to another country without review of their status or claims. *See Doe*, 928 F.3d at 3-5. Mr. Doe, a U.S. citizen, was detained in Iraq under suspicion of belonging to the Islamic State in Iraq and the Levant ("ISIL"). The government planned to transfer him to Iraqi authorities. Mr. Doe objected to the government's "forcible transfer" and sought to enjoin the transfer to a certain country and to require the government to provide notice before a transfer. *See id.* The district court entered injunctions, and the D.C. Circuit upheld them, affirming that all the injunction factors were met. *See id.*[10]

In *Doe*, the D.C. Circuit rejected the government's argument for a broad reading of *Munaf* that would give the government authority to "pick up" any U.S. citizen who voluntarily leaves the United States and "deliver" them to any foreign country that has a "legitimate sovereign interest." *Id.* at 11 (internal quotations omitted). It considered *Munaf* in light of another

---

[10] The D.C. Circuit held that Mr. Doe "succeeded" on the merits for one of his claims, as required for a permanent injunction. *Doe*, 928 F.3d at 8.

UNCLASSIFIED//FOR PUBLIC RELEASE

Supreme Court opinion, *Valentine*, which held that the government generally needed a treaty or statute to extradite a U.S. citizen to another country. *See id.* at 10-14. It understood the Supreme Court to distinguish cases in which the government extradites an individual from the United States, *see Valentine v. United States*, 299 U.S. 5 (1936), from those in which the government transfers someone who '"commit[s] crimes within a sovereign's territory to that sovereign's government for prosecution."' *Id.* at 10 (quoting *Munaf*, 553 U.S. at 699-700). As such, it held that *Munaf* stands for the proposition that the government may transfer an individual who is already in the sovereign's territory to the authority of that sovereign. *See id.* at 11-12. Therefore, *Munaf*, *Kiyemba*, and *Omar* do not necessarily mean that someone in Mr. al-Tamir's position is not entitled to have a court review their challenge to a government transfer decision.

### b. Mr. al-Tamir's Claims

First, the Court concludes that Mr. al-Tamir is unlikely to prevail on a claim under the Convention Against Torture because the D.C. Circuit has held that a challenge to a final removal order in the immigration context is the only way such a claim can be raised. *See Kiyemba*, 561 F.3d at 514-15 (*citing* 28 U.S.C. § 1252(a)(4)) ('"notwithstanding any other provision of law ... including section 2241 of Title 28, or any other habeas corpus provision, ... a petition for review [of an order of removal]

UNCLASSIFIED//FOR PUBLIC RELEASE

shall be the sole and exclusive means for judicial review of any cause or claim' arising under the Convention.") (alterations in original)); *see also* Opp'n, ECF No. 15 in 25-cv-15 at 34 n.12.

That said, for the reasons discussed below, the Court concludes that Mr. al-Tamir has a substantial likelihood of success on certain of his other arguments. First, the question of whether the government lacks authority to transfer him without his consent is discussed below. *Infra* Part III.C.3.

Second, the Court agrees with Mr. al-Tamir that the reasons courts did not permit judicial review of a transfer decision in *Munaf*, *Kiyemba*, and *Omar* do not apply in his case. As Mr. al-Tamir points out, *Kiyemba* and *Omar* are based on *Munaf*, which was concerned about 'interfere[nce] with [the country's] sovereign right to punish offenses against its laws committed within its borders." *Munaf*, 553 U.S. at 692 (quotation omitted). As Mr. al-Tamir points out, he "is being sent to Iraq not because Iraq is seeking him for prosecution but because the United States wants to have him serve a United States sentence there." Reply, ECF No. 17 in 25-cv-15 at 7.[11] The government now highlights how Mr. al-Tamir could face prosecution in Iraq for offenses, but the

_____

[11] Both parties discuss how Mr. al-Tamir could face prosecution in Iraq for another alleged criminal offense, but the government has not asserted that this is why it plans to transfer Mr. al-Tamir to Iraq. Instead, it has considered this as a risk that could impact him as he serves his sentence there for a United States offense.

UNCLASSIFIED//FOR PUBLIC RELEASE

essence of Mr. al-Tamir's claim is that the government is
transferring him to serve his U.S.-prison sentence in Iraq. *See*
Sur-Reply, ECF No. 19 in 25-cv-15 at 7. Moreover, Ms. Hensler,
Mr. al-Tamir's former counsel, represented that when the
government informed her of Mr. al-Tamir's transfer decision and
she raised the concern that he could face additional
prosecution, the government "dismissed the concern, saying that
the Iraqis 'didn't seem interested' in pursuing that case . . .
." Pet., ECF No. 1 in 25-cv-15 ¶ 87 (citing Hensler Decl., ECF
No. 1-3 at 10). Therefore, it does not appear that this is a
situation where the government's predominant interest in a
transfer is to ensure that someone accused of committing
offenses in another country is subject to the jurisdiction of
that country.

Third, Mr. al-Tamir has shown a substantial likelihood of
success on some, but not all, of his procedural claims. Mr. al-
Tamir claims that the government was required to perform a
Convention Against Torture analysis before deciding to transfer
him, but he cites no authority for this. *See* Reply, ECF No. 17
in 25-cv-15 at 12. The government cites to the 2016 National
Defense Authorization Act ("2016 NDAA") as the basis of its
notification requirements, which do not include a Convention
Against Torture analysis. *See* Sur-Reply, ECF No. 19 in 25-cv-15
at 8.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

The government provides a declaration from the Ambassador at Large and Coordinator for Counterterrorism at the State Department that describes the process the government went through to make its transfer decision. *See* Richard Decl., Ex. 1, ECF No. 15-1 in 25-cv-15. But the government's assertion that it does not need to provide documentation pertaining to any of these processes because "such information has never been finally required by any court in the detainee context" again depends on a presumption that Mr. al-Tamir has no greater procedural rights than a person who is detained until the end of hostilities. *Id.* at 10. Moreover, the government's own arguments rely on it having conducted an analysis to determine that Mr. al-Tamir's transfer complied with its "longstanding humane treatment policy," which means it made findings that it was **not** more likely than not that he would be tortured. *See* Opp'n, ECF No. 15 in 25-cv-15 at 30. Mr. al-Tamir has made a viable argument that he is at least entitled to discovery of the analysis justifying the government's determination.

For these reasons, the Court concludes that Mr. al-Tamir has not shown a substantial likelihood of success on the merits of a Convention Against Torture claim, substantively or procedurally, but that he has met this standard for his due process claims related to the government's transfer decision.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

### 2. Breach of Plea Agreement

Mr. al-Tamir's second claim is that the government's decision to transfer him to Iraq is an unconstitutional breach of his plea agreement. Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 9; Pet., ECF No. 1 in 25-cv-15 at 20-22.[12] He asserts that the government promised in the plea agreement to pursue a transfer to a "third party sovereign nation" and take into account his medical needs when arranging this transfer. Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 9. In response to the government's argument that the Plea Agreement did not bar his transfer to Iraq, Mr. al Tamir argues that, applying principles of contract law but keeping in mind that the plea agreement is part of the criminal law process, the Court must "construe ambiguities against the drafter"; consider the terms in context; and read terms so that terms are not rendered superfluous.

---

[12] Mr. al-Tamir also contends that this plea agreement breach supports his arguments in his Second Petition (17-cv-1928) because it demonstrates that "[t]he military commission is constitutionally deficient because it does not have any mechanism for Mr. al-Tamir to challenge the breach in the tribunal." Mot. for Prelim. Inj., ECF No. 183 in 17-cv-1928 at 9. He asserts that "[u]nlike a federal court that maintains authority to oversee the execution of the sentence imposed and entertain a motion to remedy prosecutorial breach, the military commission has no way for a defendant like Mr. al-Tamir to seek relief." *Id.* Because this is not the focus of his motion for preliminary injunction, the Court will not presently evaluate the impact of an alleged breach on his claims in his Second Petition.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Reply, ECF No. 17 in 25-cv-15 at 16-18. Pursuant to these principles, Mr. al-Tamir argues that the Court must read "third-party sovereign nation" to exclude Iraq. *Id.*

Mr. al-Tamir also claims that he relied on the government's promises "when he entered his guilty plea in 2022, when he debriefed with federal agents in May 2024, and when he went forward with sentencing rather than withdrawing his plea in June 2024." Pet., ECF No. 1 in 25-cv-15 at 21. Consequently, he argues that the government "waived its right to assert a different interpretation of the agreement after he relied on it." Reply, ECF No. 17 in 25-cv-15 at 20 (citing no authority). According to Mr. al-Tamir, if his counsel was mistaken and the agreement did not exclude Iraq, he could have a claim for ineffective assistance of counsel. *See id.* at 22.

Mr. Tamir also questions the government's failure to identify a suitable third-party country in the two years between when he entered his plea and was sentenced evidence that it "has not exercised good faith in its efforts to uphold this promise." *Id.* Finally, Mr. al-Tamir claims that requiring him to serve his sentence in "unconstitutional conditions," those that could violate the Eighth Amendment, would violate his plea agreement because there is an implicit understanding that a sentence will be constitutional. Reply, ECF No. 17 in 25-cv-15 at 22-23.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

The government responds that Mr. al-Tamir cannot succeed on the merits because the government did not breach the Plea Agreement. *See* Opp'n, ECF No. 15 in 25-cv-15 at 36–43. It does not dispute the contract principles that Mr. al-Tamir cites, but argues that even if the provision "third party sovereign nation" were meant to exclude Iraq, the government has not breached its agreement by deciding to transfer him to Iraq anyway. *See* Reply, ECF No. 19 in 25-cv-15 at 11–12. Even if Mr. al-Tamir's breach of contract claim had merit, the government argues that it would not warrant an injunction because he would continue to have an avenue to challenge it after he is transferred. *See* Opp'n, ECF No. 15 in 25-cv-15 at 36–43. Before addressing the other issues, the Court rejects the government's last argument that *Khadr* shows Mr. al-Tamir would be able to challenge his plea agreement after he is transferred for the same reasons discussed *supra* Part III.B.

### 1. "Third Party Sovereign Nation"

The main question for Mr. al-Tamir's breach argument is whether "third party sovereign nation" should be interpreted to exclude Iraq. Mr. al-Tamir's argument is not, as the government implies, that a failure to transfer Mr. al-Tamir anywhere (besides Iraq) violates the plea agreement; Mr. al-Tamir admits that it is not. *See* Reply, ECF No. 17 in 25-cv-19 at 19 ("He is not demanding that the U.S. resettle him—he asks only that the

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

government not send him to Iraq. If the government cannot send him to a third country, he will finish his sentence at Guantanamo."). Therefore, there is no dispute between the parties that a failure to resettle Mr. al-Tamir to another country that is not Iraq does not violate the Plea Agreement.

The question remains whether the agreement allowed for transfer to Iraq. The government asserts that "[b]y its terms, this provision [regarding transfer attempts] does not guarantee [Mr. al-Tamir] would never be repatriated to Iraq, promise that [Mr. al-Tamir] would be transferred, or not, to any particular country . . . ." Opp'n, ECF No. 15 in 25-cv-15 at 38. It claims that discussions between Mr. al-Tamir's counsel and the government are irrelevant because the Plea Agreement made clear that it was the entire agreement between the parties. *See id.* at 38-39.

The government has not disputed Mr. al-Tamir's interpretation, but asserts that it does not matter to the Court's analysis. *See* Sur-Reply, ECF No. 19 in 25-cv-15 at 11. The Court agrees with Mr. al-Tamir, and without opposition from the government, that because he is not a "sovereign nation," the terms "third party sovereign nation" implies that there is another nation, besides the United States, that is also precluded from this provision. *See* Reply, ECF No. 17 in 25-cv-15 at 18.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

The Court disagrees with the government that even with Mr. al-Tamir's interpretation, its decision to transfer him to Iraq does not violate the Plea Agreement. The government does not say so expressly, but it appears that the government's argument that the agreement is silent, so the government has the authority to transfer Mr. al-Tamir wherever it likes. One issue with this interpretation is that it would render the provision of the plea agreement superfluous, because what would be the point of Mr. al-Tamir pleading guilty to charges partly in exchange for the government's pursuit of efforts to transfer him to a third party sovereign nation, taking into account his healthcare needs, if the government could decide not to abide by this provision. *See* Reply, ECF No. 17 in 25-cv-15 at 17. The language in the Plea Agreement about the government's failure to secure such a transfer not being a breach does not mean that the government retained an ability to transfer him outside of this provision, but that Mr. al-Tamir would simply not be transferred. *Id.* at 19. The significance of this issue relates to the government's general transfer authority because the government's position that it can transfer Mr. al-Tamir to Iraq notwithstanding the lack of authority for the transfer in the Plea Agreement relies on an assumption that it has the power to transfer persons in his position without consent or authority from a statute or treaty. For all these reasons, the Court concludes that Mr. al-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Tamir has a substantial likelihood on succeeding on his argument that the government's transfer decision breached his plea agreement.

## 2. Additional Claims

Mr. al-Tamir raises several other claims to which the government only partly responds. First, the Court disagrees with Mr. al-Tamir's assertion that the government breached the covenant of good faith. *See* Reply, ECF No. 17 in 25-cv-15 at 21. Mr. al-Tamir points to delays, lack of communication, and lack of details. *See id.* But his own evidence undermines his argument. Ms. Hensler described communications where the government expressed its attempts to find a suitable transfer country that is similar to descriptions in Ambassador Richard's declaration. *See* Hensler Decl., Ex. 3, ECF No. 1-3 in 25-cv-15; Richard Decl., Ex. 1, ECF No. 15-1 in 25-cv-15. The Court agrees with the government that this record does not show evidence of bad faith. *See* Sur-Reply, ECF No. 19 in 25-cv-15 at 12.

Mr. al-Tamir's Sixth Amendment claim is more sound because the record demonstrates that even if the plea agreement does not prohibit transfers to Iraq, Mr. al-Tamir understood it to do so. Pet., ECF No. 1 in 25-cv-15 ¶¶ 68-71 (describing how he decided not to withdraw his plea prior to sentencing based on assurances that his counsel obtained from the government and conveyed to Mr. al-Tamir); Reply, ECF No. 17 in 25-cv-15 at 22. The

UNCLASSIFIED//FOR PUBLIC RELEASE

government fails to respond to this claim, which could be deemed
a concession. But Mr. al-Tamir only describes this claim in a
passing reference and cites to no authority for when the
allegations he raises would be a Sixth Amendment violation. *See
id.* Therefore, the Court cannot conclude that he has a
substantial likelihood of success on the merits at this
juncture. Similarly, Mr. al-Tamir claims that forcing him to
serve his sentence in conditions that could violate the Eighth
Amendment may be a breach of his plea agreement, and the
government again fails to refute this argument. But again, Mr.
al-Tamir cites no authority and the Court does not on this
record conclude that he has a substantial likelihood of success
on the merits. *See id.* at 22–23.

### 3. Unlawful Treaty Transfer

Mr. al-Tamir's third claim is that his transfer violates
federal law that "governs the transfer of offenders serving a
prison sentence between the United States and other countries."
Pet., ECF No. 1 in 25-cv-15 (citing 18 U.S.C. § 4100, et seq.);
*see also* Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 9
(arguing Mr. al-Tamir's transfer violates 18 U.S.C. § 4107).
Under 18 U.S.C. § 4100, "[t]he government has authority to
transfer prisoners 'only when a treaty providing for such a
transfer is in force.'" Pet., ECF No. 1 in 25-cv-15 at 22
(quoting 18 U.S.C. § 4100(a)).

UNCLASSIFIED//FOR PUBLIC RELEASE

The government concedes that there is no treaty to govern the transfer of "prisoners" with Iraq. *See* Opp'n, ECF No. 15 in 25-cv-15 at 42-43. It argues, however, that the government does not need to have a treaty in order to transfer Mr. al-Tamir. *Id.* at 43. Specifically, the government argues that 18 U.S.C. § 1400 is inapplicable because "the D.C. Circuit has concluded that Respondents' authority to transfer a military detainee—even one convicted of war crimes like [Mr. al-Tamir]—is not dependent on the existence of any such treaty." *Id.* at 9 (citing no authority). But, as Mr. al-Tamir notes, *see* Reply, ECF No. 17 in 25-cv-15 at 23, the government does not point to where the D.C. Circuit recognized authority to transfer "a person convicted of war crimes and currently serving his sentence . . . ." *Id.* Even after Mr. al-Tamir pointed out this issue in his Reply, the government failed to address it in its Sur-Reply; therefore the Court does not find it persuasive.

The government relies on the same cases, *Munaf*, *Kiyemba*, and *Omar*, for the government's authority "to transfer a wartime detainee to Iraq." *Id.* at 43. But, as Mr. al-Tamir points out, this transfer authority rests at least in part on there being no legal distinction between the various ways that there can be "disposition under the law of war" even after someone has gone through MCA proceedings and is serving a U.S.-imposed prison sentence. The Court again notes that neither party cites

UNCLASSIFIED//FOR PUBLIC RELEASE

authority for their interpretation of Mr. al-Tamir's status, but based on the Court's review of the relevant law and legal arguments, it appears that Mr. al-Tamir has a sufficient likelihood of succeeding in arguing that his status is somehow distinguishable. Reply, ECF No. 17 in 25-cv-15 at 23 (citing *Doe v. Mattis*, 889 F.3d 745, 745 (D.C. Cir. 2018)).

### 4. Sentence Calculation[13]

Mr. al-Tamir's final argument is that his transfer, with the government's ███████████████████████████████████████

███████████████████████████████████████████

████████████   ███████████████████   Pet., ECF No. 1 in 25-cv-15 at 24. Mr. al-Tamir cites authority for people convicted of federal offenses being entitled to seek credit for time served in detention. *Id.* at 25 (quoting *United States v. Wilson*, 503 U.S. 329, 330 (1992) ('"A defendant convicted of a federal crime [having] a right under 18 U.S.C. § 3585(b) to receive credit for certain time spent in official detention before his sentence begins."'). He asserts that he is entitled to credit for the time since he was taken into U.S. custody in 2006. *Id.*

Mr. al-Tamir acknowledges that the government may claim he waived his right to seek credit for this time as part of his

---

[13] Mr. al-Tamir discusses this claim only in his motion for preliminary injunction in 25-cv-15, not in 17-cv-1928. *Compare* Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 9 *with* Mot. for Prelim. Inj., ECF No. 183 in 17-cv-1928 at 9.

UNCLASSIFIED//FOR PUBLIC RELEASE

plea agreement. *Id.* at 26. But he asserts that "this waiver does
not eliminate the government's independent responsibility to
*correctly* calculate his release date under federal law as
required by *Wilson*, and it certainly does not authorize the
government to unlawfully prolong his sentence." *Id.* (quoting
*United States v. Guillen*, 561 F.3d 527, 531 (D.C. Cir. 2009)
("holding that a waiver does not prevent a defendant's claim
that his sentence 'is unlawful because it exceeds the statutory
maximum.'"). Therefore, Mr. al-Tamir claims that he has "fully
served his sentence" and if he is transferred to Iraq, the
government "should be required to inform the government of Iraq
that he has fully discharged his federal sentence, and he should
not be transferred in custody to Iraq." *Id.*

The government responds to this argument in a footnote. *See*
Opp'n, ECF No. 15 in 25-cv-15 at 41 n.16. It claims that "[i]n
his [P]lea [A]greement, however, Petitioner specifically agreed
that the sentence . . . began to run on June 10, 2022." *Id.*
(citations omitted). But it does not address any of Mr. al-
Tamir's arguments for why that provision of his plea agreement
should not be enforced, including *Wilson*, *Guillen*, and Mr. al-
Tamir's arguments that the government has an independent
obligation to correctly calculate his sentence. *Id.* As
previously noted, this Circuit sees the failure to respond to an
argument as a concession. *See Hopkins*, 284 F. Supp. 2d at 25

UNCLASSIFIED//FOR PUBLIC RELEASE

(D.D.C. 2003); *but see* Reply, ECF No. 17 in 25-cv-15 (failing to raise the government's lack of argument). It is therefore significant that the government did not adequately counter Mr. al-Tamir's arguments here. The Court concludes, however, there is not enough information in the record to determine how likely it is Mr. al-Tamir would succeed on the merits. Therefore, the Court does not base its conclusion that Mr. al-Tamir showed a substantial likelihood of success on the merits on this claim.

### D. Balance of Equities and Public Interest

Lastly, the Court considers whether the balance of equities weigh in Mr. al-Tamir's favor.

The Court has already explained the harm that would likely befall Mr. al-Tamir if transferred. *Supra* Part III.B. The government claims that Mr. al-Tamir has not shown a likelihood of irreparable harm, but the Court rejected this argument. *Supra* Part III.B; Opp'n, ECF No. 15 in 25-cv-15 at 46 (asserting that, Mr. al-Tamir has "failed to demonstrate that the balance of equities tips in his favor.").

Mr. al-Tamir argues that a preliminary injunction will cause no harm to the government. Mot. for Prelim. Inj., ECF No. 2 in 25-cv-13 at 9. He contends that there is no reason to believe the ███████████████████████████████████ and that the government will still be able to transfer him if he is unsuccessful in this litigation. *Id.* Mr. al-Tamir claims that

UNCLASSIFIED//FOR PUBLIC RELEASE

"[o]n the flip side, the government has an interest in ensuring the transfer complies with the Constitution and international treaties." He asserts that the government's rush to carry out the transfer so quickly "will undermine the government's interest in preserving the rule of law; a delay to protect the status quo . . . causes it no injury at all." *Id.*

Mr. al-Tamir argues that a preliminary injunction will further the public interest given the "widespread domestic and international criticism of the government's actions at Guantanamo Bay for the last two decades." *Id.* He highlights how people detained at Guantanamo have sought to be released for decades, but claims that "the public interest is not served by a government transfer from Guantanamo to some place that is probably even worse." *Id.; see also Huisha-Huisha v. Mayorkas,* 27 F.4th 718, 734 (D.C. Cir. 2022) (quoting *Nken*, 566 U.S. at 436) ("Plus, the Supreme Court has said that the public has a strong interest in 'preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'"). Instead, according to Mr. al-Tamir, the "public is best served by transparency, something that the government's haste obscures." *Id.* Moreover, Mr. al-Tamir contends that the public has a "strong interest in understanding why [he] would take the position" that he would rather remain at Guantanamo than be transferred to an Iraqi prison and "ensuring

UNCLASSIFIED//FOR PUBLIC RELEASE

that his fear is not lightly ignored." *Id.* Therefore, according to Mr. al-Tamir, a preliminary injunction is necessary so that the government proceeds "more deliberately and openly." *Id.*

In response, the government focuses on "adverse consequences to the public interest" including "interfere[nce] with the United States' ability to take steps consistent with its view of the Nation's national security interest, including to responsibly reduce the detainee population at Guantanamo, as well as to ███████████████████████████████

████████████    ██████████████████████████

███████████████████████████████████████████

Opp'n, ECF No. 15 in 25-cv-15 at 44. It further asserts that delaying Mr. al-Tamir's transfer would "interfere with the Executive's ability ██████████████████████

███████████████████████████████████████

*Id.* at 44-45 (alteration & quotations omitted). It claims that "an injunction would disrupt those arrangements and the United States' ability to uphold the arrangement would be contingent upon the outcome of uncertain future litigation to vacate the transfer injunction." *Id.*

In his Reply, Mr. al-Tamir criticizes the government's arguments as unsupported and far too vague. *See* Reply, ECF No. 17 in 25-cv-15 at 26. He points out that the government has "held [Mr. al-Tamir] at Guantanamo for almost 20 years" and

asserts that the Court should be skeptical of any claim that all
of a sudden there is a significant need to *immediately* remove
one prisoner from Guantanamo." *Id.* at 26. Further to this point,
he highlights how the government does not assert that it will
close Guantanamo "any time soon." *Id.* at 26–27. Regarding the
United States' diplomatic interests, Mr. al-Tamir contends that
the government has no support for its claim that ███████████

███████████████████████████████████████████████████

███████████████████████ *Id.* at 27. He claims that
the government does not ████████████████████████

██████████████████████████████████████ The

government does not respond to these arguments in its Sur-Reply.
*See* Sur-Reply, ECF No. 19 in 25-cv-15.

The Court credits the government's assertion that the
public, and the government, has an interest in responsibly
reducing the population at Guantanamo, maintaining diplomatic
relations with Iraq, and the Executive's ability to engage in
sensitive diplomatic negotiations in general. But the government
has not adequately explained why the temporary delay of Mr. al-
Tamir's transfer while his claims are considered would seriously
undermine these interests. It has not shown that there is a
reason it needs to transfer Mr. al-Tamir now or risk such
significant harm. *See also Doe*, 288 F. Supp. 3d 195, 200 (D.D.C.
2018) ("Absent a showing that the government—for international

UNCLASSIFIED//FOR PUBLIC RELEASE

relations reasons or otherwise—needs to transfer Petitioner *now*, the court does not find that the government's interests outweigh the Petitioner's right to challenge his detention without fear of his transfer to another country.").

In addition to the public interests that Mr. al-Tamir has articulated in his favor—including transparency and understanding why he would rather stay at Guantanamo than be sent to Iraq—Mr. al-Tamir prevails on the balance of equities. *See* Mot. for Prelim. Inj., ECF No. 2 in 25-cv-15 at 9. Here, the irreparable harm that Mr. al-Tamir faces outweighs the government's general interest in positive diplomatic relations with Iraq and the public interest in reducing Guantanamo when there is no indication that it would close in short order if Mr. al-Tamir is transferred immediately instead of in a few months, if Mr. al-Tamir is ultimately unsuccessful on his claims.

On this record, Mr. al-Tamir has shown a risk of irreparable harm if the Court does not grant his temporary relief; a sufficient likelihood of success on the merits of some of his claims; and that the public interest and balance of equities weigh in his favor.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Mr. al-Tamir's motion for preliminary injunction. Respondents and their officers, agents, servants, employees, attorneys, and all other

UNCLASSIFIED//FOR PUBLIC RELEASE

persons in active concern or participation with them are **HEREBY**

**ENJOINED** from transferring Mr. al-Tamir to Iraq without his

consent until the pending claims are resolved. An appropriate

Order accompanies this Memorandum Opinion.

The parties shall post a public version of this Memorandum

Opinion on the docket for this case **FORTHWITH** and by no later

than within 7 days of the date of the Order accompanying this

Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**            United States District Judge**
**            January 11, 2025**