UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NASHWAN AL-RAMER ABDULRAZZAQ (ISN 10026),<br><br>     Petitioner,<br><br>     v.<br><br>JOSEPH R. BIDEN, JR, *et al.*,<br><br>     Respondents. | No. 17-cv-1928 (EGS)<br>~~FILED UNDER SEAL~~ |
| NASHWAN AL-TAMIR (ISN 10026),<br><br>     Petitioner,<br><br>     v.<br><br>JOSEPH R. BIDEN, JR, *et al.*,<br><br>     Respondents. | No. 25-cv-0015 (EGS)<br>~~FILED UNDER SEAL~~ |

## RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

## TABLE OF CONTENTS

**Table of Authorities**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

**Index of Exhibits**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Background**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. Petitioner Has Pled Guilty to Violating the Laws of War. . . . . . . . . . . . . . . . . 5

      A. Admissions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B. Transfer Provision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C. Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. Petitioner's Medical Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III. The Efforts to Transfer Petitioner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A. The Transfer Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., .12

      B. Petitioner's Impending Transfer to Iraq. . . . . . . . . . . . . . . . . . . . . . . . . . 15

      C. How Petitioner Will Be Treated in Iraq Has Been
         Specifically Assessed and Addressed by the Executive Branch. .. . . . . 16

IV. Petitioner's Current Petitions for a Writ of Habeas Corpus. . . . . . . . . . . . . ..18

**Argument**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I. Petitioner Can Show No Likelihood of Success
  on the Merits to Enjoin His Transfer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      A. Petitioner's Due Process and CAT Claims
         Respecting Transfer Fail Because
         Binding Supreme Court and Circuit Precedent
         Precludes Courts From Enjoining
         the Transfer of Guantanamo Bay Detainees
         Based on Allegations of Potential Mistreatment. . . . . .. . . . . . . . . . .23

         1. Fear of torture. . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . .. . . . . . 23

         2. Fear of prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

         3. Medical treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . ..29

      B. Petitioner's Claims Regarding Breach of the Pretrial Agreement and
         Related Insufficiency of Military-Commission Process
         Do Not Support Issuance of an Injunction. . . . . . .. . .. . . . . . . . . . . . . . 30

i

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

     C.  Petitioner Has No Likelihood of Success on His Claim
        That His Transfer Violates The International Prisoner
        Transfer Program Reflected in 18 U.S.C. § 4107. . . . . . .. . . . . . . . . . 36
II.  The Balance of Harms and Public Interest
    Weigh Against A Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

       1.  Public Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

       2.  Irreparable harm and balance of equities. . . . . . . . . . . . . . . . . . .  39

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

ii

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

## TABLE OF AUTHORITIES

**CASES CITED AS PRECEDENT**

Aamer v. Obama, 742 F.3d 1023 (D.C. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . 21

Achagzai v. Broad. Bd. of Governors, 170 F. Supp. 3d 164 (D.D.C. 2016) . . . . . . 39

Adams v. Vance, 570 F.2d 950 (D.C. Cir. 1978) . . . . . . . . .> . . . . . . . . . . . . . . . . .22

Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.,
840 F. Supp. 2d 327 (D.D.C. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Al Hela v. Trump, 972 F.3d 120 (D.C. Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . 6.n3

Belbacha v. Bush, 520 F.3d 452 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . .22

Chaplaincy of Full Gospel Churches v. England,
454 F.3d 290 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Crosby v. Nat'l Foreign Trade Counsel, 530 U.S. 363 (2000) . . . . . . . . . . . . . . . 39

Doe v. Mattis, 889 F.3d 745 (D.C. Cir. 2018) . . . . . . . . . . . . . . . . . . . . .. . . . . . . 37

Greater New Orleans Fair Hous. Action Ctr. v. HUD,
639 F.3d 1078 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..21, 37

Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.,
933 F. Supp. 2d 58 (D.D.C. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n,
490 F. Supp. 3d 169 (D.D.C. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

Khadr v. United States, 67 F.4th 413 (D.C. Cir. 2023) . . . . . . . . . . . . . . . . . . . . . 34

Kiyemba v. Obama, 561 F.3d 509 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Munaf v. Geren, 553 U.S. 674 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Nken v. Holder, 556 U.S. 418 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37, 38

Omar v. McHugh, 646 F.3d 13 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Sherley v. Sebelius, 644 F.3d 388 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 21 n.9

United States v. Ramsdell, No. ACM 39533, 2019 CCA LEXIS 145
(A.F. Ct. Crim. App. Apr. 2, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34 n.15

United States v. Smead, 68 M.J. 44, 59 (C.A.A.F. 2009). . . . . . . . . . . . . . . . . . . . . 34 n.15

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . .20, 21

Wisconsin Gas Co. v. FERC, 758 F.2d 669 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . 21, 39

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**OTHER CASES CITED**

United States v. Abd al Hadi al-Iraqi, (Mil. Comm'n June 7, 2013)
 (available at https://www.mc.mil) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**STATUTES**

Authorization for Use of Military Force,
Pub. L. 107-40, 115 Stat. 224 (2001) . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . .5 n.3

Foreign Affairs Reform & Restructuring Act of 1998,
Pub. L. No. 105–277, § 2242, 112 Stat. 2681–761, 822 (1998) . . . . . . . . . . . . . . . . . 12, 23

International Prisoner Transfer Program, 18 U.S.C § 4100, et seq.
Pub. L. No. 95-144, 91 Stat. 1212 (Oct. 28, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 35, 36

Military Commissions Act of 2009, 10 U.S.C. § 950. . . . . . . . . . . . . . . . . . . . . . . . . .6, 35

Nat'l Defense Auth. Act for Fiscal Year 2012, §§ 1021(a) &(b)(2),
125 Stat. 1298, 1564 (2012) . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . 5 n.3

Nat'l Defense Auth. Act for Fiscal Year 2016 § 1034,
Pub. L. No. 114-92, 129 Stat. 726, 969-970 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16 n.7

**TREATIES**

The Convention Against Torture and Other Cruel, Inhuman
or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20,
465 U.N.T.S. 85. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

**OTHER AUTHORITIES**

Executive Order 13567, 76 Fed. Reg. 13,277 (Mar. 7, 2011) . . . . . . . . . . . . . . . . . . . . . . .12

International Prisoner Transfer Program - List of Participating Countries/Governments,
https://justice.gov/criminal/criminal-oia/list-participating-countriesgovernments. . . . . . . . .36

U.S. Senate Resolution of Advice and Consent to Ratification
of the Convention Against Torture and Other Cruel, Inhuman, or
Degrading Treatment or Punishment, 136 Cong. Rec. 36, 198 (Oct. 27, 1990). . . . . . . . . . .24

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**INDEX OF EXHIBITS**

(1)  Declaration of Ambassador Elizabeth Richard

(2) Petitioner's Stipulation of Facts

(3) Declaration of Senior Medical Officer

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

## INTRODUCTION

Respondents respectfully submit this Opposition to Petitioner's Motion for Preliminary Injunction seeking to enjoin Respondents from relinquishing custody of Petitioner and transferring him to the custody and control of the Government of Iraq, his home country. This matter is urgent. ██████████████████████████████████████

████████████ Therefore, Respondents respectfully request that the Court resolve Petitioner's motion promptly.

Petitioner's motion should be denied. Petitioner's arguments concerning potential mistreatment and prosecution in Iraq have been squarely rejected by both the Supreme Court and the Court of Appeals. In Munaf v. Geren, 553 U.S. 674 (2008), the Supreme Court unanimously vacated an injunction barring the United States military from transferring two American citizens detained in Iraq to the custody of the Iraqi government based on allegations that they would be subject to potential prosecution and torture. The Court of Appeals applied this decision to the Guantanamo Bay transfer context in Kiyemba v. Obama, 561 F.3d 509 (D.C. Cir. 2009), holding that lower courts are "preclude[d] from issuing a writ of habeas corpus to prevent a transfer" of Guantanamo Bay detainees based on fears that "they would be tortured in the recipient country." Id. at 513-14. The Court of Appeals subsequently reaffirmed in Omar v. McHugh, 646 F.3d 13, 21, 24 (D.C. Cir. 2011), that neither "habeas corpus" nor "due process" nor any "statutory right" provides "military transferees . . . a right to judicial review of their likely treatment in the receiving country." These decisions are controlling here and compel the conclusion that Petitioner is not entitled to an injunction preventing the United States from transferring him to Iraq based on his allegations of potential mistreatment.

1

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

Petitioner's alleged fears about his treatment in Iraq is "of course a matter of serious concern," but "that concern is to be addressed by the political branches, not the judiciary." Munaf, 553 U.S. at 700.

As was true in each of the cases cited above, the record here demonstrates that the policy of the United States is not to transfer a detainee like Petitioner to a country where he is likely to be tortured. See Ex. 1, Decl. of Amb. Elizabeth Richard ¶ 2.[1] The Department of State has extensively considered the individual circumstances of Petitioner's proposed transfer, including his medical condition, and concluded that Petitioner may be transferred safely to Iraq in accordance with the United States' humane-treatment policy. ████████████

████████████████████████

████████████████████████████

████████████████████ Id. ¶ 5.

Moreover, Ambassador Richard also declares that the ████████████████

████████████████████ ████ As the Court

of Appeals held in Kiyemba, "in light of the Government's policy, a detainee cannot prevail on the merits of a claim seeking to bar his transfer based upon the likelihood of his being tortured in

---

[1] Ambassador Richard is the Ambassador-at-Large and Coordinator for Counterterrorism at the Department of State, serving as the principal adviser to the Secretary of State on international counterterrorism matters and leading the Bureau of Counterterrorism. Ex. 1 ¶ 1. In this capacity, she also oversees the Office of the Special Representative for Guantanamo Affairs, which conducts and coordinates diplomatic engagement with foreign governments concerning the repatriation and resettlement of individuals who are detained at the U.S. detention facility at Guantanamo Bay. Id. She is a career Foreign Service Officer. Id. She has previously served as the United States Ambassador to the Lebanese Republic, as the Deputy Assistant Secretary for Near Eastern Affairs, and as the Deputy Chief of Mission in Sanaa, Yemen. Id. She has also served in Pakistan, Afghanistan, Italy, and Southeast Asia. Id.

2

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

the recipient country." Kiyemba, 561 F.3d at 514. Here, the assurances received from Iraq

dispose of both Petitioner's alleged irreparable harm and any likelihood of success on his Due

Process and Convention Against Torture claims.

Petitioner also cannot prevail on his remaining claims. Petitioner's pretrial agreement is

simply silent on a transfer to Iraq: nowhere does it prohibit Petitioner's repatriation or state that

transfer to a different country or incarceration at Guantanamo Bay were conditions of his plea

agreement. Thus, the pretrial agreement provides no basis for relief on the merits.

And lastly, 18 U.S.C § 4100, et seq. also provides no basis for relief. That statute has no

application here because it is limited to transfers pursuant to treaties negotiated as part of the

United States' International Prisoner Transfer Program. Petitioner correctly notes that there is no

treaty with Iraq under this program but fails to note that the D.C. Circuit has concluded that

Respondents' authority to transfer a military detainee—even one convicted of war crimes like

Petitioner—is not dependent on the existence of any such treaty. The International Prisoner

Transfer Program is simply inapposite.

The balance of equities and public interest also weigh decidedly in favor of denying an

injunction. The proposed transfer furthers important national security and foreign policy

interests, including responsibly reducing the detainee population at the Guantanamo Bay

detention facility. The Secretary of Defense has certified to Congress that Petitioner's transfer is

in the national security interests of the United States, including his determination that Iraq has

taken appropriate steps to substantially mitigate the risk that Petitioner could attempt to reengage

in terrorist activity or otherwise threaten the United States. That decision was informed by the

fact that Petitioner pled guilty in 2022 to various criminal offenses under the Military

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

Commissions Act of 2009, and Iraq has agreed to detain Petitioner under its own laws for the remaining seven and one-half years of his sentence.

The transfer also furthers international comity and respect for Iraq's sovereign right to enforce its laws. Iraq issued an arrest warrant for Petitioner in 2005 pursuant to its domestic laws for alleged terrorism offenses. The transfer would thus promote international cooperation between the United States and Iraq on matters of criminal justice and accord due respect for Iraq's sovereign right to prosecute Petitioner for crimes he allegedly committed on Iraqi soil. As the Supreme Court explained in Munaf, "[h]abeas corpus does not require the United States to shelter such fugitives from the criminal justice system of the sovereign with authority to prosecute them." Munaf, 553 U.S. at 705.

These compelling governmental and public interests outweigh Petitioner's asserted interest in stopping his transfer. Petitioner's medical situation is undoubtedly important, but ███

██████████████████████████████████████████████

████████████████ is not a basis for this Court to enjoin his transfer and force the United States to continue to detain him. Indeed, it would turn the writ of habeas corpus on its head if, instead of relinquishing custody of Petitioner, the Government were forced by a court order to detain him indefinitely so that the military could provide him with medical care. The Supreme Court and Court of Appeals have rejected such an outcome, concluding that the Executive Branch is best positioned to address matters about alleged treatment in foreign custody through diplomatic discussions, not litigation in domestic courts. The United States is attuned to the unique issues presented by Petitioner's transfer and has engaged ██████████████

████████████████████████████ to ensure that Petitioner's transfer is consistent with the Government's humane treatment policy and with respect to Petitioner's

4

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

medical care. Under these circumstances, as was the case in both Munaf and Kiyemba, there is

no basis for the Court to enjoin Petitioner's transfer.

For these reasons, as explained further below, the Court should deny Petitioner's motion.[2]

Given the time-sensitive nature of this matter, Respondents respectfully request that the Court

rule on this matter at its earliest opportunity.

## BACKGROUND

**I.    Petitioner Has Pled Guilty to Violating the Law of War**

Petitioner is detained at the United States Naval Station, Guantanamo Bay, Cuba, under

the authority of the Authorization for the Use of Military Force.[3]

---

[2] This Opposition is designated by Respondents as "protected information" under the protective order applicable in Civil Action 17-1928 (EGS), see Minute Order (Oct. 2, 2017), and is, accordingly, filed under seal in light of the aspects of sensitive diplomatic communications with foreign governments disclosed in this Opposition and the supporting declaration, which should not be publicly disclosed. As explained in the Declaration of Ambassador Richard, it is important that the United States government honor its commitment to keep such diplomatic discussions confidential, to avoid any harm to its ability to reach acceptable detainee transfer arrangements, including for Petitioner, with such countries or other countries with which diplomatic discussions may occur in the future. Ex. 1 at ¶ 2.

Respondents note that Petitioner has simultaneously filed this motion in his just-filed habeas action, see al-Tamir v. Biden, Civ. Act. No. 25-0015. Respondents moved today to, inter alia, enter the protective order, as amended, in No. 25-0015, which the Court has granted. ECF No. 14.

[3] The Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("AUMF") authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks [of September 11, 2001]" or who "harbored such organizations or persons." AUMF § 2(a). The Executive has interpreted the AUMF as authorizing the President to detain captured individuals who were part of or substantially supported al-Qaida, the Taliban, or associated forces. This standard, in turn, has been ratified by Congress, see Nat'l Defense Auth. Act for Fiscal Year 2012, Pub. L. No. 112-81 §§ 1021(a) & (b)(2), 125 Stat. 1298, 1564 (2012) ("2012 NDAA"); and has been accepted and applied by the Court of Appeals in these Guantanamo cases, see, e.g., Al Hela v. Trump, 972 F.3d 120, 129-30 (D.C. Cir. 2020), rehearing en banc

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

In 2013, Petitioner was charged with criminally violating the law of war and was subsequently referred for trial by a military commission under chapter 47A of title 10, United States Code (as amended by the Military Commissions Act of 2009 (title XVIII of Public Law 111–84)). See United States v. Abd al Hadi al-Iraqi, Charge Sheet, (Mil. Comm'n June 7, 2013) (available at https://www.mc.mil). In 2022, Petitioner offered to plead guilty to five charges, AE 217 Offer for Pretrial Agmt. (Mil. Comm'n May 9, 2022),[4] and that offer was subsequently accepted by the Convening Authority, the official who convened his military commission, AE 217I Accused's Pleas in accordance with May 9, 2022 Pretrial Agmt. (Mil. Comm'n June 13, 2022).[5]

### A. Admissions

As part of his plea, Petitioner agreed to and executed a Stipulation of Fact. Ex. 2, AE 217 Att. A. Petitioner expressly stated in his Pretrial Agreement that he had "reviewed the stipulation completely," "agree[d] the facts therein are true and admissible," that he "had voluntarily agree[d] to enter into this stipulation of fact," and that it was "a fair and accurate summary of the facts." Id. ¶¶ 16, 17.

---

granted, 2021 WL 6753656 (Apr. 23, 2021), reinstated in pertinent part, Al-Hela v. Biden, 66 F.4th 217, 221 (D.C. Cir. 2023).

[4] "AE" designates a document as a potential Appellate Exhibit in the military-justice and military-commission judicial systems. Each AE number is unique and is analogous to the ECF docket numbers on PACER.

[5] Petitioner's Pretrial Agreement (AE 217), as well as an Appendix thereto containing additional terms (AE 217A) and an Addendum updating and amending certain agreed-upon terms of the Pretrial Agreement (AE 217E), are included as exhibits to Petitioner's motion for preliminary injunction, Abdulrazzaq v. Biden, Civil Action 17-1928 (EGS) (Jan. 3, 2025) (ECF Nos. 183-1, 183-2, 183-3).

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

As detailed in the Stipulation of Fact, Petitioner admitted to the following acts, among

others:

**Pre-Commencement of United States and Coalition Combat Operations, October 2001**

- In early 1990s, he trained at the al Farouk Training Camp in Afghanistan, al Qaeda's primary training facility, Ex. 2, Stip. of Fact ¶ 2;

- from 1996 to 1998, he ran guest houses in Afghanistan for al Qaeda recruits and operatives, id. ¶¶ 61-63;

- in 1996, he commanded and taught at al Farouk, id. ¶ 35;

- beginning in 1997, he commanded al Qaeda operations at or near Kabul, id. ¶ 27;

- beginning in 1997 and continuing through 2001, he coordinated al Qaeda operations with the Taliban, id. ¶¶ 39-46;

- beginning in 1997, he routinely coordinated operations with and provided battlefield updates to the senior al Qaeda hierarchy, including Saif al Adl (chief of security), abu Hafs (third-in-command), Ayman Zawahiri (deputy commander), and Usama bin Laden; id. ¶¶ 28, 30, 48-56;

- beginning in 1999, he served as a liaison between al Qaeda and the Taliban, id. ¶ 58;

- in 2000, he served on al Qaeda's senior advisory council, id. ¶ 29;

- in 2000, he served as a representative to the Taliban's Arab Liaison Committee, id. ¶ 42; and

- no later than June 2001, he gave allegiance to Usama bin Laden, see id. ¶ 32.

**Post-Commencement of United States and Coalition Combat Operations**

- he facilitated the cross-border movement between Afghanistan and Pakistan of fighters from multiple groups and their families, Ex. 2, Stip. of Fact ¶ 68;

- in 2002, he met with Saif al Adl and with Khalid Sheikh Mohammed; he received approximately $10,000 from Mohammed to fund al Qaeda's operations, id. ¶ 72;

- initially he was responsible for organizing al Qaeda fighters in Jalalabad and Waziristan, Afghanistan, id. ¶ 72;

7

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

- from 2002 until sometime in 2004, he served as commander of al Qaeda forces fighting in Afghanistan, id. ¶ 75;

- from 2002 until sometime in 2004, he funded, supplied, planned, organized, directed, coordinated, and participated in attacks against United States and Coalition military forces in Afghanistan, attacks that wounded and killed multiple members of those forces id. ¶¶ 77-79, 83-108; and

- beginning no later than 2005, he served as al-Qaeda's liaison to al Qaeda in Iraq and its leader, Abu Musab al-Zarqawi, id. ¶¶ 109-117.

**B. Transfer Provision**

Petitioner's plea agreement specifically contemplated a two-year delay between acceptance of the plea by the military commission judge in June 2022 and sentencing, to allow the Government time to pursue transfer to a third-party country in which he could serve his sentence:

> 19. I shall join the Government in requesting that the Military Judge **delay the sentencing proceedings** in my case **until June 2024,** unless, by mutual request of the parties to set the sentencing proceedings for an earlier date, in order to pursue transfer to a third-party sovereign nation. I understand that the Convening Authority will recommend a transfer to a third-party sovereign nation consistent with this pretrial agreement, Appendix A, and applicable United States law, with the understanding that the third-party sovereign nation will agree to honor the terms of this agreement and my continued custody after transfer, if it occurs. Should my custody be transferred to a third-party sovereign nation, I understand that the continued service of any portion of my sentence will be under the conditions, laws, and procedures as established by such third-party sovereign nation and its appropriate governing entity willing to accept my request for transfer. Consideration of my healthcare needs will be afforded in efforts to effect a transfer. . . . I understand that failure to effect transfer to a third-party sovereign nation will not void or make voidable this pretrial agreement, and I would remain bound by this pretrial agreement. [AE 217E ¶ 19 (emphasis added).]

By its terms, even if "third-party sovereign nation" is interpreted as Petitioner suggests to exclude Iraq, this provision merely required the Government "to pursue" a different transfer location for only two years (and in fact, over one dozen countries were contacted, Ex. 1 ¶ 8). Of note, this section did not make Petitioner's approval a condition for a transfer to any country.

8

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

Nor was a transfer a condition of Petitioner's plea. And notably, nowhere in this provision—or anywhere else in the pretrial agreement—does it bar Petitioner's repatriation to Iraq after this two-year period had lapsed.

In this case, the Department of State worked diligently over a lengthy period of time to identify an appropriate and willing transfer location for Petitioner. Ex.1, Decl. of Amb. Richard ¶ 8. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ See id.

### C. Sentencing

After the lapse of the two-year transfer period, a sentencing hearing was held this past summer. A military-commission panel sentenced Petitioner to 30 years of confinement. AE 266B Sentencing Worksheet (Mil. Comm'n June 20, 2024) (available at www.mc.mil). Under the terms of the Pretrial Agreement, all but ten years of that sentence were suspended by the Convening Authority, AE 217A App. to the Offer for Pre-Trial Agreement at ¶ 2 (Mil. Comm'n May 9, 2022) (ECF No. 183-2), and the sentence to confinement began to toll on June 10, 2022 as agreed by Petitioner, id. AE 217E, Add. to May 9, 2022 Pretrial Agreement ¶ 4 (ECF No. 183-3). Accordingly, Petitioner's sentence due to the plea agreement will end in June 2032, assuming he continues to comply with the remaining conditions set out therein.

### II.    Petitioner's Medical Issues

While detained, Petitioner has undergone five spinal surgeries to decompress or fuse parts of his spine. Petitioner suffers from spondylosis, a degenerative spinal condition that can result in a narrowing (stenosis) of the spinal canal. By Petitioner's own admission, the onset of these deficits pre-dated his detention. Mem. Op. at 12 (Oct. 28, 2019) (ECF No. 175) (noting the

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

Petitioner had admitted to a pre-detention medical diagnosis of herniated spinal discs and constricted vertebrae (stenosis)).

In September 2017, he underwent a laminectomy/decompression at the L4-S vertebrae. Ex. 3, Decl. of Senior Medical Officer, Encl. pp. 1-2, 3. Later that month, he underwent a cervical fusion procedure between his C3-C6 vertebrae.[6] Id. In November, the rods and screws inserted in his cervical spine in September were replaced, and the exit for the spinal nerve at the C5 vertebrae was widened. Id. In May 2018, Petitioner underwent a fusion between his L4-S1 vertebrae, with a widening of the nerve exits, and his cervical fusion was extended from the C3 to the T2 vertebrae. Id. And lastly, in November 2022, Petitioner's spinal cord between his L3 to S1 vertebrae was decompressed by laminectomy and his S1 fusion was extended to his L3 vertebrae. Id. At that time, the treating neurosurgeon recommended surgery on his L1-L4 vertebrae, but Petitioner declined. Id.

A CT scan in November 2024 indicated that the surgical changes from the November 2022 surgery remained stable. Id. ¶ 4. Per protocol, given that Petitioner is now two years post-surgery, any additional imaging to check these changes may be by x-ray. Id. Encl. p.2.

Petitioner has several neurological deficits brought on by his spinal condition, in particular chronic musculoskeletal pain in his limbs and muscle spasms. Id. ¶ 4; see id. ¶¶ 7-10. Additionally, he suffers from osteopenia, or low bone density. Id. ¶ 5; see id. Encl. pp. 1-2. Petitioner is prescribed Acetaminophen, Ibuprofen, and Celecoxib, and Lidocaine patches as needed for his pain, with Percocet prescribed when he is to be moved externally from the detention facility. Id. ¶ 9; see id. Encl. pp. 3-4. He is prescribed valium for his muscle spasms.

---

[6] An additional surgery was needed to drain a hematoma arising from this operation.

10

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

Id. ¶ 7. For his osteopenia, he is currently finishing an 18-month course of the bone-strengthening treatment Teriparatide and is prescribed Calcium and Vitamin D supplements. Id. Encl. pp. 1, 3-4.

Petitioner can ambulate by himself using a walker or a wheelchair. Id. ¶¶ 5, 6. Because of his osteopenia he has been medically evaluated as frail. Id. ¶ 5. He can accomplish basic activities of daily living on his own, which includes bathing, dressing, toileting, feeding, maintaining continence, and transferring. See id. He can stand independently but relies on the walker for additional support and balance for stability when standing or moving. He can change his position independently. Id.

In addition to his walker and wheelchair, Petitioner is provided the following equipment to address his spinal issues:

- Lumbar support brace and pillow for comfort
- Commode assistive device
- Grabber
- Hospital chair
- Medical shower chair with isomats
- Outdoor hospital chair for comfort
- Personal Fall Alarm
- Back Roller and other physical therapy items/bands
- Wrist brace
- Rubber insoles
- Memory Foam Mattress
- Adjustable cane
- Heating pad or microwavable heater pad
- Medium antiembolism socks
- Hospital bed
- Pressure injury prevention gel cushions.
  [Id. Encl. p. 4].

Id. ¶ 10.

11

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

Other than his spinal issues, Petitioner is generally in good health. ███████

████████████████████████████████████████████████████

███████        Id.

The Senior Medical Officer (who is also Petitioner's primary care provider) has determined Petitioner is fit to travel, noting that there are no medical or psychological contraindications to his doing so by land, sea, or air. Id. ¶ 12 & Encl. p.5.

## III.    The Efforts to Transfer Petitioner

### A. The Transfer Process

Once a decision is made to transfer a military detainee from Guantanamo Bay, the Department of State seeks to identify "a suitable transfer location . . . outside of the United States," "consistent with the national security and foreign policy interests of the United States and the commitment set forth in section 2242(a) of the Foreign Affairs Reform and Restructuring Act of 1998." Ex. 1, Decl. of Amb. Richard ¶ 3; see Executive Order 13567, 76 Fed. Reg. 13,277 (Mar. 7, 2011). Consistent with Section 2242(a) of the Foreign Affairs Reform and Restructuring Act of 1998, it is the policy of the United States "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." Id. The phrase "substantial grounds for believing the person would be in danger of being subjected to torture" is understood to mean "if it is more likely than not that he would be tortured." Id. This policy is consistent with the approach taken by the United States in implementing the Convention Against Torture

12

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

and Other Cruel, Inhuman or Degrading Treatment or Punishment with respect to individuals within its territory. Id.

When seeking a country to which to transfer a Guantanamo detainee, the Department of State is responsible for obtaining, in consultation with the Department of Defense, appropriate security and humane-treatment assurances regarding the transfer and for ensuring that the humane treatment assurances, including with respect to torture, are consistent with U.S. government detainee-transfer policies. Id. ¶ 4.

Decisions with respect to the transfer of Guantanamo detainees are made on a case-by-case basis, taking into account factors such as the particular circumstances of the transfer; conditions in the proposed receiving country; any humane treatment concerns or special needs of the individual detainee, including medical needs; and assurances received from government authorities. Id. ¶ 5. Recommendations by the Department of State regarding transfers are decided through a process involving input by officials familiar with the security and humanitarian conditions in the countries concerned. Id. Within the Department, officials in the Bureau of Counterterrorism, the Office of the Legal Adviser, the Bureau of Democracy, Human Rights, and Labor, the relevant regional bureau, and the embassy in the country of destination provide their input based, among other factors, on knowledge of the country's government institutions, its human rights conditions, any history of providing humane treatment assurances related to past transfers from Guantanamo, whether the country has abided by those assurances, and any allegations of mistreatment of similarly situated individuals. Id.

Accordingly, in evaluating foreign government assurances relating to torture, the Department assesses whether it is more likely than not that the individual will be tortured in the country to which he may be transferred. Id. ¶ 6. To make this determination, the Department

13

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

considers the treatment the individual is likely to receive upon transfer, taking into account any specific commitments of officials from the foreign government responsible for accepting the transfer of custody of the individual; information or allegations of prior or potential future mistreatment in the receiving State; the receiving State's overall human rights record; any specific risk factors that may be present such as religion or political views; whether similarly situated individuals have been tortured in the receiving State; and the humane treatment assurances provided by the receiving State, including an assessment of the assurances' credibility. Id. Where concerns about the treatment of an individual cannot be resolved satisfactorily prior to transfer, the Department has in the past and would in the future recommend against transfer. Id.

As appropriate to the situation and needs of a detainee proposed for transfer, the Department may also seek specific commitments related to medical or rehabilitation services that the individual will receive. Id. ¶ 7. When evaluating such commitments, Department officials consider the identity, position, or other information concerning the official relaying the assurances, available resources and capabilities in the country, and political or legal developments in the foreign country that provide context for the commitments provided. In addition to seeking, obtaining, and evaluating assurances of humane treatment, including for necessary medical care, the Department follows up with receiving governments to monitor their treatment of the transferred individual and compliance with those assurances. Id.

**B. Petitioner's Impending Transfer to Iraq**

As noted above, Petitioner entered a plea agreement in June 2022 admitting to serious war-crimes charges, with a provision that delayed his sentencing for two years to permit the U.S. government to pursue transfer to another country in which he could serve out his sentence. Id.

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

¶ 8.  During that period, the Department of State diligently undertook efforts to identify an appropriate and willing transfer country for Mr. al-Iraqi, with due consideration for ensuring that his healthcare needs will be met.  Id.

15

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████ ██

As reflected in the record, see al-Tamir v. Biden, Civ. Action No. 25-cv-0015 (EGS), Pet.

¶ 79 (D.D.C.) (Jan. 3, 2025) (ECF No. 1), the Secretary of Defense has transmitted to Congress

the 30-day advance notice of Petitioner's transfer required by statute.  This notice certified to

Congress that Petitioner's transfer to Iraq is in the national security interests of the United States,

including that Iraq has taken appropriate steps to substantially mitigate the risk that Petitioner

could attempt to reengage in terrorist activity or otherwise threaten the United States.[7]

### C. How Petitioner Will Be Treated in Iraq Has Been Specifically Assessed and Addressed by the Executive Branch

The Executive Branch has conducted a comprehensive evaluation of Petitioner's transfer

to Iraq, ████████████████████████████████████████

████████████████████████████████████████████████

██████████████ ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[7] Congress conditioned the use of appropriations to effect a transfer of Guantanamo detainees upon the Secretary of Defense certifying 30 days in advance of the transfer that "the transfer concerned is in the national security interests of the United States," and that the receiving country has agreed to take various measures to mitigate the threat of the transferred detainee. See Nat'l Defense Auth. Act for Fiscal Year 2016 § 1034, Pub. L. No. 114-92, 129 Stat. 726, 969-970 (2015).

16

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~



17

PROTECTED INFORMATION//FILED UNDER SEAL

███████████████████████████████████████████████████████

████████████████████████████████████████████

When Petitioner is repatriated to Iraq, the Department of State plans to monitor the treatment of Mr. Al-Iraqi using the diplomatic tools and resources it has to engage effectively with the Government of Iraq, assess whether it is upholding its humane treatment assurances, and press for better treatment if necessary.  Id. ¶ 15.

## IV.     Petitioner's Current Petitions for a Writ of Habeas Corpus

Petitioner has filed three petitions for a writ of habeas corpus, the second and third of which are currently pending.[8]

Petitioner filed his second Petition for a Writ of Habeas Corpus in 2017.  See Pet., Abdullrazzaq v. Trump, Civ. Action No. 17-1928 (EGS) (Sep. 21, 2017) (ECF No. 1).  As initially filed, this Petition sought interim and final relief to remedy Petitioner's conditions of confinement, specifically relief Petitioner contended was necessary to remedy Respondents' allegedly deficient medical care for his deteriorating spinal deficits: herniated spinal discs and spinal stenosis.  Id.  To monitor Petitioner's condition during the pendency of this second Petition, the Court ordered the parties to provide bi-weekly updates on, among other things, his

---

[8] On 3 August 2009, Petitioner filed an initial Petition for a Writ of Habeas Corpus, alleging that his ongoing detention under the AUMF violated both the Suspension Clause and the Due Process Clause.  See Petition, Abdulrazzaq v. Obama, Civ. Action No. 09-1462 (EGS) (ECF No. 1).  Four years later, Petitioner sought, and Respondents agreed to, the dismissal of that Petition because criminal charges had by then been referred against Petitioner before a military commission, charges based on his alleged actions that overlapped in substantial part with those the Government would have used to oppose that habeas claim; the Court granted the requested stipulated dismissal.  See Stip. & Order (Dec. 16, 2013) (ECF No. 51).

PROTECTED INFORMATION//FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

physical condition, see Min. Order (Oct. 20, 2017), updates that included declarations as to that

condition by the Senior Medical Officer supervising his overall medical care, see, e.g., Joint

Status Report (Nov. 2, 2017) (ECF No. 35).

Petitioner subsequently twice amended this second Petition. See Am. Pet. for Writ of

Habeas Corpus (Nov. 1, 2017) (ECF No. 34) and Second Am. Pet. for Writ of Habeas Corpus

(Nov. 28, 2017) (Notice of classified filing, ECF No. 43). Petitioner's Second Amended Petition

included three additional claims unrelated to his health, claims that alleged his military-

commission prosecution or the associated procedures (1) violated the Equal Protection Clause,

(2) violated conflict-of-interest principles, and (3) impaired his Sixth Amendment and statutory

rights to communicate with counsel. Second Am. Pet. at 1-2, 22. Respondents moved to dismiss

the Second Amended Petition. Mot. Dismiss Petr.'s 2d Am. Pet. for Writ of Habeas Corpus,

(Jan. 10, 2018) (ECF No. 47).

The Court granted Respondents' Motion to Dismiss as to Petitioner's conditions-of-

confinement/health issues, Mem. Op. at 14 (ECF No. 175), rejecting his medical-care claims

under an analysis applicable to such claims through the Eighth Amendment, while deciding to

hold in abeyance Petitioner's remaining three claims to afford the military-commission judicial-

review tribunals, which include the District of Columbia Circuit, to address them in the first

instance as appropriate. Mem Op. at 22-40. The Court also stayed that Petition. Order (Oct. 28,

2019) (ECF No. 174). Last week, Petitioner moved to reopen that second Petition, a motion that

the Court has granted. See Minute Order (Jan. 4, 2025).

Simultaneous with moving to reopen the existing petition, Petitioner also filed a new

petition for a writ of habeas corpus. See al-Tamir v. Biden, Civil Action No. 25-0015 (EGS),

Petition (Jan. 3, 2025) (ECF No. 1). This new petition alleges four claims for relief: (1) that the

19

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
PROTECTED INFORMATION//FILED UNDER SEAL

transfer to Iraq would violate the Due Process clause and the Convention Against Torture ("CAT"), id. at 19-20; (2) that the transfer to Iraq is an unconstitutional breach of the pretrial agreement, id. at 20-22; (3) that the transfer to Iraq is an unlawful treaty transfer, id. at 22-24; and (4) that telling Iraq that Petitioner must remain in custody until 2032 violates due process because that is longer than the maximum sentence allowed by federal law, id. 24-26.

## ARGUMENT

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv., 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted). A preliminary injunction is "never awarded as of right" and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22, 24 (2008). The party seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Id. at 20.[9] Winter emphasized that in the absence of a likelihood of success

---

[9] Petitioner suggests that he should prevail even if the Court were to find that only one of these factors favored him sufficiently to outweigh the others. Mot. at 8. In Sherley v. Sebelius, 644 F.3d 388, 393 (D.C. Cir. 2011), the Court of Appeals noted that Winter called into question this "sliding-scale approach" to consideration of the preliminary injunction factors that had been the law of this Circuit. The Court of Appeals explained that prior decisions held that a strong showing by the movant on one preliminary injunction factor could make up for a weaker showing on another factor. See id. at 392. But the Court read "Winter at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" such that a "movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm." Id. at 393. Noting a split among the circuits on the interpretation of Winter, the Court of Appeals held that it did not need to resolve the question because the movant in Sherley failed to establish an entitlement to a preliminary injunction under

20

PROTECTED INFORMATION//FILED UNDER SEAL
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

on the merits, a movant is not entitled to a preliminary injunction no matter how the remaining factors would weigh.  Id.  Applying this holding, the Court of Appeals has emphasized that the "first and most important factor" is whether the moving party has "established a likelihood of success on the merits."  Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  "[W]hen a plaintiff has not shown a likelihood of success on the merits, we need not consider the other factors."  Greater New Orleans Fair Hous. Action Ctr. v. HUD, 639 F.3d 1078, 1088 (D.C. Cir. 2011).

The Supreme Court has also instructed that a preliminary injunction cannot issue on the basis of speculative or possible injury.  Rather, the moving party must establish that irreparable harm is "likely in the absence of an injunction," Winter, 555 U.S at 22, and the Court of Appeals has held that such harm must be "both certain and great" in order to warrant relief, Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  The burden on Petitioner is even more stringent in this case because the proposed injunction would interfere with the Executive Branch's conduct of the Nation's foreign affairs.  See Adams v. Vance, 570 F.2d 950, 954-56 (D.C. Cir. 1978) (requiring "an exceptionally strong showing on the relevant factors" where the injunction would "deeply intrude[] into the core concerns of the executive branch").

Petitioner's exclusive reliance on Belbacha v. Bush, 520 F.3d 452 (D.C. Cir. 2008), as supplying the legal standard for issuance of his requested preliminary injunction, see Mot. at 7-8, is misplaced.  For one thing, that case was decided several months prior to Winter, as well as several years before the Court of Appeals' assessment in Sherley calling into question the

_____

the "less demanding sliding-scale" approach.  Id.  This Court need not address this issue here, as Petitioner's claim for relief fails under either standard.

21

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

"sliding-scale approach" to consideration of the preliminary injunction factors. Belbacha was also decided three months prior to the Supreme Court's decision in Munaf, foreclosing arguments that a wartime detainee may challenge his transfer based on treatment concerns in the face of the United States' policy not to transfer a detainee to a country that will likely torture him.

In addition, Belbacha involved unique circumstances limiting any relevance to the circumstances involved in this case. In Belbacha the district court declined to enjoin a detainee's transfer based solely on an asserted lack of jurisdiction. 520 F.3d at 454-55. The Court of Appeals panel concluded, however, that an injunction might be appropriate because the same jurisdictional issue was pending before the Supreme Court, while noting that an analysis of the preliminary-injunction factors, apparently not undertaken by the district court, was needed before deciding to grant such relief. Id. at 457 ("We hold . . . that when the Supreme Court grants certiorari to review this court's determination that the district court lacks jurisdiction, a court can, pursuant to the All Writs Act, 28 U.S.C. § 1651, and during the pendency of the Supreme Court's review, act to preserve the status quo in other cases raising the same jurisdictional issue if a party satisfies the criteria for issuing a preliminary injunction."); id. at 459 (remanding for district court to consider preliminary-injunction factors). As explained further below, Petitioner in this case fails to satisfy the preliminary-injunction factors necessary to obtain an injunction on his transfer, as those standards have been more recently articulated by the Supreme Court and the Court of Appeals.

22

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

## I. Petitioner Can Show No Likelihood of Success on the Merits to Enjoin His Transfer

### A. Petitioner's Due Process and CAT Claims Respecting Transfer Fail Because Binding Supreme Court and Circuit Precedent Precludes Courts From Enjoining the Transfer of Guantanamo Bay Detainees Based on Allegations of Potential Mistreatment.

Petitioner has no likelihood of success on his claims that his repatriation to Iraq should be enjoined based on his concerns regarding mistreatment because the Supreme Court's decision in Munaf and the D.C. Circuit's decisions in Kiyemba and Omar foreclose his arguments that he may not be transferred to Iraq because he fears torture, prosecution, or inadequate medical care.

1. <u>Fear of torture</u>.  Where, as here, the United States has a policy not to transfer a detainee to a country that will likely torture him, "the district court may not question the Government's assessment that a potential recipient country is not likely to torture a detainee." Kiyemba, 561 F.3d at 514.  The United States's humane-treatment policy for detainee transfers is set forth in Section 2242(a) of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act").  See Pub. L. No. 105–277, § 2242, 112 Stat. 2681–761, 822 (1998) (codified at 8 U.S.C. § 1231 note).  "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." Id.  This statute directed agencies to promulgate regulations to implement the United States' non-refoulment obligations under Article 3 of The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

or Punishment (CAT).[10]  See S. Treaty Doc. No. 100-20, 465 U.N.T.S. 85 (entered into force for the United States on Nov. 20, 1994).  The Senate ratified the CAT with the understanding that "the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,'" would be understood to mean "'if it is more likely than not that he would be tortured.'"  U.S. Senate Resolution of Advice and Consent to Ratification of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, 136 Cong. Rec. 36, 198 (Oct. 27, 1990).

Given the United States longstanding humane treatment policy, and in accordance with the Supreme Court's decision in Munaf and the Court of Appeals' decisions in Kiyemba and Omar, the Court must defer to the Government's determination that a potential recipient country is not likely to torture a detainee.  "The Judiciary is not suited to second-guess such determinations—determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area."  Munaf, 553 U.S. at 702.  Consequently, a Guantanamo detainee like Petitioner cannot prevail on the merits of a claim seeking to bar his transfer based upon the alleged likelihood of his being tortured or prosecuted in the recipient country.  See Kiyemba, 561 F. 3d at 514.

In Munaf, the Supreme Court directly rejected those petitioners' claims that their transfers to the custody of Iraq should be denied because they feared torture.  553 U.S. at 700.

---

[10] As a matter of policy, the United States upholds the principle of non-refoulement as reflected in CAT Article 3 with respect to all transfers, regardless of location.  However, as a matter of law, the United States has taken the position that Article 3 does not apply to transfers occurring outside U.S. sovereign territory, including at the base in Guantanamo Bay.  Its reference here is to contextualize the policy, not to concede that Article 3 of the CAT applies.

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

Emphasizing concerns about the separation of powers, the limited role for the courts in foreign relations and national security, and the deference due Executive Branch determinations in those areas, the Supreme Court held that allegations about treatment in the recipient country "are to be addressed by the political branches, not the Judiciary." Id. at 689, 700-702.

Kiyemba applied Munaf in the context of transferring detainees from Guantanamo Bay. In Kiyemba, nine Uighurs held at Guantanamo Bay sought an order requiring the Government to provide 30 days' advance notice to the court and to counsel before they could be transferred from Guantanamo, "[a]sserting that they feared being transferred to a country where they might be tortured or further detained[.]" 561 F.3d at 511. The District Court granted the requested interim relief, and the Government appealed. The Court of Appeals reversed and held such an order restricting the Executive's ability to transfer detainees was precluded under Munaf.

Specifically, the Court of Appeals rejected the position that a court can enjoin the Government from transferring detainees from Guantanamo Bay in such circumstances because "the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." Id. at 514 (citing Munaf, 553 U.S. at 702). It held that "[i]n light of the Government's policy [not to transfer detainees to countries where it is more likely than not that they would be tortured], a detainee cannot prevail on the merits of a claim seeking to bar his transfer based on the likelihood of his being tortured in the recipient country." Id.

The Court of Appeals subsequently reiterated this position in Omar, where the petitioner, who had also been a petitioner in Munaf, reasserted his concerns he might be tortured if transferred to Iraqi custody and attempted to recast his claims and raise an additional claim that

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

the FARR Act mandated judicial review of his claims.[11] See 646 F.3d at 15. Again rejecting his claims, the Court noted the "general principle" that "absent congressional direction otherwise [which is missing from this case], courts may not inquire into the treatment a transferee . . . might receive in the custody of another sovereign. Id. at 16 (citing Munaf, 553 U.S. at 700-703).

Here, in light of Munaf, Kiyemba, and Omar, Petitioner cannot show a likelihood of success on his claim that his transfer would violate Due Process or CAT because he fears being tortured. As noted above, it remains the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. See Ex. 1, Decl. Amb. Richard at ¶ 3. In accordance with the rigorous process applicable to Guantanamo detainee transfers, Petitioner's transfer to Iraq was carefully assessed by senior officials of the Department of State with input from the applicable Department experts, including the Bureau of Counterterrorism, the Office of the Legal Adviser, the Bureau of Democracy, Human Rights, and Labor, the relevant regional bureau, and the embassy in Iraq. Id. ¶ 5; see id. ¶ 9 (process applied to Petitioner's transfer). ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[11] The petitioner in Omar, one of the two petitioners in Munaf, was a military detainee/transferee, like Petitioner here. Unlike Petitioner, he was held in United States military custody in Iraq, not Guantanamo Bay.

26

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION//FILED UNDER SEAL

Consequently, ███ ██ ███████████████████████████

████████████████████████████████████████████ the

Executive has concluded that Petitioner's transfer to Iraq is consistent with the United States'

policy not to transfer a detainee to a country where it is more likely than not that he will be

tortured. As a result, governing precedent counsels that Petitioner "*cannot prevail on the merits*

27

PROTECTED INFORMATION//FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

of a claim seeking to bar [his] transfer based upon the likelihood of [him] being tortured in the recipient country." Kiyemba, 561 F.3d at 514 (emphasis added).[12]

    2. Fear of prosecution. Petitioner's claim that he may not be transferred because he has concerns that he may be prosecuted by Iraq likewise is foreclosed squarely by Munaf and Kiyemba.

    In Munaf, the Supreme Court held that federal courts could not exercise their equity powers under habeas-corpus jurisdiction to enjoin the transfer to Iraqi authorities of two American citizens detained by the United States military in Iraq. 553 U.S. at 679-80. The petitioners had filed habeas actions seeking an injunction preventing their transfer to Iraqi custody for criminal prosecution in Iraqi courts. Id. at 681-82. In holding that federal courts could not prevent the transfers, the Court noted that, while the typical remedy in habeas is release from unlawful Executive detention, petitioners were instead using habeas to seek "a court order requiring the United States to shelter them from the sovereign government seeking to have them answer for alleged crimes committed within that sovereign's borders." Id. at 693-94. The Supreme Court emphatically rejected the argument that the writ of habeas corpus could be used in such a novel way. See id. at 705.

    Applying Munaf, the Court of Appeals in Kiyemba recognized that "[a]fter release from the custody of the United States, any prosecution or detention the petitioners might face would

---

[12] Petitioner's claim fails for the additional reason that the "FARR Act provides a right to judicial review of conditions in the receiving country only in the immigration context, for aliens seeking review of a final order of removal." Omar, 646 F.3d at 17-18 ("The FARR Act does not give extradition or military transferees—the other two categories in which transfer issues typically arise—a right to judicial review of conditions in the receiving country."). Additionally, the CAT is a "multilateral treaty" that is "non-self-executing and thus does not itself create any rights enforceable in U.S. courts." Id. at 17.

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

be effected 'by the foreign government pursuant to its own laws and not on behalf of the United States[,]'" and that principles of comity "necessarily render invalid attempts to shield" petitioners from foreign prosecution. Kiyemba, 561 F.3d at 515. The court held that Munaf barred "a court from issuing a writ of habeas corpus to shield a detainee from prosecution and detention by another sovereign according to its own laws." Id. at 515.

Here, Petitioner is an Iraqi citizen. The Government of Iraq has issued a warrant for his arrest based on allegations he violated the sovereign criminal law of Iraq. Munaf and Kiyemba instruct that Petitioner's fear that he may be arrested and tried for those crimes in Iraq can provide no ground for this Court to enjoin his transfer. Accordingly, he has no likelihood of success on any part of his claim based on fear of prosecution.

3. Medical treatment. Lastly, Petitioner's medical condition cannot provide any basis to enjoin his transfer.

First, to the extent he frames his medical-treatment claim as a form of inhumane treatment, such a claim is similarly foreclosed by Munaf, Kiyemba, and Omar. Here, the Department of State specifically took his unique medical needs into account when considering his transfer to the custody of the Government of Iraq. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

████████████████████  ██████    ████████████

████████████████████████████████  ███████████████

█████████████████████████████████████████████████

██████████████████████  █████████████████████████  Given

that the Executive has considered ████████████████ that Petitioner's medical

needs will be adequately addressed, any framing of his medical treatment concerns as one of

alleged inhumane treatment fails for the same reasons as his claim based on his fear of torture.

To the extent Petitioner seeks to frame his medical treatment claim as some other basis to

enjoin his transfer, the same issues of comity and non-interference in foreign relations that

informed Munaf—in particular, negotiations over the transfer of military detainees—apply here.

As the Supreme Court specifically noted, the principles underlying Munaf are broader than just

inhumane treatment or prosecution:

> Even with respect to claims that detainees would be denied constitutional rights if
> transferred, we have recognized that it is for the political branches, not the
> judiciary, to assess practices in foreign countries and to determine national policy
> in light of those assessments.  553 U.S. 700-701.

This holding prohibits any attempt by Petitioner to assert that his future medical care in Iraq

provides any basis to enjoin his transfer.

### B. Petitioner's Claims Regarding Breach of the Pretrial Agreement and Related Insufficiency of Military-Commission Process Do Not Support Issuance of an Injunction

Petitioner argues that his transfer to Iraq would be a breach of his plea agreement and that

the military-commission system provides no avenue for him to raise such a claim, thus the Court

must enjoin his transfer while it considers this claim. See Mot. at 9 ("repatriation to Iraq is

directly contrary to the terms of the plea agreement;" "military commission . . . does not have

30

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

any mechanism for [Petitioner] . . . to challenge the breach"). Petitioner's claim, however, does not warrant or support an injunction. Petitioner has no likelihood of success on the claim that his plea agreement is being breached; indeed, his claim is without merit. Further, even if, assuming for the sake of argument, the claim had potential merit, it would be no legal impediment to the United States relinquishing custody of Petitioner and transferring him to Iraq. Avenues exist for Petitioner after his transfer to continue pursuing in the military-commission system claims related to the efficacy of the plea agreement and any effect on his military-commission sentence.

As an initial matter, under the plain terms of Petitioner's plea agreement, a transfer of Petitioner to Iraq is not contrary to the agreement. Petitioner asserts that his transfer to Iraq would violate the Pretrial Agreement because he was promised that he would not be repatriated to Iraq, but resettled in some other country. See Al-Tamir v. Biden, Civ. Action No. No. 25-cv-0015 (EGS), Pet. at pp. 9-12, 20-21 (D.D.C.) (Jan. 3, 2025) (ECF No. 1). Under the terms of the Pretrial Agreement, however, this is not correct. As discussed supra, Petitioner's plea agreement specifically contemplated a two-year delay between acceptance of the plea by the military commission judge in June 2022 and sentencing, to allow the Government time "to pursue transfer to a third-party sovereign nation" in which he could serve his sentence:

> 19. I shall join the Government in requesting that the Military Judge delay the sentencing proceedings in my case until June 2024, unless, by mutual request of the parties to set the sentencing proceedings for an earlier date, in order to pursue transfer to a third-party sovereign nation. I understand that the Convening Authority will recommend a transfer to a third-party sovereign nation consistent with this pretrial agreement, Appendix A, and applicable United States law, with the understanding that the third-party sovereign nation will agree to honor the terms of this agreement and my continued custody after transfer, if it occurs. Should my custody be transferred to a third-party sovereign nation, I understand that the continued service of any portion of my sentence will be under the conditions, laws, and procedures as established by such third-party sovereign nation and its appropriate governing entity willing to accept my request for transfer. Consideration of my healthcare needs will be afforded in efforts to effect

31

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

> a transfer. . . . I understand that failure to effect transfer to a third-party sovereign nation will not void or make voidable this pretrial agreement, and I would remain bound by this pretrial agreement.

Pretrial Agreement Addendum, AE 217E ¶ 7 (modifying ¶ 19 of Pretrial Agreement) (ECF 183-3). By its terms, this provision does not guarantee Petitioner would never be repatriated to Iraq; promise that Petitioner would be transferred, or not, to any particular country; or otherwise promise that Petitioner would be transferred, if at all, only to a resettlement location. This is especially true given that the two-year period contemplated in the provision has lapsed. Nor does any other provision of the plea agreement shield Petitioner from repatriation.

Petitioner asserts that separate discussions by his military-commission defense counsel with the State Department support his claim of a promise not to be repatriated to Iraq. Al-Tamir v. Biden, Civil Action Case No. 25-cv-0015, Pet. at pp. 9-12, 20-21. Respondents contest this assertion.[13] In all events, however, the plea agreement makes clear, repeatedly, that the Pretrial Agreement itself contains the entire agreement of the parties regarding the matter. See AE 217 ¶

---

[13] Indeed, the declaration of Petitioner's military-commission defense counsel undermines Petitioner's assertion. As explained previously, the State Department, following the plea, diligently undertook efforts to identify an appropriate and willing resettlement country for Petitioner, see supra; Ex. 1, Decl. Amb. Richard ¶ 8, and Petitioner's military defense counsel declaration states that the State Department envoy during those efforts explained, in early 2023,

> . . . [W]e are working hard to find a location for transfer that would meet all the requirements needed to bring this case to sentencing. I doubt very much, in that vein, we would aim for a country we feared Mr. Hadi would reject.

Al-Tamir v. Biden, Civil Act. No. 25-cv-0015 (EGS), Pet. at pp. 10-11; id. Ex. 3, Decl. of S. Hensler ¶ 46. Such language may reflect a preference for resettlement, but certainly does not rule out repatriation or constitute a promise that Iraq would never be considered as a potential transfer location. (The reference to the "requirements needed to bring this case to sentencing" is an apparent reference to Petitioner's ability to seek to withdraw from the Pretrial Agreement prior to sentencing. See AE 217E ¶ 1 (modifying ¶ 5 of the Pretrial Agreement, AE 217) (ECF 183-3)).

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

31 (ECF No. 183-1) (Pretrial Agreement "contain[s] all the terms, conditions, and other provisions of my Offer and represent the entire agreement with the Convening Authority. There are no other inducements that are not expressly contained in this agreement that affect my offer to plead guilty. Any modifications of this agreement shall be effective only if made in writing and signed by the Convening Authority and me."); id. ¶ 34 ("This Agreement supersedes any prior understandings, promises, or conditions between the parties. There are no additional understandings, promises, or conditions between the parties other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties."); AE 217E (ECF No. 183-3) (Pretrial Agreement Addendum: "Any further modifications to this pretrial agreement will be in writing and signed by the parties and counsel of record.").

Moreover, the Pretrial Agreement is explicit that if Petitioner is not transferred to another country, such circumstances do not breach the agreement. It provides, "I [Petitioner] understand that failure to effect transfer to a third-party sovereign nation will not void or make voidable this pretrial agreement, and I would remain bound by this pretrial agreement." See AE 217E ¶ 7 (modifying ¶ 19 of Pretrial Agreement). So even under Petitioner's view that "third-party sovereign nation" means only a resettlement location, the failure to accomplish such resettlement does not breach the agreement.[14] Thus, nothing in the terms of the plea agreement in the circumstances of this case, where Petitioner's transfer involves repatriation and not resettlement,

---

[14] Petitioner claims that "third-party sovereign nation" as used in the plea agreement means only a resettlement location and not Iraq. Respondents do not concede this point. "Third-party sovereign nation" means a country that is not one of the parties to the plea agreement, that is, not the United States and not Petitioner. Thus, Iraq could be a "third-party sovereign nation." The Court need not resolve the issue, however; under the arguments outlined above, Petitioner's repatriation to Iraq does not breach the plea agreement even under Petitioner's interpretation of "third-party sovereign nation.

33

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

suggests that such repatriation breaches the agreement; Petitioner cannot escape the plain terms of his plea agreement.

Accordingly, Petitioner has no claim that his repatriation breaches the Pretrial Agreement, and the absence of a likelihood of success on that claim undermines his request for an injunction on his transfer.

In any event, an injunction on Petitioner's repatriation is neither necessary nor appropriate to permit Petitioner to pursue his claim of a breach of the plea agreement or related efficacy of the plea or its effect on his sentence, even after his repatriation. As reflected in the D.C. Circuit decision in Khadr v. United States, 67 F.4th 413 (D.C. Cir. 2023), Petitioner is incorrect that no potential avenue exists in the military-commission system for Petitioner to challenge an alleged breach of the plea agreement and its effect on his sentence.

In Khadr, Guantanamo detainee Omar Khadr was convicted before a military commission pursuant to a plea agreement, after which he was repatriated to Canada to serve the remainder of his sentence. Id. at 417. Khadr initiated proceedings in the Canadian courts and obtained a ruling that his sentence had expired. Id. Khadr subsequently challenged his conviction in the United States Court of Military Commission Review (CMCR), a military appellate court within the military commission system. Id. After the CMCR remanded the matter to the Convening Authority for certain action, the CMCR took up the case again, and after Khadr received an adverse ruling, he appealed to the D.C. Circuit, which has "exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission," 10 U.S.C. § 950(g) (Military Commissions Act of 2009). Khadr challenged his conviction on jurisdictional and constitutional grounds, and he challenged his plea agreement as well, claiming it was unknowing, involuntary, and lacked a factual basis. Id. at 417-18. The Court of Appeals

34

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

considered his claims, including reviewing the validity of his plea, ultimately concluding, however, that Khadr had "waived his right to challenge his conviction on appeal and did so knowingly, intelligently and voluntarily." Id. at 419-24.

Accordingly, Khadr was able to raise claims regarding his plea agreement and conviction in the military commission system, even after the dissolution of his military commission and even after Khadr's repatriation.[15] Petitioner likewise has the option to pursue claims regarding a breach of his plea agreement within the military-commission system such as before the CMCR.

To be clear, this is not to suggest that Respondents believe or concede that Petitioner's claims have merit; they do not. The point is that a preliminary injunction on Petitioner's transfer is not necessary for Petitioner to have an avenue to attempt to pursue his claims of a breach of the plea agreement and any effect that may have on his conviction or sentence in the military commission system.[16]

Accordingly, Petitioner's claims that his transfer to Iraq would breach his plea agreement

---

[15] This is analogous to the courts-martial system, in which a pretrial agreement establishes a "contract between the accused and the convening authority," "noncompliance with a material term" of which permits a Court of Criminal Appeals to "consider whether the error is susceptible to remedy in the form of specific performance or in the form of alternative relief agreeable to the appellant." United States v. Smead, 68 M.J. 44, 59 (C.A.A.F. 2009); See also United States v. Ramsdell, No. ACM 39533, 2019 CCA LEXIS 145, at *4 (A.F. Ct. Crim. App. Apr. 2, 2019) (dismissing charges as a result of government's violation of plea agreement).

[16] This would include Petitioner's new claim raised in his latest petition that his sentence has not been properly computed. See Al-Tamir v. Biden, Civ. Action No. No. 25-cv-0015 (EGS), Pet. at pp. 24-26. In his plea agreement, however, Petitioner specifically agreed that the sentence provided by the plea agreement began to run on June 10, 2022, see AE 217E Add. to May 9, 2022 Pretrial Agreement ¶ 4 (ECF No. 183-3) (modifying ¶ 8 of the Pretrial Agreement so that it reads, in pertinent part, "The period of any approved sentence to confinement shall run from 10 June 2022 in consideration for the Accused's good faith effort to enter a plea consistent with the Agreement on that date.").

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

and that the military commission system provides no avenue for him to raise such a claim

provide no basis or support for the issuance of a preliminary injunction enjoining his transfer.

### C. Petitioner Has No Likelihood of Success on His Claim That His Transfer Violates The International Prisoner Transfer Program Reflected in 18 U.S.C. § 4107.

Lastly, Petitioner errs by arguing that 18 U.S.C. § 4107 prohibits his transfer to Iraq

without his consent. See Mot. at 9 (citing Petition, ¶¶ 28-36, in Case No. 25-cv-0015). That

statute has no application here because it is limited to transfers pursuant to treaties negotiated as

part of the United States' International Prisoner Transfer Program. This program began in 1977

after Congress passed enabling legislation, now codified at 18 U.S.C. §§ 4100-4115, under

which the Federal Government negotiated a series of treaties to permit the United States to

transfer convicted foreign nationals in state or federal custody back to their home countries,

where the receiving country assumes responsibility for enforcing the sentence. See Pub. L. No.

95-144, 91 Stat. 1212 (Oct. 28, 1997). Congress, however, expressly stated that the statutory

scheme, including § 4107, "shall be applicable only when a treaty providing for such a transfer is

in force, and shall only be applicable to transfers of offenders to and from a foreign country

pursuant to such a treaty." 18 U.S.C. § 4100(a). The United State has no such prisoner transfer

treaty with Iraq. See "International Prisoner Transfer Program - List of Participating

Countries/Governments" at https://justice.gov/criminal/criminal-oia/list-participating-

countriesgovernments. Accordingly, section 4107 has no application to this case.

More generally, any argument by Petitioner that his transfer cannot proceed absent a

prisoner transfer treaty between the United States and Iraq also lacks merit. The Supreme Court

rejected a similar argument in Munaf. See 553 U.S. at 704-705 (stating that the petitioners

argued that the United Staes must "identify a treaty or statute that permits it to transfer them to

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

Iraqi custody"). There, the Supreme Court distinguished the government's authority to transfer a wartime detainee to Iraq from its authority in the domestic criminal extradition context. Id. at 704. Further, as the D.C. Circuit emphasized in Omar, "[s]ince the Founding, the United States has routinely transferred wartime detainees" and the Court never suggested that such transfers were unlawful because the United States did not have a transfer treaty with the receiving country. Omar, 646 F.3d at 19 (stating that "history matters" and "neither military detainees nor those facing extradition historically have possessed a right to judicial review of conditions in the receiving country before they were transferred). Accordingly, there is no dispute that the "military possesses settled wartime authority under the law of war to transfer enemy combatants to allied countries." Doe v. Mattis, 889 F.3d 745, 759–60 (D.C. Cir. 2018).

* * *

As explained above, Petitioner cannot demonstrate a likelihood of success on the merits of his claims seeking to bar his transfer – one of "the most critical" factors in deciding an injunction motion. See Nken v. Holder, 556 U.S. 418, 434 (2009). This failure is dispositive of his motion; thus, the Court need not reach any other factors as his motion may and should be denied on this basis. See Greater New Orleans Fair Hous., 639 F.3d at 1088 (D.C. Cir. 2011) ("[W]hen a plaintiff has not shown a likelihood of success on the merits, we need not consider the other factors.").

## II.    The Balance of Harms and Public Interest Weigh Against A Preliminary Injunction.

Petitioner has also failed to satisfy the other components necessary to justify a preliminary injunction. Here, Petitioner has not demonstrated the requisite "great and certain" irreparable harm, and the balance of the harms and public interest also weigh against entry of any

37

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

injunction. See Nken, 556 U.S. at 435 (balance of equities and public interest typically merge when United States is opposing motion for preliminary injunction.).

    1. Public Interest. The Supreme Court has directed "courts of equity [to] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S., 840 F. Supp. 2d 327, 340 (D.D.C. 2012) (citing Winter, 555 U.S. at 24).

    Presently, the adverse consequences to the public interest from the requested injunction would be substantial. Specifically, the injunction would interfere with the United States' ability to take steps consistent with its view of the Nation's national security interests, including to responsibly reduce the detainee population at Guantanamo, ███████████████████

███████████████████████████████████████████████

███████████████████████████████ See Kiyemba, 561 F.3d at 515.

Here, the United States has arranged to transfer Petitioner ███████████████

███████████████, and an injunction would disrupt those arrangements and the United States' ability to uphold the arrangement would be contingent upon the outcome of uncertain future litigation to vacate the transfer injunction. This type of contingency harms foreign relations interests, as well as the diplomatic process. The Department of State must have the ability to make reliable representations and commitments when engaging directly with foreign countries, including Iraq, on matters of such high sensitivity and concerning an Iraqi national. Id.; see also, e.g., Crosby v. Nat'l Foreign Trade Counsel, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice dealing with foreign governments"). In sum, an injunction would impose significant harm on Respondents, including by "interfer[ing] with the Executive's ability to conduct the sensitive

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

diplomatic negotiations required to arrange safe transfers for detainees." See Kiyemba, 561 F.3d at 515. Such interference is legally and otherwise improper.

    2. Irreparable harm and balance of equities. As explained supra, to warrant a preliminary injunction, one of the factors Petitioner must show, in addition to a likelihood of success on his claims, is that irreparable harm to him is likely in the absence of an injunction. Winter, 555 U.S. at 22. The Court of Appeals has described the needed injury as having to be "both certain and great." See Wisconsin Gas Co., 758 F.2d at 674. "[A] showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction." See Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n, 490 F. Supp. 3d 169, 188 (D.D.C. 2020) (quoting Achagzai v. Broad. Bd. of Governors, 170 F. Supp. 3d 164 (D.D.C. 2016)). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." See Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). The threat of irreparable injury must be "both certain and great; it must be actual and not theoretical." Id.

    There is presently no showing of likely—let alone certain—harm to support any injunction in light of the Government's policy to assure humane treatment. See generally Ex. 1, Decl. Amb. Richard ¶ 3. Petitioner claims that he will face irreparable harm in light of his prior alleged crimes in Iraq, minority religious affiliation, and medical needs. Petitioner's claims of potential harm, however, are not well-founded █████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

Consequently, Petitioner fails to articulate a tangible injury that is "certain and great," and he has

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

failed to satisfy the irreparable injury prong of the preliminary injunction standard. See Gospel

Churches, 454 F.3d at 297.

Under these circumstances, Petitioner has failed to demonstrate that the balance of

equities tips in his favor. Petitioner's uncertain treatment concerns, which are contrary to the

assessment of the Government—an assessment to which Munaf, Kiyemba, and Omar instruct the

Court to defer—fail to demonstrate irreparable harm and are outweighed by the public interest

concerns discussed supra, including the harm to foreign relations and national security.

* * *

In summary, Petitioner cannot satisfy any of the prongs necessary to support the

extraordinary relief that he seeks here. Most importantly, he can show no likelihood of success,

a failure that dooms his motion. Accordingly, he has provided the Court with no ground to grant

him the preliminary injunctive relief he seeks.

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

## CONCLUSION

For the foregoing reasons, Petitioner's motion for a preliminary injunction should be

denied.

8 January 2025

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

TERRY M. HENRY
Assistant Branch Director

/s/ Ronald J. Wiltsie
RONALD J. WILTSIE (DC Bar 431562)
ANDREW I. WARDEN (IN Bar No. 23840-49)
Senior Trial Counsel
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, NW, Room 7500
Washington, D.C. 20530
Tel: 202-514-4107
Email: Terry.Henry@usdoj.gov

*Attorneys for Respondents*

41

~~PROTECTED INFORMATION//FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION FILED UNDER SEAL~~

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

NASHWAN AL-RAMER
ABDULRAZZAQ (ISN 10026),

    Petitioner,

    v.

JOSEPH R. BIDEN, JR, *et al.*,

    Respondents.

No. 17-cv-1928 (EGS)
~~FILED UNDER SEAL~~

NASHWAN AL-TAMIR (ISN 10026),

    Petitioner,

    v.

JOSEPH R. BIDEN, JR, *et al.*,

    Respondents.

No. 25-cv-0015 (EGS)
~~FILED UNDER SEAL~~

## RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION

### EXHIBIT 1

DECLARATION OF AMBASSADOR ELIZABETH RICHARD

~~PROTECTED INFORMATION FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION – FILED UNDER SEAL

## DECLARATION OF ELIZABETH RICHARD

I, Ambassador Elizabeth Richard, pursuant to 28 U.S.C § 1746, hereby declare and say as follows:

1. I am the Ambassador-at-Large and Coordinator for Counterterrorism at the Department of State, serving as the principal adviser to the Secretary of State on international counterterrorism matters and leading the Bureau of Counterterrorism. In this capacity, I also oversee the Office of the Special Representative for Guantanamo Affairs, which conducts and coordinates diplomatic engagement with foreign governments concerning the repatriation and resettlement of individuals who are detained at the U.S. detention facility at Guantanamo Bay. I am a career Foreign Service Officer. Previously, I served as the U.S. Ambassador to the Lebanese Republic, as the Deputy Assistant Secretary for Near Eastern Affairs, and as the Deputy Chief of Mission in Sanaa, Yemen. I have also served in Pakistan, Afghanistan, Italy, and Southeast Asia.

2. The information provided in this declaration is based on information supplied to me in my official capacity.

3. The Department of State is committed to identifying "a suitable transfer location . . . outside of the United States" for transfer-eligible Guantanamo detainees, "consistent with the national security and foreign policy interests of the United States and the commitment set forth in section 2242(a) of the Foreign Affairs Reform and Restructuring Act of 1998." *See* Executive Order 13567. Consistent with Section 2242(a) of the Foreign Affairs Reform and Restructuring Act of 1998, it is the policy of the United States "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." The United States interprets "substantial grounds for believing the person would be in danger of being subjected to torture" to mean "if it is more likely than not that he would be tortured." This policy is consistent with the approach taken by the United States in implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment with respect to individuals within its territory.

PROTECTED INFORMATION – FILED UNDER SEAL

1

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION – FILED UNDER SEAL

4. The Department of State is responsible for obtaining, in consultation with the Department of Defense, appropriate security and humane treatment assurances regarding any Guantanamo detainee to be transferred to another country and ensuring the humane treatment assurances, including with respect to torture, are consistent with U.S. government detainee transfer policies.

5. Decisions with respect to the transfer of Guantanamo detainees are made on a case-by-case basis, taking into account factors such as the particular circumstances of the transfer; conditions in the proposed receiving country; any humane treatment concerns or special needs of the individual detainee, including medical needs; and assurances received from government authorities. Recommendations by the Department of State regarding transfers are decided by the interagency through a process involving input by officials familiar with the security and humanitarian conditions in the countries concerned. Within the Department, officials in the Bureau of Counterterrorism, the Office of the Legal Adviser, the Bureau of Democracy, Human Rights, and Labor, the relevant regional bureau, and the embassy in the country of destination provide their input based, among other factors, on knowledge of the country's government institutions, its human rights conditions, any history of providing humane treatment assurances related to past transfers from Guantanamo, whether the country has abided by those assurances, and any allegations of mistreatment of similarly situated individuals.

6. Accordingly, in evaluating foreign government assurances relating to torture, the Department assesses whether it is more likely than not that the individual will be tortured in the country to which he may be transferred. To make this determination, the Department considers the treatment the individual is likely to receive upon transfer, taking into account any specific commitments of officials from the foreign government responsible for accepting the transfer of custody of the individual; information or allegations of prior or potential future mistreatment in the receiving State; the receiving State's overall human rights record; any specific risk factors that may be present such as religion or political views; whether similarly situated individuals have been tortured in the receiving State; and the humane treatment assurances provided by the receiving State, including an assessment of the assurances' credibility. Where concerns about the treatment of an individual cannot be resolved

PROTECTED INFORMATION – FILED UNDER SEAL

2

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

satisfactorily prior to transfer, the Department has in the past and would in the future recommend against transfer.

7. As appropriate to the situation and needs of a detainee proposed for transfer, the Department may also seek specific commitments related to medical or rehabilitation services that the individual will receive. When evaluating such commitments, Department officials consider the identity, position, or other information concerning the official relaying the assurances, available resources and capabilities in the country, and political or legal developments in the foreign county that provide context for the commitments provided. In addition to seeking, obtaining, and evaluating assurances of humane treatment, including for necessary medical care, the Department follows up with receiving governments to monitor their treatment of the transferred individual and compliance with those assurances.

8. Mr. Abd al Hadi al-Iraqi (also known as Nashwan al-Tamir, ISN 10026) is currently in U.S. Department of Defense custody at the U.S. Naval Station in Guantanamo Bay, Cuba. Mr. al-Iraqi entered a plea agreement in June 2022 to serious military commission terrorism charges, with a provision that delayed his sentencing for two years to permit the U.S. government to seek another country in which he could serve out his sentence. The Department of State has diligently undertaken efforts to identify an appropriate and willing transfer country for Mr. al-Iraqi, with due consideration for ensuring that his healthcare needs will be met.



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION – FILED UNDER SEAL



10.

11.

PROTECTED INFORMATION – FILED UNDER SEAL

4

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION – FILED UNDER SEAL



12.

13.

14.

15. The Department plans to continue to monitor the treatment of Mr. Al-Iraqi after transfer and is confident it has the diplomatic tools and resources to engage effectively with the Government of Iraq, assess whether it is upholding its humane treatment assurances, and press for better treatment if necessary.

16. This declaration is being submitted under seal, because it outlines aspects of sensitive diplomatic communications with foreign governments. As a general matter, the Department does not disclose the content of specific sensitive diplomatic communications with foreign governments, as such disclosure could have a chilling effect on future communications with those governments. Nor does the Department disclose the internal deliberative reasons why

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION – FILED UNDER SEAL

it has recommended that a particular detainee may or may not be transferred to a particular country

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true, accurate, and correct to the best of my knowledge.

Jan. 8  2025

Date

Elizabeth Richard /RR

Elizabeth Richard

PROTECTED INFORMATION – FILED UNDER SEAL

6

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION FILED UNDER SEAL~~

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

NASHWAN AL-RAMER
ABDULRAZZAQ (ISN 10026),

       Petitioner,

       v.

JOSEPH R. BIDEN, JR, *et al.*,

       Respondents.

No. 17-cv-1928 (EGS)
~~FILED UNDER SEAL~~

NASHWAN AL-TAMIR (ISN 10026),

       Petitioner,

       v.

JOSEPH R. BIDEN, JR, *et al.*,

       Respondents.

No. 25-cv-0015 (EGS)
~~FILED UNDER SEAL~~

## RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION
## FOR PRELIMINARY INJUNCTION

### EXHIBIT 2

### PETITIONER'S STIPULATION OF FACTS

~~PROTECTED INFORMATION FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



## STIPULATION OF FACT

This Stipulation of Fact is entered into by the Prosecution and Defense knowingly and voluntarily in the case of *United States v. Abd al Hadi al Iraqi* (Variants: Abd al-Hadi, Abdul Hadi, al-Iraqi, Hadi), a.k.a. Nashwan Abd al-Razzaq Abd al-Baqi (Variants: Nashwan, al-Rezzaq, al-Baqi), a.k.a. Abdallah Khan, a.k.a. Abu 'Abdallah, a.k.a. Abd al-Muhayman al-Iraqi (Variant: Abdul Muhaymin), a.k.a. Abd al-Hadi al-Ansari, a.k.a. Abu Nadia, a.k.a. Ahmad Gazi (Variant: Ghazi), a.k.a. Khutaiba al Ansari (Variant: Khotaiba), a.k.a. Abdulrahman Yar Mohammed (Variant: Abdurahman Son of Yar Mohammed), a.k.a. Mohammad Reza Ranjbar Rezai (Variant: Muhammet Reza Ranjbar Rezaei), and a.k.a. Nashwan al Tamir (the "Accused").

It is hereby stipulated and agreed, by and between the Prosecution and Defense, with the express consent of the Accused, that the following facts are true and, based on the evidence the Prosecution intends to introduce against the Accused, could be proven beyond a reasonable doubt:

### I.    The Accused's Background

1.  The Accused was born in Mosul, Iraq in 1961. He studied engineering and mechanics in college for two years and graduated in 1980. He was then drafted into the Iraqi army and from 1980 to 1984, he operated and repaired the target boxes that raised and lowered on the targeting range. During this assignment, he also drove a taxi part time at night and on holidays. He later served in the 444 ("Four Four Four") Brigade. The Accused enlisted in the reserves and remained on active duty. In 1984, he was assigned to be an office clerk, with responsibility for general administrative duties such as payroll, tracking muster, and writing reports on any discipline issues. He continued in this assignment until late 1988 after obtaining promotion to sergeant.

2.  The Accused returned to Mosul, where, until 1989, he drove his taxi and worked as a contractor in road construction. He was recalled to the Iraqi army in 1990, but did not report as instructed. He fled to northern Iraq to assist the Kurdish Islamic Movement and its leader, Sheikh Uthman, in its opposition against Saddam Hussein. He then traveled to Pakistan, arriving in Peshawar in 1991 to join the Mujahedeen and joined the jihad ("meritorious struggle or effort") and fight the former Soviet Union. Mujahedeen are "Muslims who fight on behalf of Islam or the Muslim community." The Accused trained at Al-Farouk training camp.

3.  In 1997, he married an Afghan woman and moved to Kabul. He and his wife have four children.

### II.    The Accused is subject to the Jurisdiction of the United States Military Commission

4.  The Accused is, and has been at all times relevant to these proceedings, a person subject to trial by military commission under Section 948c of the Military Commissions Act of 2009 ("M.C.A.") as an "alien unprivileged enemy belligerent." The Accused has never been a citizen of the United States and is therefore an "alien."

Prosecution Exhibit 37
Page 1 of 21

1

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION//FILED UNDER SEAL

5.  The Accused is an "enemy belligerent" because he engaged in hostilities against the United States and its coalition partners; purposefully and materially supported hostilities against the United States and its coalition partners; and was part of al Qaeda at the time of the alleged offense.

6.  The Accused is an "unprivileged" belligerent because he does not fall within one of the eight categories enumerated under Article 4 of the Geneva Convention Relative to the Treatment of Prisoners of War of 1949.

### III.    The Accused's Activities Took Place in the Context of and Were Associated with Hostilities

7.  The Accused's activities occurred during the period of hostilities between al Qaeda and the United States.

8.  In approximately 1990, Bin Laden called for the withdrawal of U.S. troops from the Arabian Peninsula. Shortly thereafter, Bin Laden directed his mujahedeen fighters in Afghanistan and Sudan to attack the Saudi Arabian government and to overthrow governments perceived to be secular and apostate, like Saudi Arabia, by attacking their main supporter, the United States.

#### a. Usama Bin Laden and Al Qaeda Background

9.  Bin Laden founded al Qaeda in approximately 1991 with Sheikh Abu Hafs al-Masri ("Sheikh Abu Hafs, Abu Hafs, Mohammed Atef, Ahmed Abd al-Aziz Ahmed bin 'Abd al-Aziz, Abu Hafs Al-Commandant, Abu Hafs al Commandan, Al-Komandat, The Commandant, el Khabir, Taysir, Sheikh Taysir Abdullah," and ("Abu Hafs")). Al Qaeda was headquartered in Afghanistan and Peshawar, Pakistan. Al Qaeda opposed the continued presence of American military forces in Saudi Arabia during and following the 1991 war with Iraq.

10. Al Qaeda opposed the U.S. Operation Restore Hope in Somalia in 1992 and 1993. Immediately following the withdrawal of U.S. troops from Somalia, Bin Laden advocated for attacks on U.S. targets in the Arabian Peninsula.

11. In or about August 1996, Bin Laden issued a public statement entitled "Declaration of Holy War Against the Americans Who are Occupying the Land of the Two Holy Places" ("1996 Declaration"), in which Bin Laden called for, among other things, the killing of U.S. military personnel serving on the Arabian Peninsula. This declaration was published in the Quds Al-Arab, a United Kingdom newspaper.

12. Bin Laden published religious justification from multiple Islamic scholars supporting Bin Laden's ideas. This publication served as a warning to the U.S. and Israel as Islam dictates a Muslim must first warn his enemies before attacking them.

13. In or about March 1997, in an interview with CNN, Bin Laden promised to "drive Americans away from all Muslim countries," and warned the U.S. military and civilians.

Prosecution Exhibit 37<br>
Page 2 of 21

2

PROTECTED INFORMATION//FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

14. Bin Laden, called for the immediate withdrawal of U.S. troops from the Arabian Peninsula. Bin Laden justified this position through a series of fatwas that supported Kafirs, primarily Christians and Jews to be removed from the Arabian Peninsula. Fatwas are legal ruling on a point of Islamic law by a "mufti" – a recognized authority. Kafir is a non-believer.

15. In approximately 1998, Bin Laden and Abu Hafs from al Qaeda met with several other Islamic militant groups, including Abu Yassir from Jamaat Islamiyya, and Dr. Zawahiri from Egyptian Islamic Jihad ("EIJ"). They adopted the banner of the International Front for Jihad against Christians and Jews, also known as the Jamaa Al-Alemmia. They agreed with the concept of attacking Americans and agreed to adopt the strategy of attacking the U.S. and its interests around the world. The group published disseminated to several news outlets a document to notify the world of the groups' unification and collective goals. Bin Laden further announced the unification in an interview with ABC news. This fatwa ("1998 Fatwa") claimed that "to kill Americans and their allies, both civilian and military, is the individual duty of every Muslim able to do so, and in any country where it is possible" or words to that effect. The 1998 Fatwa further declared it is "God's order to kill Americans and plunder their wealth wherever and whenever they find it," or words to that effect.

16. Bin Laden conducted interviews with the United Kingdom based Quds Al-Arab newspaper and with Al-Jazeera as well as to additional U.S. media representatives to ensure Americans received his warning.

17. On or about May 28, 1998, in an interview with ABC News in Afghanistan, Bin Laden reiterated the 1998 Fatwah's call for killing Americans, emphasizing that "We do not differentiate between those dressed in military uniforms and civilians. They are all targets of this fatwah." Bin Laden further stated that if his demands were not met, al Qaeda would "send" to the U.S. "the wooden boxes and coffins" containing the corpses of American troops and the American civilians."

18. On or about May 29, 1998, Bin Laden issued a statement entitled "The Nuclear Bomb of Islam," calling for all Muslims to continue efforts to seek nuclear and biological weapons in preparation for a war against America and its allies. In it, Bin Laden stated that "it is the duty of the Muslims to prepare as much force as possible to terrorize the enemies of God."

19. Al Qaeda attacked the U.S Embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya on 7 August 1998. The attacks killed 224 people, including 12 American citizens, and wounded more than 4,000 people.

20. In or about spring of 1999, the Accused documented in a blue notebook lessons about jihad and fighting against apostates and infidels where the Accused described jihad as "signifying going to fight . . . against the infidels, People of the Book, and the apostates." The Accused defined apostasy as "the abandonment of Islamic faith by consent or action or non-belief, by anyone who was proven Muslim before; without cause, or justification" or words to that effect.

Prosecution Exhibit 37
Page 3 of 21

3

PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

21. On 12 October 2000, al Qaeda attacked the U.S.S. COLE in Yemen, killing 17 United States Sailors, injuring 37 other personnel, and causing over $250 million in damage to the U.S.S. COLE.

22. Bin Laden authorized attacks against U.S. civilians inside of the U.S., including the terrorist attacks of September 11, 2001, which killed 2,976 military and civilian personnel, injured thousands more, and caused over $40 billion in property damage and economic losses.

23. From at least 1990 and continuing today, in response to al Qaeda's hostile actions the United States committed substantial political and military resources to combat al Qaeda throughout the world. The actions of the United States included, amongst others developing political, intelligence, and military agreements with foreign nations throughout Europe, Asia, the Middle East, and Africa to form a counter balancing force to combat al Qaeda around the world; deploying and using military force against al Qaeda, such as missile strikes and training assistance to friendly forces between 1990 and 2001; and continued commitment to substantial political and military resources to combat al Qaeda throughout the world.

24. Specifically, the United States took numerous actions, including, but not limited to: in 1996, the CIA opened a special Bin Laden Station to focus U.S. intelligence operations; on 20 August 1998, in response to al Qaeda's bombings of two U.S. Embassies in East Africa, the United States launched missile strikes on al Qaeda targets in Afghanistan and Sudan as part of Operation Infinite Reach, invoking Article 51 of the Charter of the United Nations because the missile strikes were an exercise of the inherent right to self-defense, in letters to the United Nations and notification to Congress of military action; President William J. Clinton announced that the strikes were necessary military actions and lawful under the law of war, in order to respond to the deaths of 12 American citizens (among the deaths of 224 people and wounding of more than 4,000 people) in the Embassy bombings; on 18 September 2001, Congress passed and the President signed into law the Authorization for Use of Military Force, authorizing the President to use all necessary and appropriate force against the organizations responsible for the September 11 terrorist attacks, culminating in the 2001 military response in Afghanistan; on 7 October 2001, President George W. Bush announced that the United States had begun military strikes on al Qaeda facilities in Afghanistan and invoked United Nations Article 51 self-defense to justify the strikes and military actions against al Qaeda and the Taliban; on 13 November 2001, the President announced that al Qaeda attacks on United States diplomatic and military personnel were on a scale that created a state of armed conflict. The President highlighted the lengthy and sustained actions of al Qaeda as a systemic campaign of hostilities justifying application of the law of war. The major al Qaeda attacks included: the August 1998 Embassy bombings in Kenya and Tanzania; the October 2000 attack on U.S.S. COLE; and the September 11, 2001 terrorist attacks.

## IV. The Accused was a Senior Leader in Al Qaeda in Afghanistan and Supported the Goals and Objectives of Al Qaeda and Usama Bin Laden

25. The Accused performed activities on behalf of al Qaeda, al Qaeda associates, and the Taliban.

Prosecution  Exhibit 37
Page 4 of 21

4

PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION//FILED UNDER SEAL

26. Beginning in or about 1996 through in or about 1998, the Accused distributed copies of al Qaeda propaganda to existing and prospective al Qaeda members to garner support for al Qaeda.

27. Beginning in or about 1997, the Accused commanded al Qaeda's operations at or near Kabul, Afghanistan.

28. In or about 2000, the Accused attended an event in celebration of the unification of Al Qaeda and the Egyptian Islamic Jihad. Bin Laden was elected Emir, Dr. Zawahiri his deputy, and Abu Hafs was elected third in charge. The new group was called "Jamaat al Qaeda wa-Jihad." The meeting included prominent al Qaeda members: Abu Hafs, Abu Khair, Dr. Zawahiri, Saif Al-Adl, Abu Hafs Al-Mauritan, Abdul Malik, Sheikh Sa'id, and Bin Laden.

29. In or about 2000, the Accused served on al Qaeda's senior advisory council.

30. Beginning in or about 1999, the Accused met with co-conspirators, including Bin Laden and Dr. Zawahiri, regarding matters at the frontline. He would also visit with his co-conspirators, including Bin Laden and Dr. Zawahiri, when he traveled to Kandahar to pick up supplies. During those visits, they would listen to speakers on Israel's treatment of the Palestinians, the legitimacy of the Taliban, and other topics.

31. Beginning in or about 2000, the Accused and other members of al Qaeda's senior advisory council drafted al Qaeda's Organizational Manual that defines the goals of al Qaeda and lays out the governing rules, responsibilities, and requirements of the Emir, the leadership Council, the Military Committee, the Political Committee, the Administrative and Financial Committee, the Security Committee, and the Follow-Up Committee.

32. In or about June 2001, the Accused was appointed by Bin Laden as a Consultative Council Member for the Union Agreement between Qa'idat Ansar Allah (a.k.a al Qaeda) and Al-Jihad (a.k.a. EIJ), which formed a newly united al Qaeda, and all members to the Union Agreement gave allegiance to the al Qaeda Emir, Bin Laden. The Council, held several responsibilities, such as: appointment and dismissal of the Emir, oversight of the Emir and the group's activities, receive reports on Emir's future activities, attend the Consultative Council meeting every six months, attend emergency council sessions as requested by the Emir, select members of the Judicial Committee, file charges against any members of al Qaeda through the Judicial Committee, and to act as a voting member for resolutions.

33. As a general member to the newly united al Qaeda, the Accused also agreed to several rules, including: obedience to the orders of the Islamic Emirate of Afghanistan and viewing al Qaeda as a subordinate organization; acknowledgment of al Qaeda's global work scope; upholding the secrets, finances, properties, and reputation of al Qaeda; compliance with his commitments to al Qaeda; espouse the tenets of Islam, to include the unity of all Muslims; giving advice to rulers and common people of the Muslim community; and a prohibition from affiliation with any other organization.

34. On or about June 2001, Bin Laden in Tarnak Qila ("Tarnak Farms") in Kandahar, Afghanistan, announced the merger of the Egyptian Islamic Jihad and al Qaeda.

Prosecution Exhibit 37
Page 5 of 21

5

PROTECTED INFORMATION//FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION//FILED UNDER SEAL

### V.    The Accused Prepared, Trained, and Fought In the Tajikistan Civil War

35. In or about 1996, the Accused commanded and taught at al Farouk training camp located at or near Khost, Afghanistan for the purpose of training individuals to fight against the government of Tajikistan in support of the United Tajik opposition. Al-Qaeda members, amongst others, trained at the al-Farouk camp.

36. At the Al-Farouk camp, the Accused taught courses on topography, and history. The Accused's goals for trainees at the Al-Farouk camp were to develop fighting skills and confidence on the battlefield, which the Accused accomplished through lessons in Islam, the objectives of jihad, and weapons training.

37. In or about 1996, the Accused and his trainees traveled to Northern Afghanistan to fight against the government of Tajikistan, where the Accused met with Mullah Omar (not the same individual as the leader of the Islamic Emirate of Afghanistan, Mullah Mohammad Omar) and the Accused suggested guerilla warfare as the strategy for fighting.

38. In or about 1997, in a meeting with Abu Hafs, the Accused advocated al Qaeda's support in Tajikistan involving sending well-trained Arab and Tajik Taliban groups to coordinate attacks with al-Nahda, another jihadist group operating in Tajikistan.

### VI.    The Accused Prepared, Trained, and Fought In the Afghanistan Civil War

#### a.  Interactions with Taliban Senior Leaders

39. In or about late 1997, the Accused met with Mullah Omar's Deputy, Muhammad Rabbani a.k.a. Mullah Hajji Sahib, to discuss plans for the release of al Qaeda fighters captured by Massoud, vehicle shortages on the front lines, and a location for the Accused's headquarters.

40. In or about April 1998, the Accused requested from Muhammad Rabbani, Taliban Deputy Chairman of the Head Council, registration documents for a vehicle utilized by the Accused and his al Qaeda fighters on the Kabul front lines, in support of the Taliban.

41. In or about June 1998, the Accused coordinated with the Taliban and al Qaeda member, Abu Ata, the possible acquisition of stolen Russian Army supplies, containing: 1,000 AKM, 500 Klakov, 100 Shishnikov, 100 PK, 100 Makarov, 100 RPG, 600,000 AKM bullets, 10,000 RPG projectiles, and 6 MU8MTB1 helicopters.

42. In or about 2000, the Accused served as a representative to the Taliban's "Arab Liaison Committee."

43. The Accused liaised with the Taliban governors of Khost and Herat (both known as Abdul Rauf); Mullah Mohammad Fazl (Variant: Mullah Fasl, and Mullah Mohammad Fasl) a.k.a. Mullah Fadl, and Abdul Razzaq from Mazar-e-Sharif; and another Abdul Razzaq, the Taliban Minister of the Interior, who was also in command when the Taliban took control of Kabul in 1996.

Prosecution  Exhibit 37
Page 6 of 21

6

PROTECTED INFORMATION//FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION//FILED UNDER SEAL

44. In or about October 2000, the Islamic Emirate of Afghanistan's Ministry of National Airline and Tourism informed the Department of Ariana Airlines that the Accused's companions would be charged the same airfare as Afghans.

45. In or about 2001, the Islamic Emirate of Afghanistan's General Department of Intelligence informed the Afghan Government Housing Department that a house located near Sharinaw has been assigned to the Accused.

46. In or about May 2001, the Islamic Emirate of Afghanistan's Special Office of the Supreme Leader informed the Afghan Government General Department of Intelligence that the Accused and his companions were authorized to possess weapons and vehicles with tinted windows and instructed the General Department of Intelligence to prepare government identification cards for the Accused and his travel companions.

### b. Interaction with Al Qaeda Senior leaders

47. In or about 1997 the Accused had command of al Qaeda fighters in Kabul to assist the Taliban in the Afghan Civil War. In or about 1997, the Accused received Bin Laden's personal vehicle to utilize on the Kabul front lines in support of the Taliban.

48. Between 1997 and 2000, the Accused and Abu Hafs corresponded and communicated regarding al Qaeda's presence in Afghanistan and their support for the Taliban. This included the Accused providing battlefield updates, logistics, personnel matters, and training; and requesting instruction regarding al Qaeda fighters captured by Massoud on the Kabul front.

49. In or about November 1998, the Accused informed Saif al Adl, al Qaeda chief of security, of growing ideological discontentment within the ranks of his fighters potentially causing objection to supporting the Taliban. The Accused, with support from Abu Faraj, directly requested from Saif al Adl that al Qaeda initiate an informative program for the Arab fighters on the Taliban frontlines.

50. In or about November 1998, the Accused informed Saif al Adl of battlefield updates in support of the Taliban, and that he coordinated with the Taliban on al Qaeda housing and vehicle shortages in Kabul.

51. In or about November 1998, the Accused requested Abu Hafs approve the al Qaeda Front Line Organization Chart where the Accused assigned the following positions and responsibilities: himself as the Emir of the Front, a Deputy/Chief of Staff to be named, Abd al Salam al-Hadrami as the frontline commander who would fulfill the position of Chief of Staff/Deputy until the arrival of the Deputy to the front, Abu Tariq al Tunisi as Commander of the Heavy Arms Position, Abu al-Hasan as the Frontline Administrative Commander, and Abu Hafs al-Arab as the Guest house Commander.

52. In or about November 1998, Abu Hafs informed the Accused of the first meeting of the al Qaeda Chiefs of Staff to be held on December 07, 1998 where the Accused, as the Emir of the Front, was instructed to produce the frontier organizational chart, the frontier financial records, the second phase of the military operational plan, and any other issues.

Prosecution Exhibit 37
Page 7 of 21

PROTECTED INFORMATION//FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

53. In or about November 1998, the Accused informed Abu Hafs regarding tasks of the frontlines to include participating with the Taliban in the defense of Kabul, driving the enemy away from the holy place of Islam and the Muslims, and to train new recruits so they can establish their credibility and increase their ability to perform.

54. In or about February 1999, Abu Hafs corresponded with the Accused and assured him that the relationship between al Qaeda and the Taliban, to include Mullah Omar, was strong following Bin Laden's interview with Al Jazeera and BBC; provided updates to the Accused regarding the Taliban and the United States, and their political relationships with Saudi Arabia, United Arab Emirates, Egypt, France, Russia, and Palestine; informed the Accused that the United States threatened the Taliban on multiple occasions and that the U.S. would take action holding the Taliban responsible should Bin Laden conduct operations against U.S. interests; and informed the Accused that the Taliban sent Mullah Abd-al-Jalil as their representative to Pakistan to discuss terms with the United States envoy regarding Bin Laden's presence in Afghanistan. Abu Hafs provided to the Accused what he understood to be the terms given to Mullah Abd-al-Jalil by the United States envoy.

55. In or about spring 1999, Abu Hafs, on multiple occasions, provided the Accused with advice on how to handle a conflict between the Accused and Abu Musab al Suri and other disagreements/conflicts that could arise amongst the various fighting groups or within al Qaeda.

56. In or about May 1999, the Accused provided Abu Hafs multiple battlefield updates on an operation conducted in coordination with the Taliban where the Accused and his fighters directly engaged Jamiat-e Islami, led by Ahmad Shah Massoud. In or about September 1999, the Accused, as "Director of the Arab brothers in Kabul," sent an official request to the Coordinator of Hawa'i field for the Islamic Emirate of Afghanistan requesting official flights to Kandahar for Abd-al-Salam al-Hadrami and Abu Rawaha al-Hadrami.

57. In 1999 Abu Hafs requested that the Accused represent al Qaeda in a meeting with Mullah Omar in Kandahar that was attended by the various fighting groups in Afghanistan for the goal of coordinating their efforts and operations with the Taliban in Afghanistan. The Accused met with Mullah Omar individually before the meeting.

58. Beginning in or about 1999, the Accused served as a liaison between al Qaeda and the Taliban.

59. In or about July 2000, the Accused wrote an instructional letter on how foreign fighters should conduct themselves on the Taliban frontlines. The Accused stated that fighting with the Taliban was a matter of Sharia and further iterated that fighting with the Taliban was a training ground for al Qaeda forces in order to fight against more organized and capable armies.

60. In or about March 2001, Mullah Obaidullah authorized the Accused and other foreign fighters, including al Qaeda members, to travel to Bamiyan to assist the Taliban with the destruction of the Buddha statues at or near Bamiyan, Afghanistan. After unsuccessful attempts by the Taliban to destroy the Buddha statues with tank and rocket fire, the Taliban asked the Accused's men to travel to the region and assist in using high explosives to destroy the statues, including the main Buddha statue, approximately 55 meters high, and the smaller Buddha statue,

8

Prosecution Exhibit 37
Page 8 of 21

PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

approximately 38 meters. The Accused and his men assisted the Taliban's on-scene explosives expert in destroying the head of a Buddha statue. The Accused's men used local Shia/Hazara men (lowered from timber above the statue) to plant the high explosives charge. After a statue was broken into large pieces, the Accused and his men assisted the Taliban in attempting to destroy the remaining statues by hand with mining picks. The Accused then went to Kabul to try to obtain a jackhammer to expedite the effort, but could not locate one. A few days later, he went back to Bamiyan to pick up his men.

## VII.   The Accused Managed and Oversaw Guest House Operations

61. Beginning in or about 1996 through in or about 1998, the Accused commanded al Qaeda guesthouse operations at or near Kabul, Afghanistan, including the Ashara and the Ghulam Bacha guesthouses. The Ashara Guesthouse was originally called the Khotaiba (Variants: Kutayba, Qutayba, Qutaiba) Guesthouse, after one of the Accused's aliases, or kunya. The Accused established the Ashara guesthouse in Kabul, Afghanistan.

62. The Accused managed the Ashara guesthouse for two to three months, before handing off responsibility to Abu Wakil so the Accused could leave Kabul to command mujahedeen on the front lines. The Accused oversaw all guesthouse operations in Kabul, to include Ashara and Ghulam Bacha, both well-known al Qaeda guesthouses. During this time, Abu Wakil, in his role as manager of the Ashara guesthouse, reported directly to the Accused. Abu Wakil, like all guesthouse managers, was given al Qaeda funds to pay the staff, purchase food, blankets, sleeping bags, and other needed supplies. These funds were provided on behalf of al Qaeda leadership, often directly from the Accused.

63. In or about 1999, the Accused, as Emir of the Front, received 131,900 Kildars to support employees and workers in Khost and Kabul, including those supporting the Al-Ansar guesthouse, al Qaeda fighters on the frontlines, and married Al Qaeda members.

## VIII.   The Accused Commanded, Funded, and Liaised With Other Jihadist Groups, To Support Al Qaeda in Preparation of Al Qaeda's Conflict With the United States in Afghanistan

64.       Bin Laden gave a standing order for al Qaeda to kill Pakistani President Pervez Musharraf, Afghan General Abdul Rashid Dostum, and Ahmad Shah Massoud, leader of the Northern Alliance and Jamiat-i Islami party.

65. The Accused met with Mullah Fazl of the Taliban, regarding the Accused's strategy for his proposed imminent attack on the Northern Alliance forces.

66. After the 9/11 attacks, the Accused expressed concern to senior al Qaeda leadership on the timing of the attacks and al Qaeda and the Taliban's readiness for U.S. retaliation. In or about summer 2001, Bin Laden provided the Accused with approximately $20,000 U.S. for weapons and ammunition to be used in Northern Afghanistan to address the concern that the U.S. would join with the Northern Alliance. Following the meeting, the Accused attempted to make his way to Northern Afghanistan but the road had been destroyed by Shia Afghans. The Accused then attempted to travel to Northern Afghanistan via a different route, but this pass had

PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

also been destroyed. He returned to Kabul and provided the money to Abu Khair for al Qaeda's Kabul operations.

67. In or about the fall of 2001, the Accused left Kabul for Takhar and had two meetings with Mullah Fazl.

68. The Accused met with Khalid Sheikh Mohammed at Zormat, near Shahi Khot, after the September 11, 2001 attacks. Zormat was a central stopping point for individuals travelling from Afghanistan to Pakistan. The Accused helped facilitate cross border movement of fighters from multiple groups and their families.

69. Usama Bin Laden fled to Tora Bora toward the end of 2001 with approximately 200 al Qaeda fighters. The Accused, Abu Faraj, and approximately 600 other fighters were in Khost Province. Several hundred other fighters were with Abu Hafs and Saif al Adl in Kandahar. Abu Faraj and the Accused indirectly communicated with Bin Laden during this time. After the Accused lost contact with Bin Laden, the Accused, Abu Faraj, and their 600 fighters traveled into Zormat, Shahi Khot.

70. The Accused, and other leaders, attended a meeting in Zormat led by Abu Khair to discuss al Qaeda strategy and tactics. They decided that they would wait before initiating a guerilla war. The Accused led approximately 100 fighters in Afghanistan and Pakistan.

71. Approximately 40-50 individuals under the Accused's command chose to stay in the mountains on the Afghan side of the border.

72. The Accused met with Saif al Adl in Khost Province and informed him of Abdul Wakeed's death in an airstrike. The Accused traveled to Peshawar, Pakistan, where he had several meetings with Khalid Sheikh Mohammed in or about spring 2002. Khalid Sheikh Mohammed asked for assistance getting a vehicle so that he could travel to Quetta. Khalid Sheikh Mohammed provided the Accused approximately $10,000 U.S. to fund al Qaeda's operations and the Accused provided receipts for previous expenses in accordance with al Qaeda policy.

73. The Accused resided in Northern Afghanistan and was responsible for organizing al Qaeda fighters in Jalalabad and Waziristan. This included securing housing for the fighters and developing a network of supporters. While in Peshawar the Accused requested that Abu Faraj to take over the responsibility of organizing al Qaeda fighters in Jalalabad. Abu Faraj replaced Khalid Sheikh Mohammed upon his arrest. Abu Faraj, in a letter, informed the Accused that the Accused would have to take back the responsibility for the Jalalabad cell.

74. Al Qaeda does not have a uniform, nor do they have any way of visibly identifying a superior. Al Qaeda dresses like the local population. Al Qaeda fighters would carry arms and bandoliers openly in Afghanistan and Pakistan. Al Qaeda fighters would typically wear multiple bandoliers, carry a knife, a Leatherman multi-tool, a Kalashnikov, and at least two grenades. Because they were carrying more munitions then the average local Pashtun, they would hide some of their weapons under their clothing.

Prosecution Exhibit 37
Page 10 of 21

PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

IX.    **The Accused Commanded, Trained, Funded, and Supplied Al Qaeda Fighters,
Operatives, and Suicide Bombers In Support of Al Qaeda's Conflict With
United States in Afghanistan From 2002 - 2004**

75. From 2002 through 2004, the Accused served as commander of al Qaeda forces fighting
in Afghanistan. As such, the Accused had authority and effective command and control over
subordinate al Qaeda commanders.

76. The Accused had the authority to independently conduct operations in Afghanistan on al
Qaeda's behalf. During this period, he was the ultimate approval authority within this region for
attacks by al Qaeda, and sometimes the Taliban, that resulted in the deaths of U.S. and coalition
forces.

77. Between in or about March 2002 and in or about 2004, the Accused directed, organized,
funded, supplied, and oversaw al Qaeda's operations against U.S. and coalition forces in
Afghanistan.

78. Between in or about March 2002 and in or about 2004, the Accused coordinated al
Qaeda's operations with Taliban and other associated groups' and persons' operations against
U.S. and coalition forces in Afghanistan.

79. The Accused funded, planned, or participated in the attacks against U.S. and Coalition
military forces with the intention of influencing the policy of the U.S and coalition governments
to force them out of Afghanistan.

80. The Accused implemented al Qaeda and the Taliban's goals and objectives in
Afghanistan. The purpose of the attacks orchestrated and approved by the Accused was to fulfill
at least one of their mutual objectives: forcing the U.S. Government to withdraw its forces from
Afghanistan.

81. Between in or about March 2002 and in or about 2004, the Accused funded Taliban and
other associated groups' and persons' operations against U.S. and coalition forces in
Afghanistan.

82. Between in or about March 2002 and continuing at least until in or about 2004, the
Accused issued orders consistent with, and his co-conspirators adhered to, the following guerrilla
tactics: to attack U.S. and coalition forces; to dress in local attire in order to blend in with the
local civilian population in order to commit treacherous and perfidious acts; to use non-
conventional methods such as suicide bombings and vehicle borne improvised explosive devices
("VBIEDs"); and to videotape attacks and victims' deaths for propaganda purposes.

83. The Accused left Afghanistan for Pakistan and selected, funded, housed, trained, and
equipped approximately 70 al Qaeda fighters to conduct a guerilla war.

84. In or about December 2002, the Accused's co-conspirators conducted attacks on U.S.
military installations at or near L'Wara, Afghanistan. After Ramadan 2002, the fighters
conducted approximately nine Katushya rocket attacks against a U.S. military base in L'Wara,
firing approximately five to six rockets during each attack. On or about 21 December 2002, at or

Prosecution Exhibit 37

11                      Page 11 of 21

PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

near Shkin, Afghanistan, one of the fighters shot and killed a U.S. soldier. On or about 29 December 2002, at or near L'Wara, Afghanistan, one of the fighters shot a U.S. soldier, which rendered the soldier blind. After U.S. troops left L'Wara, the Accused's co-conspirators went to the base and burned all the structures down. One of the Accused's co-conspirator's filmed the destroyed and abandoned base for use in a propaganda video.

85. The Taliban and foreign fighters, including al Qaeda members at the direction of the Accused, staged routine mortar attacks on the military base at or near Angor Ada and Shkin, Afghanistan. Expenses incurred by individuals that conducted patrols and attacks in Shkin Afghanistan were funded by al Qaeda through the Accused. As the commander, the Accused was provided an after action report.

86. The Accused had the autonomy to commit attacks, as he deemed appropriate, within the confines of Afghanistan. The Accused provided recommendations and advice to his sub-commanders for potential targets or operations.

87. Between 2003 and 2004, the Accused considered his al Qaeda leaders to be Bin Laden, and his deputy, Dr. Zawahiri. Until his capture in Iran in 2002, Saif al Adl held the highest position in al Qaeda, below Bin Laden and Dr. Zawahiri. Saif al Adl was replaced as a senior manager in al Qaeda by Khalid Sheikh Mohammed. After Khalid Sheikh Mohammed's capture, Abu Faraj was promoted to the position. Approximately six months after Abu Faraj's capture, Sheikh Sa'id was named as Abu Faraj's successor. Sheikh Sa'id acted as the general counsel for al Qaeda until at least November 2006.

88. Abu Hafs was in charge of al Qaeda finances until his death in 2001, at which time he was succeeded by Sheikh Sa'id. Part of Sheikh Sa'id's duties as head of finances included distributing funds to al Qaeda members and their families for living expenses. The Accused's experience with financial matters as a commander allowed him to deal with both superiors and subordinates regarding distribution and accounting of al Qaeda funds.

89. When the Accused received money on behalf of al Qaeda, he would deliver the funds to al Qaeda's Sheikh Sai'id as soon as possible. When the Accused required operating funds, he would receive money from Sheikh Sai'id. The Accused understood this procedure, and followed it when handling al Qaeda money. The Accused delivered money to, and received from, Sheikh Sa'id for, and on behalf of al Qaeda. The Accused presented written budgets and requests to Sheikh Sa'id for finances to be used for al Qaeda operational purposes. The Accused provided written documentation of his prior expenditures.

90. The Accused often divided large amounts of cash and distribute smaller amounts to trusted al Qaeda confidants for safe keeping. The Accused distributed cash to individuals for specific attacks against American or coalition interests. The Accused distributed cash to sub commanders for operations within their area of responsibility. The accused required the sub-commanders to provide the Accused with detailed receipts documenting previous expenses. Khalid Habib and Abu Faraj also handled al Qaeda finances in the same manner. The Accused also knew that finances for planned external operations were delivered to Hamza Rabia from Abu Faraj, who had received the funds from Sheikh Sa'id.

Prosecution Exhibit 37
Page 12 of 21

12

PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

91. Between in or about 2003 and in or about 2004, the Accused served on a senior advisory council for the area at or near the town of Shkai on or around the border of Afghanistan and Pakistan to address the needs of Arab fighters, including members of al Qaeda, and their families in the region. Shura Councils were senior advisory councils that were responsible for making decisions regarding operations, which included al Qaeda operations, in a designated area. Bin Laden and Dr. Zawahiri would not interfere with the actions or decisions of a Council. Other members of the Shkai Shura Council in approximately 2003/2004 included Sheikh Sa'id, Khalid Habib, Abdul Rahman Al-Muhajir, Abu Khokal Al-Sudani, Abu Hamam Al-Filistini, and Abu Jihad Al-Masri.

92. In or about 2003, the Accused provided Dr. Zawahiri with a secure location in the area for several days.

93. On or about 25 April 2003, at or near Shkin, Afghanistan, the Accused's fighters attacked a U.S. military convoy, killing two U.S. service members and injuring numerous others. The Accused compensated his fighters.

94. As ultimate approval authority in the region, the Accused approved several additional rocket and mortar attacks with the intent to kill or injure U.S. and coalition forces and which likely injured or killed soldiers.

95. In or about September 2003, the Accused organized, planned, and led an ambush attack on U.S. forces located at or near a U.S. military installation at or near Shkin, Afghanistan. The Accused led a group that included 30 men from within al Qaeda, approximately 15 Uzbek fighters, and a group of Taliban fighters in the attack, which resulted in the death of one, and injury to two, U.S. military personnel. The Accused's fighters, while under the command and control of the Accused, intentionally fired RPGs and small arms at a properly marked military medical ("medevac") helicopter, which was protected property and the object of the RPG and small arms attack, as it attempted to evacuate U.S. military casualties from the battlefield. As commander, the Accused failed to take appropriate measures to ensure compliance with the law of war and prevent his fighters from violating the law of war by attacking protected property. Despite knowledge of his fighters' attack on the medevac helicopter, the Accused failed to discipline any member of his force for attacking the medevac helicopter.

96. The Accused knew, or should have known, that a medical evacuation helicopter would arrive to evacuate U.S. casualties. The Accused knew, or should have known, that the military medical evacuation helicopter was protected property under the laws of war as a military medical aircraft bearing the emblem and distinctive sign of the Medical Service of armed forces, to wit: the red cross on a white background.

97. The Accused ordered the 29 September 2003 attack on U.S. forces to be videotaped and utilized for a propaganda film, entitled "Harb Wa Salib," which includes video footage of a U.S. soldier being shot during the battle. The video also contains a shot from the Accused's command vantage point of the battle depicting a U.S. helicopter flying at eye level with the Accused and a U.S. warplane dropping cluster bombs and flares. The Accused considers the media an essential tool in warfare. The Accused provided input as to editing and submitted the video to Abdul Rahman Al-Maghrebi for propaganda purposes. The Accused understood these

Prosecution Exhibit 37
Page 13 of 21

PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION//FILED UNDER SEAL

videos had value to al Qaeda for purposes of drawing in new fighters, funds, and to spread a message that al Qaeda was successful in fighting the United States.

98. During October 2003, Abu Ayman, one of the Accused's sub-commanders who was in charge of al Qaeda operations in Gamal, Afghanistan, planned an ambush attack of a military convoy that al Qaeda understood to be Afghan Army vehicles, accompanied by one, maybe two dark four-by-four Sport Utility Vehicles (SUV), travelling from the Shkin base to the Pakistan/Afghanistan border approximately once a month and would return via the same route approximately two days later.

99. On or about 25 October 2003 Abu Ayman and his fighters ambushed the convoy on its return trip to the Shkin base by using RPGs and small arms, killing two U.S. persons. During this attack, the Accused fighters shot at a group of coalition soldiers, including injured service members. The surviving al Qaeda fighters returned from the battlefield and provided the Accused details of the attack.

100. On or about 23 May 2004, the Accused directed, planned, funded, and trained fighters for an attack on coalition forces at or near Kabul, Afghanistan. The Accused and his sub-commander, Abdul Rauf, a.k.a. Layaqat, planned to use conventional tactics in an ambush attack against a military convoy. The Accused provided two al Qaeda operatives. The money used to conduct this attack was taken from Layaqat's operational budget, which was funded by the Accused. The operatives attacked a convoy of Norwegian forces using small arms and RPGs, that resulted in the death of a member of the Norwegian military. They first fired two to three RPG rounds into the convoy, followed by two to three hand grenades, hitting at least one vehicle.

101. In approximately the summer of 2004, one of the Accused's al Qaeda fighters identified a new U.S. military base near Qalat, Afghanistan in the Zabul Province. The Accused and Abu Layth Al-Libi, of the Libyan Islamic Fighting Group, a.k.a. LIFG, developed a plan to bury a large land mine on the patrol route. The Accused ordered two of his fighters to surveil the area for the purposes of planting an improvised explosive device ("IED") with the intent to attack coalition forces at or near Qalat, Afghanistan. Due to the area being too secure they did not carry out the attack at that time. On or about 29 May 2004 the Accused's co-conspirators planted and armed a pressure-plate roadside IED which then detonated, killing four U.S. service members. Funding for this operation came from the operational budget that the Accused regularly provided on behalf of al Qaeda to Abu Layth.

102. The Accused viewed the conflict in Afghanistan as a guerilla war. The Accused considered suicide attacks to be a technique to protect one's forces and minimize risk.

103. On or about 7 June 2003, the Accused supplied Layaqat with a volunteer suicide bomber, approximately $2,000 U.S., and a video camera to execute and record an attack on coalition forces at or near Kabul, Afghanistan. On or about 7 June 2003, the operatives targeted a German military bus transporting German soldiers to Kabul Airport who were returning home to Germany. The operation consisted of two groups, one which watched traffic for a targeting opportunity, and the other a suicide car bomb team. When the spotting team saw the German bus, they contacted the car bomb team via radio and advised them of the approaching target. The volunteer suicide bomber, provided by the Accused to Layaqat, detonated a VBIED appearing to

Prosecution Exhibit 37
Page 14 of 21

PROTECTED INFORMATION//FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

be a civilian vehicle near the bus carrying members of the German military, killing and injuring numerous German military members, and injuring civilians. The Accused invited confidence and belief of at least one person that a vehicle appearing to be a civilian vehicle was entitled to protection under the law of war, and, intending to use and betray that confidence and belief, did, thereafter, make use of that confidence and belief to detonate explosives in said vehicle thereby attacking a bus carrying members of the German military, resulting in the death of four and injury to at least 29 German military members.

104.    On or about January 2004, the Accused provided a volunteer suicide bomber and funding to Layaqat to execute two simultaneous suicide attacks on coalition forces at or near Kabul, Afghanistan. Layaqat had secured an Afghan Taliban member as a second volunteer for a suicide mission. Layaqat provided the volunteer suicide bomber referred by the Accused an explosives vest. The Afghan Taliban member was in a VBIED, made by the same person who made the explosives vest.

105.    On or about 27 January 2004, at or near Kabul, Afghanistan, the suicide bomber the Accused provided to Layaqat detonated an explosive vest directed at a Canadian convoy, killing a member of the Canadian military, injuring three Canadian military members, and injuring civilians. The suicide bomber dressed as a noncombatant civilian was entitled to protection under the law of war, approached a group of Canadians military members who were traveling in two vehicles western Kabul. The suicide bomber at the direction of the Accused and his sub-commander, Layaqat, intended to use and betray the confidence and belief that he was in fact a civilian, thereafter, making use of that confidence and belief detonated his explosive device that was concealed beneath his civilian clothes.

106.    On or about 28 January 2004, the Afghan Taliban member saw a patrol of British soldiers on the east side of Kabul and drove his vehicle, appearing to be a civilian vehicle that was entitled to protection under the law of war with the intent to invite the confidence and belief of the military members, and further intended to betray that confidence and belief, thereafter, made use of that confidence and belief and detonated explosives hidden the vehicle thereby attacking a coalition convoy carrying members of the British and Estonian militaries, resulting in death of one British military member and injury to British and Estonian military members.

107.    The Accused was aware of the general plans of this coordinated attack before it occurred, and was advised of the specific details afterwards in a report from Layaqat. Layaqat paid for this operation out of his operating budget that he received from the Accused on behalf of al Qaeda, with a small supplement from the Taliban.

108.    On or about 29 March 2004 at or near Jalalabad, Afghanistan, with the specific intent to commit the offense of Using Treachery or Perfidy, the Accused provided a suicide bomber to attack coalition forces at or near Jalalabad, Afghanistan. The Accused directed the suicide bomber to Jalalabad, where he was assigned to attack a U.S patrol by appearing to be operating a civilian taxi cab to deliver explosives. The intent of the Accused's plan was to invite the confidence and belief of the military members that the taxi was entitled to protection under the law of war and further intended to betray that confidence and belief, thereafter, attempted to make use of that confidence and belief by attempting to detonate the explosives in the civilian

Prosecution  Exhibit 37
Page 15 of 21

PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

vehicle with the intent to kill and injure members of the U.S. military. The suicide bomber continued with the attack, but was killed in a gun battle with U.S. forces.

## X.    The Accused Was an Al Qaeda Liaison To Al Qaeda in Iraq ("AQI") from 2005 and Began a Journey To Iraq in 2006 To Advise and Assist AQI With Its Insurgency

109. The Accused met Abu Musab Al-Zarqawi in approximately 1999 in Kabul. The Accused also met Abu Darda.

110. Beginning no later than in or about 2005, the Accused acted as an al Qaeda liaison to AQI. In 2005, as part of the Accused's preparation to assist Zarqawi, all correspondence between Zarqawi and al Qaeda would either go to the Accused or be briefed to the Accused.

111. On approximately one or two occasions, Abu Faraj briefed the Accused regarding correspondence between Abu Zarqawi and Bin Laden. The information included AQI's attacks against the U.S. in Iraq and about a conflict between Zarqawi and Ansar Al-Sunnah. On two occasions, the Accused and Shaikh Sa'id met with Abu Darda and Sheikh Ahmed from Ansar Al-Sunnah, to discuss the conflict between Ansar Al-Sunnah and Zarqawi. They recorded the discussions, which were stored on tape and MP3, then delivered to Bin Laden. Ansar Al-Sunnah had expressed that they did not like the fact that Zarqawi pledged bayat to Bin Laden, nor did they like Zarqawi's indiscriminate attacks that killed Iraqi civilians, and Ansar Al-Sunnah thought Zarqawi was fighting the Americans for his own glory rather than to assist the Iraqi people. They also did not think Zarqawi knew Iraq and the Iraqi people well.

112. In 2006, at the direction of Bin Laden, the Accused began travel to Iraq to advise and assist AQI.

113. After being assigned to travel to Iraq by Bin Laden, the Accused corresponded with Zarqawi via letters transported by courier. The Accused sent two letters to Zarqawi and had received two letters from Zarqawi. The Accused sent a letter to Dr. Zawahiri expressing displeasure with the conduct of Zarqawi in Iraq, specifically regarding beheadings. The Accused expressed his thought that it was important for Dr. Zawahiri to make a speech or write a letter providing guidance to al Qaeda on more honorable means to detain and execute prisoners. Dr. Zawahiri responded to the Accused with a letter in 2005, which was later published in the media.

114. The Accused thought that Zarqawi's efforts to ignite a civil war between rival Sunni/Shia factions in Iraq would be detrimental to al Qaeda's stated goals and overall mission of forcing U.S. troops out of Iraq. The Accused also believed that once a civil war was started in Iraq, it would never end.

115. After the death of Zarqawi, Abu Ayoub Al-Masri became the leader of AQI.

116. In 2006, the Accused traveled from Pakistan to Iran under a Turkish passport with the alias of Mustafa and paid 100 dollars U.S. to gain entry into Zahedan, Iran. The Accused later paid 200 dollars U.S. to travel from Iran to Turkey. The Accused's driver facilitated both of his border crossings at official border checkpoints. On or about 16 October 2006, in an effort to

Prosecution Exhibit 37
Page 16 of 21

PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION//FILED UNDER SEAL

continue to travel to Iraq to advise and assist AQI, the Accused presented himself to Turkish officials and presented a fraudulent passport with a number of counterfeit entry stamps to conceal his true identity. Between on or about 16 October 2006 and on or about 27 October 2006, in an effort to continue to travel to Iraq to advise and assist AQI with its insurgency, the Accused made one or more false statements concerning his true identity and travel intentions during one or more interviews with Turkish officials. On or about 17 October 2006, in an effort to continue to travel to Iraq to advise and assist AQI with its insurgency, the Accused applied for asylum from Turkey in the name "Abdulrahman Yar Mohammed" and made false statements in connection with that request to conceal his true identity. He presented himself to Turkish officials in the name "Abdulrahman Yar Mohammed" when fingerprinted by Turkish officials.

117. On or about 27 October 2006, in an effort to continue to travel undetected to Iraq to advise and assist AQI with its insurgency, the Accused filed a "letter of objection" to the denial of his request for asylum in which he continued to use the name "Abdulrahman Yar Mohammed" and made false statements. On or about 28 October 2006, the Accused was given a Turkish immigration document entitled "Delivery and Receipt Document" in the name "Abdulrahman Yar Mohammed" wherein the Accused was notified that Turkish authorities had rejected his request for asylum.

118. At no time did the Accused seek to voluntarily withdraw from the conspiracy.

## XI.    The Accused pleads Guilty to Certain Charged Offenses

119. The Accused, while in a position of effective command and control over subordinates, and his co-conspirators participated in a common plan and agreement, and aided, abetted, counseled, commanded, and procured the commission on or about 29 September 2003 to intentionally attack a military medical helicopter, which was protected property under the laws of war as a military medical aircraft bearing the emblem and distinctive sign of the Medical Service of armed forces, to wit: the red cross on a white ground, by firing at said military medical helicopter as it attempted to evacuate a United States military casualty from the battlefield, which protected property was the object of the attack and the Accused knew and should have known of the factual circumstances that established the military medical helicopter's protected status and the conduct took place in the context of hostilities.

120. The Accused, in the context of and associated with hostilities, on or about 7 June 2003, at or near Kabul, Afghanistan while in a position of effective command and control over subordinates, and with his co-conspirators, participated in a common plan and agreement, and aided, abetted, counseled, commanded, and procured the commission to invite the confidence and belief of at least one person that a vehicle appearing to be a civilian vehicle was entitled to protection under the law of war, and, intending to use and betray that confidence and belief, did, thereafter, make use of that confidence and belief to detonate explosives in said vehicle thereby attacking a bus carrying members of the German military, resulting in death and injury to at least one of those German military members.

121. The Accused, in the context of and associated with hostilities, on or about 27 January 2004, at or near Kabul, Afghanistan, and while in a position of effective command and control over subordinates, and with his co-conspirators, participated in a common plan and agreement,

Prosecution  Exhibit 37
Page 17 of 21

PROTECTED INFORMATION//FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION/FILED UNDER SEAL~~

and aided, abetted, counseled, commanded, and procured the commission to invite the confidence and belief of at least one person that an individual appearing to be a noncombatant civilian was entitled to protection under the law of war, and, intending to use and betray that confidence and belief, did, thereafter, make use of that confidence and belief to detonate explosives concealed beneath said individual's civilian clothing thereby attacking a coalition convoy carrying members of the Canadian military resulting in death and injury to at least one of those Canadian military members.

122.   The Accused, in the context of and associated with hostilities, on or about 28 January 2004, at or near Kabul, Afghanistan, while in a position of effective command and control over subordinates, and with his co-conspirators, participated in a common plan and agreement, and aided, abetted, counseled, commanded, and procured the commission to invite the confidence and belief of at least one person that a vehicle appearing to be a civilian vehicle was entitled to protection under the law of war, and, intending to use and betray that confidence and belief, did, thereafter, make use of that confidence and belief to detonate explosives in said vehicle thereby attacking a coalition convoy carrying members of the British and Estonian militaries, resulting in death and injury to at least one of those military members.

123.   The Accused, in the context of and associated with hostilities, on or about 29 March 2004, at or near Jalalabad, Afghanistan, while in a position of effective command and control over subordinates, and with his co-conspirators, participated in a common plan and agreement, and aided, abetted, counseled, commanded, and procured to the commission, attempted, with the specific intent to commit the offense of Using Treachery or Perfidy (10 U.S.C. § 950t(17)), invite the confidence and belief of at least one person that a vehicle appearing to be a civilian vehicle was entitled to protection under the law of war, and, intending to use and betray that confidence and belief, did, thereafter, make use of that confidence and belief to attempt to detonate explosives in said vehicle thereby attacking a convoy carrying United States military members with the with the intent to kill and injure at least one person.

124.   The Accused, in or about 1996 to on or about 1 November 2006, at multiple locations in and around Afghanistan, Pakistan, Iraq, Turkey, and elsewhere, knowingly conspired and agreed with Usama bin Laden, Ayman al Zawahiri, Mohammed Atef, Khalid Shaikh Mohammad, and other individuals, known and unknown, to commit the following substantive offenses triable by military commission:  Using Treachery or Perfidy; Attacking Protected Property; and Attacking Civilian Objects; in order to force the United States and its allies out of Afghanistan and Iraq. The Accused knew the unlawful objectives and purposes of the agreement, did willfully join said agreement with the intent to further its unlawful objectives and purposes and did, thereafter, knowingly commit acts in order to accomplish some objective or purpose of the agreement.

9 Jun. 2022

Date

Abd al Hadi al Iraqi
Aka Nashwan al Tamir
ISN 10026

Prosecution  Exhibit 37
Page 18 of 21

18

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

6/9/22
Date

Ms. Susan Hensler
Lead Defense Counsel

6 9 22
Date

Ms. Karyn Kissiah
Detailed Defense Counsel

9 JUN 2022
Date

Jacob Meusch,
LCDR, USN, JAGC
Detailed Defense Counsel

Date

Morgan Engling
Maj, USAF
Detailed Defense Counsel

9 JUN 22
Date

Jessica Casciola
CPT, USA
Detailed Defense Counsel

9 JUNE 2022
Date

Mr. Douglas J. Short
Trial Counsel

Prosecution Exhibit 37
Page 19 of 21

19

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION/FILED UNDER SEAL~~

_____   Susan Hensler
Date                        Member of the Bar of the District of Columbia
                            Lead Defense Counsel


_____   Jacob Meusch.
Date                        LCDR, USN, JAGC
                            Detailed Defense Counsel
                            Certified under Article 27(b) UCMJ


9 June 2022
_____   Morgan Engling
Date                        Maj. USAF
                            Detailed Defense Counsel
                            Certified under Article 27(b) UCMJ


_____   Jessica Casciola
Date                        CPT, USA
                            Detailed Defense Counsel
                            Certified under Article 27(b) UCMJ


_____   Mr. Douglas J. Short
Date                        Trial Counsel


_____   Tiffany A. Johnson
Date                        Lt Col, USAF
                            Managing Deputy Trial Counsel
                            Certified under Article 27(b) UCMJ

                                      Prosecution Exhibit 37
                                      Page 20 of 21
           19

~~PROTECTED INFORMATION/FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL

9 Jun 22
_____
Date

_Tiffany A. Johnson_
_____
Tiffany A. Johnson
Lt Col, USAF
Managing Trial Counsel

9 Jun 22'
_____
Date

_____
Craig C. Morris,
LCDR, USN, JAGC
Assistant Trial Counsel

Prosecution Exhibit 37
Page 21 of 21

20

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION FILED UNDER SEAL~~

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

NASHWAN AL-RAMER
ABDULRAZZAQ (ISN 10026),

    Petitioner,

    v.

JOSEPH R. BIDEN, JR, *et al.*,

    Respondents.

No. 17-cv-1928 (EGS)
~~FILED UNDER SEAL~~

NASHWAN AL-TAMIR (ISN 10026),

    Petitioner,

    v.

JOSEPH R. BIDEN, JR, *et al.*,

    Respondents.

No. 25-cv-0015 (EGS)
~~FILED UNDER SEAL~~

## RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION
## FOR PRELIMINARY INJUNCTION

### EXHIBIT 3

### DECLARATION OF SENIOR MEDICAL OFFICER

~~PROTECTED INFORMATION FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION//FILED UNDER SEAL~~



**DEPARTMENT OF DEFENSE**
JOINT MEDICAL GROUP
U.S. NAVAL STATION, GUANTANAMO BAY, CUBA
FPO, AE 09522-9998

6 January 2025

~~(U//FOUO)~~ DECLARATION OF SENIOR MEDICAL OFFICER, CAMP V

Pursuant to 28 U.S.C. § 1746, I, the Senior Medical Officer (SMO)[1] hereby declare:

1. ~~(U//FOUO)~~ I currently serve as the Senior Medical Officer, Joint Medical Group (JMG), Joint Task Force Guantanamo Bay (JTF-GTMO), Cuba, with responsibility for the medical care provided to detainees referred to as "high-value" or "TS/SCI" detainees. I supervise the operation of the JMG that provides medical care to those detainees. I have served in this position since 5 August 2024. I have personal knowledge of the procedures that are in place for the operation and application of medical care at JTF-GTMO medical facilities.

2. ~~(U//FOUO)~~ I am responsible for the medical care for detainee Nashwan Al-Ramer Abdulrazzak, ISN 10026. He continues to have access twenty-four hours a day to medical acute care, as well as daily interaction with and assessment by the nursing staff. I serve as Primary Care Provider for this patient as well as bearing overall responsibility for detainee medical care.

3. ~~(U//FOUO)~~ The Patient's medical summary was compiled on 25 November 2024. See exhibit (1). The patient's medical summary in exhibit (1) is still accurate with the following additions: (1) ███████████████████████████████ ███████████████████████████████ (2) The patient has no projected surgical needs in the future.

4. ~~(U//FOUO)~~ The ISN is now 2 years status post his last surgery with no significant interval neurologic or clinical status changes since neurosurgical consultation in May 2024 and again in November 2024. Stable surgical changes seen on most recent CT imaging per neurosurgical review with no pathology to indicate neurosurgical intervention. Neurosurgeon reiterated in his assessments that plain film (X-ray) imaging can be used to follow his stable condition; an MRI scan is not needed. Neurosurgeon is always available to the medical team for telehealth review and consultation, if needed. He continues to have chronic musculoskeletal axial spine pain with myofascial, muscular/spasm, spondylotic, and radicular components but no new radicular symptoms. Current symptoms partially attributed to his deconditioning due to decreased activity levels from noncompliance with medical treatment plan, which includes activity-

---

[1] My name is not being used in this declaration in order to protect my identity. Given the sensitivity of the position in which I serve and potential threats to the safety of myself and my family that may result from my service in that position, either presently or in other positions in which I may serve in the future, it is the policy of JTF-GTMO that my name not be used or disclosed in litigation-related or other public filings.

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION/FILED UNDER SEAL~~

JTF-GTMO-JMG
SUBJECT: DECLARATION OF SENIOR MEDICAL OFFICER, CAMP V

loading his spine and maintaining mobility. CT bone scan (2024) revealed osteopenia improved from osteoporosis status post 17 months of teriparatide.

5. ~~(U//FOUO)~~ The patient can ambulate but will have regular muscle spasms and suffers from osteopenia which increases his risk of injury from falls. He has a frailty questionnaire (FRAIL scale) score consistent with being "frail." He can accomplish basic activities of daily living but at times chooses not to and asks for help. Basic activities of daily living are those which an individual must accomplish to be self-sufficient: bathing, dressing, toileting, transferring, maintaining continence, and feeding. While the patient can currently stand independently, he relies on a four wheeled walker for additional support and balance for stability and mobility. Per Occupational Therapy evaluation, he can currently perform functional transfers of multilevel surfaces with the walker and has a functional mobility of distances >50 feet with a manual wheelchair. He has appropriate dynamic and static sitting balance but has impairments in both dynamic and static standing balance when not using an assistive device. His flexion/extension and lateral range of motion is limited by his spinal surgeries, but he is able to independently doff and don bilateral shoes. Since he can make position changes independently, he does not have time limitations for specific positions as he can make changes when needed.

6. ~~(U//FOUO)~~ Accommodations for his care include assistive devices that will travel with him for his use, e.g. 4-wheeled walker, his manual wheelchair, and a shower stool. The patient was provided a suction cup grabber-reacher by his legal team. His personal fall alarm is a means to ensure that care can be given if he falls. The patient was provided a pressure injury prevention gel cushion and multiple foam cushions to relieve any persistent pressure on bony areas when lying in bed or seated for prolonged periods. His cell and shower accommodations include widened doorways for wheelchair and walker access, a lowered bed for easier transfers, a handheld shower head, and lowered soap rack and mirrors.

7. ~~(U//FOUO)~~ The patient continues to use Valium (diazepam) as his primary muscle relaxant. Previously, the neurology specialty provider concurred with Valium for his foot neuropathy as it improves the patient's symptoms and is safe and effective for treating muscle spasms. The neurologist noted the following in his consultant note: "He (ISN 10026) reports that he is still able to concentrate with taking Valium and does not feel sedated." The neurosurgery specialty provider who evaluated the ISN in November 2024 concurred with Valium for muscle spasms as well. He can take up to three doses of Valium but his symptoms are managed with twice daily Valium. He is also prescribed Celebrex (celecoxib) 100mg twice a day as well.

8. ~~(U//FOUO)~~ The neurologist and neurosurgeon agreed that the patient's neuropathy is stable and persistent. Neurosurgery consultant recommended continued physical therapy and continuing teriparatide injections through January 2025 for bone health given his deconditioning. Specialty providers have concurred with trials of gabapentin for treatment of the burning foot pain associated with the neuropathy but the patient has since refused this medication as well as others such as pregabalin and duloxetine for neuropathic chronic pain.

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION/FILED UNDER SEAL~~

JTF-GTMO-JMG
SUBJECT:  DECLARATION OF SENIOR MEDICAL OFFICER, CAMP V

9. (U//FOUO) The patient is currently prescribed the following medications for management of pain and muscle spasms:

   a. (U//FOUO) Tylenol (acetaminophen) 325-975mg up to 3 times a day (with max acetaminophen dose of 4g/24-hour period) as needed for pain relief. Not likely to cause significant cognitive impairment. The patient is not currently requesting Tylenol.

   b. (U//FOUO) Celebrex (celecoxib) 100mg. Up to twice daily as needed for pain relief. Not likely to cause sedation or cognitive impairment. The patient is currently taking this once daily.

   c. (U//FOUO) Lidocaine patch 5%. Patch applied for 12 hours and removed for 12 hours as needed for treatment of muscle pain. Also available as needed.

   d. (U//FOUO) Valium (diazepam) 5mg. Up to three times a day as needed for pain and muscle spasms. Often causes side effect of sedation and drowsiness in patients, although this effect lessens with repeated use. He takes this medication regularly twice daily, in the morning and the evening.

   e. (U//FOUO) Percocet (oxycodone/acetaminophen) 5/325mg. Given *only for* external movement operations with max acetaminophen dose of 4g/24-hour period. May cause sedation and drowsiness; however, these effects are more limited than those experienced with Valium. The patient takes this medication infrequently for the additional pain that may be associated with external moves.

10. (U//FOUO) See exhibit (1) for a full list of the patient's current medications and authorized equipment.

11. (U//FOUO) The patient's current pattern of as needed medication use, functional capacity, and mobility is consistent with a stable disease condition. I continue to recommend that the patient be allowed to change position as desired from sitting, lying in bed or standing as needed to alleviate discomfort and prevent pressure injuries. The care plan and accommodations provided within his detention setting are within the standard of care for his disease condition.

12. (U//FOUO) As stated in exhibit (1), the patient is fit to fly. His 4-wheeled walker, pressure injury prevention gel cushion, multiple foam cushions, compression stockings, and other authorized and appropriate medical equipment will be available

~~PROTECTED INFORMATION/FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION/FILED UNDER SEAL~~

JTF-GTMO-JMG
SUBJECT:  DECLARATION OF SENIOR MEDICAL OFFICER, CAMP V

13. (U) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true, accurate and correct to the best of my knowledge.

Dated:  1/6/25

*SMO22*

Senior Medical Officer
Camp V

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL



PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL



PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL



PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION//FILED UNDER SEAL



PROTECTED INFORMATION//FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

PROTECTED INFORMATION/FILED UNDER SEAL



PROTECTED INFORMATION/FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE