UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION//FILED UNDER SEAL~~

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NASHWAN AL-RAMER ABDULRAZZAQ (ISN 10026),<br><br>Petitioner,<br><br>v.<br><br>JOSEPH R. BIDEN, JR, *et al.*,<br><br>Respondents. | No. 17-cv-1928 (EGS) |
| NASHWAN AL-TAMIR (ISN 10026),<br><br>Petitioner,<br><br>v.<br><br>JOSEPH R. BIDEN, JR, *et al.*,<br><br>Respondents. | No. 25-cv-0015 (EGS) |

**RESPONDENTS' SUR-REPLY IN OPPOSITION TO PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION**

In accordance with the Court's Minute Order dated January 9, 2025, Defendants submit this sur-reply to respond to several issues raised for the first time in Petitioner's reply brief.

Respondents' opposition brief explained that binding Supreme Court and D.C. Circuit precedent does not afford Petitioner any statutory, constitutional, or treaty right to challenge his transfer to the custody of the Government of Iraq, even when Petitioner's alleges, contrary to the sworn statements of senior U.S. officials and U.S. policy, that the transfer will likely result in torture. Munaf v. Geren, 553 U.S. 674 (2008); Kiyemba v. Obama, 561 F.3d 509 (D.C. Cir. 2009); Omar v. McHugh, 646 F.3d 13, 21, 24 (D.C. Cir. 2011). Petitioner cannot evade these decisions by incorrectly characterizing the transfer as constructive custody by the United States,

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

which the sworn declarations in the record squarely refute. Nor is there any merit to Petitioner's novel assertion that his conviction for war crimes by a military commission somehow prohibits the Government from transferring him to custody of Iraq in the absence of a specific treaty. Petitioner also misses the mark with his new procedural arguments; the record here demonstrates that Respondents have satisfied all the necessary legal requirements to proceed with the transfer to Iraq, including a robust individualized assessment that Petitioner's transfer is consistent with the U.S. government's longstanding humane transfer policy. Finally, Defendants have not breached the plea agreement, and Petitioner's reliance on contract principles and assertions of bad faith do not withstand scrutiny.

For these reasons, as well as those set forth in Respondents' opposition brief, Petitioner cannot demonstrate the "clear showing" required for the extraordinary remedy of a preliminary injunction barring Respondents' from transferring him to his home country of Iraq. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22, 24 (2008).

## ARGUMENT

### A. There is No Constructive Custody Because the United States Is Relinquishing Custody of Petitioner and Transferring Him to the Custody and Control of Iraq.

Petitioner asserts that his proposed transfer to Iraq would be "constructive custody" by the United States because he would be detained in Iraq "on behalf of the United States" for the remainder of his military commission sentence. See Petr's Reply at 2, 11. Not so. As explained in the Declaration of Ambassador Richard, the United States obtains appropriate security and humane treatment assurances from foreign governments before proceeding with a transfer of a Guantanamo Bay detainee. Ex. 1, Decl. of Amb. Richard ¶ 3. Those assurances are necessary both to ensure compliance with the Government's humane treatment policy and to mitigate any threat that the detainee may pose following release from United States custody. See Nat'l

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

Defense Auth. Act for Fiscal Year 2016 § 1034, Pub. L. No. 114-92, 129 Stat. 726, 969-970 (2015) (FY2016 NDAA) (requiring Secretary of Defense to certify before transferring Guantanamo detainee that the foreign country "has taken or agreed to take appropriate steps to substantially mitigate any risk the individual could attempt to reengage in terrorist activity or otherwise threaten the United States or its allies or interests"). Here, among the assurances the United States received from Iraq is ███████████████ ███████████████ ███████████████ ███████████████ Upon his transfer, Petitioner will thus no longer be in any form of actual or constructive custody of the United States; any further detention will be exclusively by the Government of Iraq pursuant to its own laws. See Kiyemba, 561 F.3d at 515 n.7 ("In view of the Government's sworn declarations, and of the detainees' failure to present anything that contradicts them, we have no reason to think the transfer process may be a ruse—and a fraud on the court—designed to maintain control over the detainees beyond the reach of the writ."); see also id. at 521 (Kavanaugh, J., concurring) (stating that the Government's "declaration suffices to demonstrate that the proposed transfer of an alien to the custody of a foreign nation is not the same thing as the U.S. Government's maintaining the detainee in U.S. custody").

As the Court of Appeals held in Kiyemba, a Guantanamo detainee seeking to block his transfer cannot "prevail on the ground that [a] foreign sovereign is an agent of the United States merely because . . . the Government engages in a dialogue to ascertain or establish what measures the receiving government intends to take pursuant to its own domestic laws." Kiyemba, 561 F.3d at 515 n.7 (D.C. Cir. 2009). "Whether, acting pursuant to its own laws, a

foreign nation will continue detention of the petitioners . . . is precisely the inquiry Munaf forbids this court from undertaking." *Id.* (cleaned up); see id. at 515 ("To the extent the detainees seek to enjoin their transfer based upon the expectation that a recipient country will detain or prosecute them, Munaf again bars relief."). Munaf and Kiyemba thus preclude the Court from blocking Petitioner's transfer based on the ground that he would be subject to further prosecution or detention by the Government of Iraq pursuant to its own domestic laws.

### B. Petitioner's Argument that Munaf, Omar, and Kiyemba Have No Application In This Case Is Erroneous.

Petitioner argues in his Reply that Munaf, Omar, and Kiyemba do not apply with respect to his challenge to his repatriation, such that the Court is free to enjoin his transfer, because he "is not a wartime detainee in a foreign country; he is prisoner serving a sentence in a United States facility," and "[u]nlike the detainees in Munaf and its progeny, [Petitioner]'s status as a person serving a U.S. prison sentence affords him constitutional protections those detainees lacked." *See* Petr's Reply at 3, 7. Relatedly, Petitioner asserts that "Respondents point to no basis for finding that transfer of Petitioner to Iraq is a sensitive matter of international relations." Id. at 3. Petitioner's arguments are faulty, both legally and factually, and provide no basis to enjoin his transfer.

As an initial matter, Petitioner, as a matter of law and fact, remains a military detainee and his apparent attempt to characterize his sentence pursuant to his military commission guilty plea as imbuing him with the same qualities and protections respecting transfer to another country as in a domestic criminal incarceration situation is misplaced under both statute and explicit provisions of his plea agreement.

The National Defense Authorization Act for Fiscal Year 2012 "affirm[ed]" that the President's authority under the AUMF includes the power to detain individuals who were "part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners . . . pending disposition under the law of war," Nat'l Defense Auth. Act for Fiscal Year 2012, Pub. L. No. 112-81 § 1021(a) & (b)(2), 125 Stat. 1298, 1564 (2012) (2012 NDAA). And under the NDAA, "disposition under the law of war" "may include" the following:

> (1) Detention under the law of war without trial until the end of the hostilities authorized by the Authorization for Use of Military Force.
> (2) Trial under chapter 47A of title 10, United States Code (as amended by the Military Commissions Act of 2009 (title XVIII of Public Law 111–84)).
> (3) Transfer for trial by an alternative court or competent tribunal having lawful jurisdiction.
> (4) Transfer to the custody or control of the person's country of origin, any other foreign country, or any other foreign entity.

2012 NDAA § 1021(c)(1)-(4).

Accordingly, Petitioner's military commission proceeding and resulting sentence pursuant to his plea agreement under the Military Commissions Act of 2009 (2009 MCA) do not remove Petitioner from any military detention scheme or mean that he somehow should be treated equivalent to a domestic criminal convict. Indeed, the 2009 MCA by its terms "establishes procedures governing the use of military commissions to try alien unprivileged enemy belligerents for violations of the law of war and other offenses triable by military commission," 10 U.S.C. § 948b(a), and also establishes aspects of sentences for convictions for such offenses, *id.* §§ 949s-949u. Importantly, the statute defines alien "unprivileged enemy belligerent," *inter alia*, as an alien who "was a part of al Qaeda at the time of the alleged offense," *id.* § 948a(7)(C), language reflecting a subset of those considered detainable under the AUMF and 2012 NDAA. *See also* Respts' Opposition at 6-8 (summarizing Petitioner's

admissions in his plea agreement concerning his activities on behalf of al-Qaida). And, in fact, Petitioner confirmed his status as an alien unprivileged enemy belligerent under the MCA in his plea agreement. In that Agreement, Petitioner explicitly stated and agreed:

> 7. I understand the Convening Authority has no power to affect my status as an alien unprivileged enemy belligerent, and does not purport to do so by the terms of this agreement.

AE 217 ¶ 7 (ECF 183-1). Just as other Guantanamo detainees, such as those involved in *Kiyemba* were, consistent with the 2012 NDAA, subject to "[d]etention under the law of war without trial until the end of the hostilities authorized by the [AUMF]" and then "[t]ransfer[red] to the custody or control of the person's country of origin [or another] . . . other foreign country," 2012 NDAA § 1021(c)(1),(4), Petitioner over the course of his time in Department of Defense custody at Guantanamo has been subject to, initially, "[d]etention under the law of war without trial until the end of the hostilities authorized by the [AUMF]," then "trial under [the 2009 MCA]," and now "[t]ransfer to the custody or control of [his] . . . country of origin," *id.* § 1021(c)(1), (2), (4). Accordingly, consistent with the AUMF, 2012 NDAA, and 2009 MCA, Petitioner's guilty plea and sentence at Guantanamo does not mean that Petitioner is no longer "a wartime detainee" or that he has attained a status that affords him "protections" from repatriation that the 2012 NDAA does not afford or that the military detainees in Munaf, Omar, or Kiyemba somehow "lacked."[1]

---

[1] Likewise, Petitioner's ongoing status is confirmed by analogy to the law of war applicable in international armed conflicts. The Third Geneva Convention itself contemplates that a law of war detainee can be subject to criminal trial. *See* Geneva Convention (III) relative to the Treatment of Prisoners of War. Geneva, 12 August 1949 ("Third Geneva Convention"), art. 99–108 (addressing judicial proceedings for prisoners of war). Moreover, Article 88 provides that "[p]risoners of war who have served disciplinary or judicial sentences may not be treated differently from other prisoners of war." *Id.* art. 88. Thus, the applicable law of war analogy provides that a prisoner of war who has served a criminal sentence, rather than being rendered ineligible for continued law of war detention, must be treated like any other prisoner of

Accordingly, the fact that Petitioner is serving a sentence pursuant to a guilty plea in the military commission system does not somehow mean that the key precedents reflected in Munaf, Omar, and Kiyemba must be thrown out the window and disregarded.[2] As explained in Respondents' Opposition, those precedents preclude a court "from issuing a writ of habeas corpus to prevent a transfer" of Guantanamo Bay detainees based on fears that "they would be tortured in the recipient country" or to "shield" habeas petitioners from foreign prosecution, Kiyemba, 561 F.3d at 513-15, warranting that Petitioner's motion to enjoin his transfer be denied.

Petitioner is also wrong that this case does not implicate important matters of foreign relations or prosecutorial interest by Iraq in one of its own nationals. Respondents' Opposition explained, to the contrary, ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Respts'

Opposition at 17-18, 28-29, 38-39. Further, despite Petitioner's assertions in his Reply, his most recent habeas petition acknowledges Iraq's current prosecution interest in him. *See Al-Tamir v. Biden*, Civil Act. No. 25-cv-0015 (EGS), Petition ¶ 87; *id.* Ex. 3, Decl. of S. Hensler ¶ 79 (acknowledging that "an Iraqi court had actually renewed the decades-old warrant [for Petitioner] not too long ago").

---

war eligible for law of war detention after the conclusion of that sentence.

[2] Indeed, in light of the Supreme Court's unanimous rejection of the claims asserted by the United States citizens in Munaf, there is certainly no basis for the Court to treat Petitioner, a non-citizen, more favorably because he has been convicted for war crimes by military commission.

### C. Petitioner Cannot Establish a Likelihood of Success on the Merits of His Claim That Respondents Did Not Follow Procedural Requirements for the Transfer.

The Court should also reject the new argument in Petitioner's reply brief that his transfer should be enjoined because of Respondents' alleged "failure to follow procedural requirements that govern a transfer." *See* Petr's Reply at 8-10. Petitioner cites two alleged procedural failings, both of which lack merit.

First, the Secretary of Defense has fully complied with the requirement in the FY2016 NDAA that he provide certain information to Congress 30 days prior to the transfer. *See* Pub. L. No. 114-92, § 1034. As reflected in the record, see al-Tamir v. Biden, Civ. Action No. 25-cv-0015 (EGS) (ECF No. 1-3, ¶ 60), the Secretary of Defense transmitted the required notice of Petitioner's transfer to Congress ▆▆▆▆▆▆▆▆▆▆▆▆. Contrary to Petitioner's argument, the FY2016 NDAA does not require the Secretary of Defense to present Congress with findings about whether "the transfer would violate the Convention Against Torture." *See* Petr's Reply at 8. The elements required by § 1034(b) of the FY2016 NDAA focus instead on security related findings, such as whether the foreign government is a state sponsor of terrorism or has agreed to share intelligence information with the United States. *See* Pub. L. No. 114-92, § 1034(b). Whether the Secretary's certification included a humane treatment analysis of the proposed transfer would not give rise to a procedural defect that warrants enjoining the transfer.[3]

Second, Petitioner speculates that the Department of State did not conduct an appropriate analysis of Petitioner's transfer as required by the Convention Against Torture (CAT). *See* Petr's Mot. 8-10. As an initial matter, the CAT provides no grounds for relief in this case

---

[3] Respondents can make available a copy of the Secretary's certification to the Court via a supplemental TOP SECRET or other classified submission should the Court wish to review it. *See* Pub. L. No. 114-92, § 1034(b)(4) (stating that one element of the certification is an intelligence assessment of the foreign country that can include classified information).

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

because it is a "multilateral treaty" that is "non-self-executing and thus does not itself create any rights enforceable in U.S. courts." Omar, 646 F.3d at 17. Further, the Foreign Affairs Reform and Restructuring Act (FARRA), the statute that implements the CAT into domestic law, "limited judicial review under the Convention to claims raised in a challenge to a final order of removal." Kiyemba, 561 F.3d at 514; see Omar, 646 F.3d at 17-18. Petitioner is not challenging a final order of removal in the immigration context, thus he has no likelihood of success on his CAT claim. *See* Respts' Opposition at 24 n.10, 28 n.12.

Even setting that fatal legal defect aside, Ambassador Richard's declaration explains in detail that the Department of State ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ensure that Petitioner's transfer is consistent with the Government's humane treatment policy not to transfer detainees to countries where they are likely to be tortured, consistent with the standard in the FARRA. *See* Richard Decl. ¶¶ 3-15. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Petitioner contends that it was procedural error for the Government to submit this information in a sworn declaration instead of a purported "CAT Analysis and Certification packet." *See* Petr's Reply at 9. But there is no legal requirement that Respondents submit internal State Department documents or diplomatic communications with a foreign country to substantiate its humane treatment analysis. In Munaf, the Supreme Court relied on

representations from the Solicitor General that the petitioners' transfer would comply with "the policy of the United States not to transfer any individual in circumstances where torture is likely to result." 563 U.S. at 702 (citing the Federal Government's merits and reply briefs). And in Kiyemba, as is the case here, the D.C. Circuit relied on the declaration from a Department of State Ambassador setting forth the Government's policies and practices for assessing "whether a particular country is likely to torture a particular detainee." 561 F.3d at 514 (citing declaration of United States Ambassador–at–Large for War Crimes Issues). Petitioner complains that Respondents opposed his overbroad, legally inappropriate, and unduly burdensome discovery requests, see Petr's Reply at 10, but he fails to acknowledge that such information has never been finally required by any court in the detainee transfer context. Ambassador Richard's declaration is more than sufficiently detailed to defeat Petitioner's claims regarding his treatment in Iraq.

### D. Petitioner's Invocation of Contract Interpretation Principles and Assertions of Bad Faith Do Not Support a Likelihood of Success for Petitioner on His Claim that the Plea Agreement Will Be Breached by His Repatriation.

In his Reply, Petitioner argues that Respondents' interpretation of the term, "third-party sovereign nation" in ¶ 19 of the Pretrial Agreement, see AE 217E ¶ 19 (ECF 183-3), must be rejected under various contract interpretation principles. See Petr's Reply at 12-16. He also claims that Respondents failed to act in good faith in complying with ¶ 19 of the agreement. See id. at 16-17. Petitioner argues that in either case, he is likely to prevail on his claim that his repatriation to Iraq would breach his plea agreement. Petitioner's arguments should be rejected.

Respondents do not disagree that principles of contract interpretation would apply when interpreting the terms of Petitioner's Pretrial Agreement. Cf. United States v. Acevedo, 50 M.J. 169, 172 (C.A.A.F. 1999) (pretrial agreements in courts-martial are "created through the process of bargaining, similar to that used in creating any commercial contract. As a result, we look to

the basic principles of contract law when interpreting pretrial agreements.").[4] Petitioner spills extensive ink discussing various principles of contract interpretation from outside the military context that he claims support his interpretation of "third-party sovereign nation" as a nation other than Iraq and warrants rejection of Respondents' position that the term does not exclude Iraq. The problem with Petitioner's approach, however, is that as noted in Respondents' Opposition, Respondents' argument that repatriation would not violate the plea agreement does not depend on the Court accepting Respondents' interpretation of "third-party sovereign nation." See Respts' Opposition at 8, 33 n.14 ("The Court need not resolve the [interpretation] issue, however; under the arguments outlined [in the Opposition] . . . , Petitioner's repatriation to Iraq does not breach the plea agreement even under Petitioner's interpretation of 'third-party sovereign nation.'"). As explained in Respondents' Opposition at 8-9, 30-34, by its terms, ¶ 19 of the Pretrial Agreement, even if "third-party sovereign nation" in that provision is interpreted as Petitioner suggests to exclude Iraq, it does not guarantee Petitioner would never be repatriated to Iraq; promise that Petitioner would be transferred, or not, to any particular country; otherwise promise that Petitioner would be transferred, if at all, only to a resettlement location; or make Petitioner's approval a condition for a transfer to any country. Cf. Acevedo, 50 M.J. at 172 ("We begin any analysis of a pretrial agreement by looking first to the language of the agreement itself. When the terms of a contract are unambiguous, the intent of the parties is discerned from the four corners of the contract.").[5] The Agreement merely required the Government "to pursue" a

---

[4] The United States Court of Military Commission Review recently confirmed this point with respect to Pretrial Agreements in the military commission system. See Slip. Op. at 8, In re Mohammad, No. 24-001 (U.S.C.M.C.R. Dec. 30, 2024) (yet to be reported), mandamus on other grounds sought, In re United States, No. 25-1009 (D.C. Cir.).

[5] Respondents' argument here is that the term, "third-party sovereign nation," is not disputed for the purposes of argument only, and thus can be considered on par with "unambiguous" as referenced in Acevedo.

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

transfer location for two years, and at most, provided that transfer to a "third-party sovereign nation" would include certain aspects favorable to Petitioner related to the service of his sentence in the receiving country and consideration of healthcare in negotiations ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Nor can Petitioner mount any meritorious argument that Respondents failed to act in good faith in complying with ¶ 19 of the agreement. In this case, the Department of State worked diligently over a lengthy period of time to identify an appropriate and willing transfer location for Petitioner, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Respts' Opposition at 8-9; Ex.1, Decl. of Amb. Richard ¶ 8. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Petitioner, however, improperly seeks to transform into an absence of good faith the Government's attempt to locate a country Petitioner would agree to. Compare Petr's Reply at 17 ("If the government had acted in good faith, it would have arranged a transfer to a third-party country within the two years.") with Respts' Opposition at 8 (noting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), 32 n.13 (State communication reflecting preference for potential resettlement, but not guaranteeing same).[6]

---

[6] Petitioner finally claims that if the plea agreement would not be breached by repatriation, then the plea agreement should be set aside as not knowingly entered. Reply at 17-18. How such an argument supports Petitioner's claim to an injunction on repatriation, however, is unclear. Respondents note that the Court in Khadr v. United States, 67 F.4th 413 (D.C. Cir. 2023), reviewed the validity of a plea agreement by another Guantanamo detainee on such grounds, even after that detainee's repatriation. Presumably, Petitioner could raise such a claim in the military commission system, too, but an attempt to set aside the plea agreement that Petitioner claims prohibits repatriation would not, as a logical matter, serve to require a court to enjoin his repatriation.

## CONCLUSION

For the foregoing reasons and those stated in Respondents' Opposition, Petitioner's motion for a preliminary injunction should be denied.

Dated: January 10, 2025

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

/s/ *Terry M. Henry*
TERRY M. HENRY
Assistant Branch Director
ANDREW I. WARDEN (IN Bar No. 23840-49)
Senior Trial Counsel
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, NW, Room 7500
Washington, D.C. 20530
Tel: 202-514-4107
Email: Terry.Henry@usdoj.gov

*Counsel for Respondents*

~~PROTECTED INFORMATION//FILED UNDER SEAL~~

## CERTIFICATE OF SERVICE

I hereby certify that I have served this day via electronic mail a true and correct copy of Respondents' Sur-Reply in Opposition to Petitioner's Motion for a Preliminary Injunction, which is being filed under seal pursuant to the Protective Order, on:

Benji McMurray
Benji_McMurray@fd.org
Attorney for Petitioner

Dated: January 10, 2025               /s/ *Terry M. Henry*
                                      Attorney for Respondents